**RAINES FELDMAN LLP**
KATHY BAZOIAN PHELPS (SBN 155564)
*kphelps@raineslaw.com*
DAVID CASTLEMAN (SBN 326812)
*dcastleman@raineslaw.com*
1800 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone:  (310) 440-4100
Facsimile: (310) 691-1943

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY D. SHARP, as the Permanent Receiver for the Estate of DIRECT LENDING INVESTMENTS, LLC, DIRECT LENDING INCOME FUND, L.P., DIRECT LENDING INCOME FEEDER FUND, LTD., DLI CAPITAL, INC., DLI LENDING AGENT, LLC, DLI ASSETS BRAVO, LLC, and THEIR SUCCESSORS, SUBSIDIARIES, AND AFFILIATED ENTITIES, | Case No. 2:21-cv-9197 **COMPLAINT FOR AVOIDANCE AND RECOVERY OF ACTUAL AND CONSTRCUTIVE FRAUDULENT TRANSFERS AND FOR UNJUST ENRICHMENT** **JURY TRIAL DEMANDED** **[Cal. Civil Code § 3439 *et seq.*]** |
| Plaintiff, | |
| v. | |
| SHINHAN BANK CO., LTD.; KOOKMIN BANK CO., LTD.; KOREA SECURITIES FINANCE CORPORATION; GOLDENBRIDGE ASSET MANAGEMENT CO., LTD.; JB ASSET MANAGEMENT CO., LTD.; KOREA ALTERNATIVE INVESTMENT ASSET | |

MANAGEMENT CORPORATION;
GB US FINTECH INCOME FUND OF
FUNDS #1; GB US FINTECH
INCOME FUND OF FUNDS #2; GB
US FINTECH INCOME FUND OF
FUNDS #3; GB US FINTECH
INCOME FUND OF FUNDS #4; GB
US FINTECH INCOME FUND OF
FUNDS #5; GB US FINTECH
INCOME FUND OF FUNDS #6; GB
US FINTECH INCOME FUND OF
FUNDS #7; GB US FINTECH
INCOME FUND OF FUNDS #8; GB
US FINTECH INCOME FUND OF
FUNDS #9; GB US FINTECH
INCOME FUND OF FUNDS #10; GB
US FINTECH INCOME FUND OF
FUNDS #11; GB US FINTECH
INCOME FUND OF FUNDS #12; GB
US FINTECH INCOME FUND OF
FUNDS #13; GB US FINTECH
INCOME FUND OF FUNDS #14; GB
US FINTECH INCOME FUND OF
FUNDS #15; GB US FINTECH
INCOME FUND OF FUNDS #16; JB
US FIN-TECH FUND OF FUNDS #1;
JB US FIN-TECH FUND OF FUNDS
#2; JB US FIN-TECH FUND OF
FUNDS #3; JB US FIN-TECH FUND
OF FUNDS #4; JB US FIN-TECH
FUND OF FUNDS #5; JB US FIN-
TECH FUND OF FUNDS #6; JB US
FIN-TECH FUND OF FUNDS #7; JB
US FIN-TECH FUND OF FUNDS #8;
JB US FIN-TECH FUND OF FUNDS
#9; JB US FIN-TECH FUND OF
FUNDS #10; JB US FIN-TECH FUND
OF FUNDS #11; JB US FIN-TECH
FUND OF FUNDS #12; KAIC US FIN-
TECH FUND OF FUNDS #1; KAIC US
FIN-TECH FUND OF FUNDS #3;
KAIC US FIN-TECH FUND OF

FUNDS #4; KAIC US FIN-TECH
FUND OF FUNDS #5; and KAIC US
FIN-TECH FUND OF FUNDS #9,

Defendants.

Bradley D. Sharp, the Court-appointed permanent receiver (the "Receiver") for the estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund, L.P. ("DLIF"), Direct Lending Income Feeder Fund, Ltd. ("DLIFF"), DLI Capital, Inc. ("DLIC"), DLI Lending Agent, LLC, DLI Assets Bravo LLC ("DLIAB"), DLI Assets, LLC ("DLIA"), and their successors, subsidiaries, and affiliated entities (collectively, the "Receivership Entities"), hereby alleges and complains against Shinhan Bank Co., Ltd. ("Shinhan"), Kookmin Bank Co., Ltd. ("Kookmin"), Korea Securities Finance Corporation ("KSFC") (Shinhan, Kookmin and KSFC collectively, the Trustee Defendants); Goldenbridge Asset Management Co., Ltd. ("GBAM"), JB Asset Management Co., Ltd. ("JBAM"), and Korea Alternative Investment Asset Management Corporation ("KAIC") (GBAM, JBAM, and KAIC collectively, the "Manager Defendants"); GB US Fintech Income Fund of Funds #1, GB US Fintech Income Fund of Funds #2, GB US Fintech Income Fund of Funds #3, GB US Fintech Income Fund of Funds #4, GB US Fintech Income Fund of Funds #5, GB US Fintech Income Fund of Funds #6, GB US Fintech Income Fund of Funds #7, GB US Fintech Income Fund of Funds #8, GB US Fintech Income Fund of Funds #9, GB US Fintech Income Fund of Funds #10, GB US Fintech Income Fund of Funds #11, GB US Fintech Income Fund of Funds #12, GB US Fintech Income Fund of Funds #13, GB US Fintech Income Fund of Funds #14, GB US Fintech Income Fund of Funds #15, GB US Fintech Income Fund of Funds #16, JB US Fin-Tech Fund of funds #1, JB US Fin-Tech Fund of funds #2, JB US Fin-Tech Fund of funds #3, JB US Fin-Tech Fund of funds #4, JB US Fin-Tech Fund of funds #5, JB US Fin-Tech Fund of funds #6, JB US Fin-Tech Fund of funds #7, JB US Fin-Tech Fund of funds #8, JB US Fin-Tech Fund of funds #9, JB US Fin-Tech Fund of funds #10, JB US Fin-Tech Fund of funds #11, JB US Fin-Tech Fund of funds #12, KAIC US Fin-Tech Fund of funds #1, KAIC US Fin-Tech Fund of funds #3, KAIC US Fin-Tech Fund of funds #4, KAIC US Fin-Tech Fund of funds #5, and KAIC US Fin-Tech Fund of funds #9 (the foregoing 33 funds collectively, the "Fund Defendants") (the Trustee Defendants, Manager

Defendants, and Fund Defendants, collectively, "Defendants") as follows:

## PRELIMINARY STATEMENT

1.     The Fund Defendants were 33 separate investment funds that collectively invested over $150 million in DLIF. DLIF was placed into receivership by the Securities and Exchange Commission (the "SEC") on April 1, 2019. After a lengthy investigation, the SEC uncovered that DLI and DLIF, through Brendan Ross ("Ross"), who was leading DLI's pre-receivership operations and whose fraudulent intent may be imputed to DLI and DLIF, was engaged in a pervasive fraud in the operation of DLI and DLIF. The Fund Defendants collectively received $166,611,118.64 of total transfers from DLIF in each of the 33 funds, which consisted of the return of the Fund Defendants' principal investment of $150,706,822.95 (the "Principal") plus fictitious profits of $15,904,295.69 (the "Fictitious Profits") summarized as follows:

| Fund Defendant | Principal | Transfers | Fictitious Profits |
|---|---|---|---|
| GB US Fintech Income Fund of Funds #1 | $6,465,000.00 | $7,074,903.98 | $609,903.98 |
| GB US Fintech Income Fund of Funds #2 | $3,929,000.00 | $4,299,659.38 | $370,659.38 |
| GB US Fintech Income Fund of Funds #3 | $3,607,000.00 | $3,931,675.81 | $324,675.81 |
| GB US Fintech Income Fund of Funds #4 | $2,358,000.00 | $2,558,197.55 | $200,197.55 |
| GB US Fintech Income Fund of Funds #5 | $2,176,000.00 | $2,357,997.35 | $181,997.35 |
| GB US Fintech Income Fund of Funds #6 | $3,936,000.00 | $4,270,171.99 | $334,171.99 |
| GB US Fintech Income Fund of Funds #7 | $4,149,000.00 | $4,501,255.99 | $352,255.99 |
| GB US Fintech Income Fund of Funds #8 | $5,500,516.00 | $5,967,517.62 | $467,001.62 |
| GB US Fintech Income Fund of Funds #9 | $3,997,800.00 | $4,336,428.34 | $338,628.34 |
| GB US Fintech Income Fund of Funds #10 | $1,498,000.00 | $1,624,886.09 | $126,886.09 |
| GB US Fintech Income Fund of Funds #11 | $4,786,395.69 | $5,191,820.96 | $405,425.27 |
| GB US Fintech Income Fund of Funds #12 | $8,338,300.00 | $9,032,400.98 | $694,100.98 |
| GB US Fintech Income Fund of Funds #13 | $5,866,200.00 | $6,354,517.17 | $488,317.17 |
| GB US Fintech Income Fund of Funds #14 | $6,058,800.00 | $6,563,149.67 | $504,349.67 |
| GB US Fintech Income Fund of Funds #15 | $3,597,000.00 | $3,888,506.88 | $291,506.88 |
| GB US Fintech Income Fund of Funds #16 | $3,005,811.26 | $3,206,277.73 | $200,466.47 |
| JB US Fin-Tech Fund of funds #1 | $5,505,000.00 | $6,004,437.98 | $499,437.98 |
| JB US Fin-Tech Fund of funds #2 | $6,101,000.00 | $7,194,899.86 | $1,093,899.86 |
| JB US Fin-Tech Fund of funds #3 | $4,093,000.00 | $4,303,687.46 | $210,687.46 |
| JB US Fin-Tech Fund of funds #4 | $4,050,000.00 | $4,255,862.45 | $205,862.45 |
| JB US Fin-Tech Fund of funds #5 | $4,470,000.00 | $4,893,651.15 | $423,651.15 |
| JB US Fin-Tech Fund of funds #6 | $4,475,000.00 | $4,897,168.64 | $422,168.64 |
| JB US Fin-Tech Fund of funds #7 | $5,737,000.00 | $6,278,224.91 | $541,224.91 |
| JB US Fin-Tech Fund of funds #8 | $5,315,000.00 | $5,766,251.04 | $451,251.04 |
| JB US Fin-Tech Fund of funds #9 | $3,399,000.00 | $3,687,579.92 | $288,579.92 |
| JB US Fin-Tech Fund of funds #10 | $6,000,000.00 | $6,508,222.03 | $508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $4,705,000.00 | $5,091,282.31 | $386,282.31 |
| JB US Fin-Tech Fund of funds #12 | $2,949,000.00 | $3,185,587.89 | $236,587.89 |

| Fund Defendant | Principal | Transfers | Fictitious Profits |
|---|---|---|---|
| KAIC US Fin-Tech Fund of funds #1 | $4,903,000.00 | $6,109,893.77 | $1,206,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $9,954,000.00 | $12,105,244.90 | $2,151,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $2,575,000.00 | $2,822,272.44 | $247,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $4,640,000.00 | $5,583,018.66 | $943,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $2,567,000.00 | $2,764,465.74 | $197,465.74 |
| **Totals** | **$150,706,822.95** | **$166,611,118.64** | **$15,904,295.69** |

The return of Principal and Fictitious Profits, along with any commissions, fees or other payments made by DLIF to the Defendants are hereinafter referred to collectively as the "Transfers."[1]

2.      At the time that the Transfers were made to the Fund Defendants, the fraud in DLI and DLIF had become so pervasive that the enterprise had morphed into a Ponzi scheme, and those Transfers were made in furtherance of the fraud and Ponzi scheme. The Receiver brings this action to recover the Transfers for the benefit of the defrauded DLIF investors who have collectively lost hundreds of millions of dollars.

3.      The fraudulent scheme was an intricate, multi-year fraud, orchestrated by inflating the value and returns for the DLI-managed investment funds, including DLIF, starting in or around early 2014 through March 2019. Central to Ross's efforts to keep the scheme going (efforts that may have been unbeknownst to certain key individuals within DLI) was ensuring that when investors requested a redemption, that redemption was paid in full including with its massively overstated profits. As such, throughout the life of the Ponzi scheme and DLIF's fraudulent operations, some investors received returns on their investment in excess of the amounts of the principal they originally invested.  The Fund Defendants were each one such investor.

---

[1] For ease of use, "Principal," and "Fictitious Profits" will refer to the transfers, principal, and fictitious profits with respect to each of the 33 Fund Defendants.  Any references to specific Funds will be so indicated.

Attached as Exhibit "1" hereto is a list of each of the Fund Defendants, whether KSFC, Shinhan or Kookmin was trustee; whether GBAM, JBAM or KAIC was the fund manager; the dates of the initial investments and redemptions for each Fund; and the return of Principal and payment of Fictitious Profits for each Fund.

3

1    4.    However, those excess profits were not the result of legitimate business

2 activities, rather merely fictitious numbers meant to keep the scheme afloat. Instead,

3 DLIF used money from new investors to pay old investors. The money used to pay

4 the "net winners" like the Fund Defendants came from DLIF investors gulled by

5 fraudulent representations made by DLIF and DLI. Even if the Fund Defendants or

6 the Manager Defendants had no knowledge of the fraud, the Fund Defendants still

7 benefited from that fraud and were unjustly enriched by receipt of the Fictitious

8 Profits, and the Manager Defendants by earning fees on those Fictitious Profits.

9 Defendants should not be permitted to benefit from a fraud at the expense of the other

10 DLIF investors.

11    5.    This Action follows significant enforcement efforts by both the SEC and

12 the United States Department of Justice (the "DOJ"). On March 22, 2019, the SEC

13 filed an action against DLI, alleging fraud by DLI in violation of various federal

14 securities law, including Sections 206(1) and 206(2) of the Advisors Act,

15 Section 10(b) of the Exchange Act and Rule 10(b)(6), and Section 17(a) of the

16 Securities Act, and Section 207 of the Advisers Act ("SEC DLI Action").[2] On April 1,

17 2019, Bradley Sharp was appointed as receiver over the Receivership Entities in the

18 SEC DLI Action.[3]

19    6.    On August 11, 2020, Ross was arrested by special agents of the Federal

20 Bureau of Investigation ("FBI") following a grand jury indictment on ten counts of

21 wire fraud, including a forfeiture allegation, filed on July 30, 2020 (the "DOJ

22 Action").[4] The indictment charges that Ross made material misrepresentations that

---

[2] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.).

[3] *Id.* at Dkt. No. 10.

[4] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-00327-CSF (C.D. Cal.).

defrauded investors beginning as early as December 2013, and that Ross began falsifying the monthly reporting of the funds as early as April 2014, long before DLIF fraudulently transferred the Fictitious Profits to the Fund Defendants. The indictment alleges that Ross caused the monthly net asset value ("NAV") of DLIF to be cumulatively inflated by over $300 million. The DOJ Action is pending before the same Court as the SEC DLI Action.

7.    In addition to its complaint against DLI, the SEC filed a civil complaint against Ross individually in this Court on August 11, 2020, alleging that Ross defrauded investors of DLI, including the investors that invested through DLIF, and seeking disgorgement of all funds received from his illegal conduct and civil penalties (the "SEC Ross Action").[5] The SEC alleges that Ross orchestrated an intricate, multi-year fraud by inflating the value and returns for the investment fund, starting in or around early 2014 through March 2019. The SEC Ross Action was transferred to the same court as the SEC DLI Action, as a related action.[6]

8.    At the same time that the DOJ and the SEC were pursuing their actions against Ross individually, the Receiver undertook a detailed investigation into the Receivership Entities' business conduct prior to April 2019. The Receiver's investigation also uncovered the details of the pervasive fraud that existed from the inception of DLI. Based on detailed findings, the Receiver discovered that the operations of DLI and DLIF had effectively morphed into a Ponzi scheme no later than mid-2016, as the fraud and commingling of funds grew. He prepared and filed the Receiver's Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distributions (the "Receiver's Report"), a copy of which is attached hereto as Exhibit "2" and incorporated herein by reference.

---

[5] *SEC v. Brendan Ross*, Case No. 2:20-cv-7202-DSF-MRW (C.D. Cal.), Dkt. No. 1.

[6] *Id*., Dkt. No. 11.

9.     The Transfers were made with actual fraudulent intent and are avoidable and recoverable pursuant to Cal. Civil Code § 3439.04(1).

10.    The Fictitious Profits are recoverable as constructive fraudulent transfers pursuant to Cal. Civil Code § 3439.04(2), whether or not Defendants had any knowledge of the DLI entities' pervasive fraud, or true nature as a Ponzi scheme. Additionally, Defendants should not be permitted to be unjustly enriched from a fraud at the expense of the other investors, so at a minimum the Fund Defendants must return the Fictitious Profits and the Manager Defendants must return any fees earned or any monies paid from the Transfers, subject to proof at the time of trial.

11.    The Receiver therefore brings this proceeding pursuant to Cal. Civil Code § 3439 *et seq.* to avoid actual fraudulent transfers and constructively fraudulent transfers to Defendants and for unjust enrichment.

## JURISDICTION & VENUE

12.    This Court has jurisdiction over this proceeding under 15 U.S.C. § 77v(a), and 15 U.S.C. § 78aa because the proceeding is ancillary to the SEC DLI Action.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and conduct that form the basis of Receiver's causes of action occurred when DLI and DLIF fraudulently offered investments for sale from its headquarters in Glendale, California, in Los Angeles County, within this District.  This lawsuit is also ancillary to the SEC DLI Action and the receivership.

14.    The Fund Defendants made the investments at issue through DLIF in the DLI investment scheme – itself located in Los Angeles County, California within this District – by the Trustee Defendants signing, on behalf of each of the 33 Fund Defendants,[7] a subscription agreement agreeing to be governed by the laws of the

---

[7] Specifically, KSFC signing on behalf of the 29 funds for which it acted as trustee (the "KSFC Fund Defendants"), Shinhan signing on behalf of the 2 funds for which it acted as trustee (the "Shinhan Fund Defendants"), and Kookmin signing on behalf of

State of California. A copy of each subscription agreement is attached hereto as Exhibits "3" through "35" (the "Subscription Agreements"). This Court has jurisdiction over the Fund Defendants and the Trustee Defendants because they purposefully availed themselves of the benefits of this state, by doing business in the State of California such that the United States District Court of California may exercise personal jurisdiction over it.

15.     The Fund Defendants each invested in a fund located in California, purposefully availing themselves of the protection of California law.

16.     The Trustee Defendants signed the Subscription Agreements on behalf of each of the Fund Defendants for which they served as trustee, by which each such Fund Defendant made the investment in DLIF, with DLI as its General Partner and each Fund Defendant identified as an investor and limited partner.

17.     The Manager Defendants each directed the Fund Defendants under their management (as specified below) to invest in a fund located in California, purposefully availing themselves of the protection of California law.

18.     The Subscription Agreements reflected that the addresses of DLI and DLIF were 1150 Foothill Blvd., Suite F, La Canada, California 91011.

19.     The Trustee Defendants and the Fund Defendants knew or should have known that DLI and DLIF were located in California.

20.     The Manager Defendants all attended in-person due diligence sessions about DLI in California in 2016, and each knew that DLI and DLIF were located in California.

21.     The Subscription Agreements contained a California choice-of-law provision at paragraph 6 as follows:

This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of California and

_____

the 2 funds for which it acted as trustee (the "Kookmin Fund Defendants"), as set forth in Exhibit "1."

7

together with the rights and obligations of the parties hereunder, shall be construed under and governed by the laws of such state without giving effect to any choice of law or conflict of law provisions or rules that would cause the application of the domestic substantive laws of any other jurisdiction.

22.     Pursuant to the Subscription Agreements, each of the Fund Defendants became a limited partner in DLIF, which is a limited partnership headquartered and located in California.  Plaintiff's claims, as set forth below, arise directly out of each of the Fund Defendants' investment-related activities as a limited partner of DLIF.

23.     The Manager Defendants and the Trustee Defendants further purposefully availed themselves of California law and the laws of the United States by representing to DLI that they had control over the management of DLI limited partners (to wit, the respective Fund Defendants under their management), and by exercising such control.

24.     DLIF was located in California for purposes of Cal. Civil Code § 3439.10(b).

25.     Plaintiff's claims, as set forth below, arise directly from the Manager Defendants' choice to direct each of the Fund Defendants under their management to invest in a fund (DLIF) that Defendants knew or should have known was located in California, and managed by an investment manager (DLI) that Defendants knew or should have known was located in California.

26.     Plaintiff's claims, as set forth below, arise directly out of the voidable Transfers from a California entity to each Fund Defendant.

**PARTIES**

27.     Plaintiff Bradley D. Sharp is the Permanent Receiver for the Receivership Entities.

28.     Plaintiff Bradley D. Sharp is a federally appointed receiver acting pursuant to Federal Rule of Civil Procedure 66, the provisions of 28 U.S.C. §§ 754, 959, and 1692, as well as this District Court's April 1, 2019 Preliminary Injunction

8

and Order Appointing Permanent Receiver ("Receivership Order") in the SEC Action.

29.     The Court appointed the Receiver to marshal and preserve all assets of the Receivership Entities. The Receiver is authorized and empowered to investigate claims and commence legal actions for the benefit and on behalf of the Receivership Entities as the Permanent Receiver deems necessary and appropriate.

30.     The Receiver is authorized to file this action pursuant to both the Receivership Order and the Order Granting Motion of Receiver for: (1) Authority to Pursue Avoidance Actions; (2) Approval of Proposed Procedures; and (3) Form and/or Limitation of Notice Under Local Rule 66-7.[8]

31.     Defendant Shinhan Bank Co., Ltd. (Shinhan) is a company located in South Korea at the address 20 Sejong daero 9-gil, Jung-gu, Seoul, 04513, Korea. Shinhan is sued individually with respect to any portions of the Transfers it received, whether as fees for trustee services, for acting as sales agent, or otherwise.  Shinhan is also sued in its capacity as a trustee of the Shinhan Fund Defendants, as set forth below and in Exhibit "1," each of which was a former investor in DLIF.  Shinhan executed two Subscription Agreements with DLIF; one for each of the Shinhan Fund Defendants.  Shinhan's wholly owned subsidiary, Shinhan Bank America, conducts banking services on Defendant's behalf in the United States, and has five offices located in California (specifically, Los Angeles, Torrance, Buena Park, Irvine and San Diego).

32.     Defendant Kookmin Bank Co., Ltd. (Kookmin) is a company located in South Korea at the address 84, Namdaemun-ro, Jung-gu. Seoul 04534, Korea. Kookmin is sued individually with respect to any portions of the Transfers it received, whether as fees for trustee services, for acting as sales agent, or otherwise.  Kookmin is also sued in its capacity as a trustee of the Kookmin Fund Defendants, as set forth below and in Exhibit "1," each of which was a former investor in DLIF.  Kookmin

---

[8] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt No. 526.

1  executed two Subscription Agreements with DLIF; one for each of the Kookmin Fund
2  Defendants.  Kookmin has a branch in the United States.

3        33.    Defendant Korea Securities Finance Corporation (KSFC) is a corporation
4  located in South Korea at the address 10, Gukjegeumyumg-ro 8-gil,
5  Yeongdeungpo-gu, Seoul, Korea.  KSFC is sued individually with respect to any
6  portions of the Transfers it received, whether as fees for trustee services, for acting as
7  sales agent, or otherwise.  KSFC is also sued in its capacity as trustee of the 29 KSFC
8  Fund Defendants, as set forth below and in Exhibit "1," each of which was a former
9  investor in DLIF.  KSFC executed 29 Subscription Agreements with DLIF; one for
10  each of the KSFC Fund Defendants.

11        34.    Defendant Golden Bridge Asset Management Co., Ltd. (GBAM), is a
12  company located in South Korea at the address 14th floor, FKI Hall, 24 Yeoui-daero,
13  Yeouido-dong, Yeongdeungpo-gu, Seoul 07320, Korea.  GBAM is in part owned by
14  Golden Bridge Investment and Securities Co., a subsidiary of Sangsangin Co. Ltd., a
15  Korean financial holding company located at 358 Hwangsaewul-Ro, Bundang-Gu,
16  Seongnam-Si, Gyeonggi-Do, Korea.  GBAM was the fund manager for Fund
17  Defendants GB US Fintech Income Fund of Funds #1, GB US Fintech Income Fund
18  of Funds #2, GB US Fintech Income Fund of Funds #3, GB US Fintech Income Fund
19  of Funds #4, GB US Fintech Income Fund of Funds #5, GB US Fintech Income Fund
20  of Funds #6, GB US Fintech Income Fund of Funds #7, GB US Fintech Income Fund
21  of Funds #8, GB US Fintech Income Fund of Funds #9, GB US Fintech Income Fund
22  of Funds #10, GB US Fintech Income Fund of Funds #11, GB US Fintech Income
23  Fund of Funds #12, GB US Fintech Income Fund of Funds #13, GB US Fintech
24  Income Fund of Funds #14, GB US Fintech Income Fund of Funds #15, and GB US
25  Fintech Income Fund of Funds #16 (collectively, the "GBAM Fund Defendants").

26        35.    Defendant JB Asset Management Co., Ltd., a/k/a KERR Asset
27  Management Co., Ltd. (JBAM), is a company located in South Korea at the address
28  Jeonbuk Bank Bldg., 566 Baekjedae-ro, Deokjin-gu, Jeonju-si, Jeonbuk, Korea.

10

JBAM is a wholly owned subsidiary of JB Financial Group Co. Ltd., a Korean financial holding company located at the same address.  JBAM was the fund manager for Fund Defendants JB US Fin-Tech Fund of funds #1, JB US Fin-Tech Fund of funds #2, JB US Fin-Tech Fund of funds #3, JB US Fin-Tech Fund of funds #4, JB US Fin-Tech Fund of funds #5, JB US Fin-Tech Fund of funds #6, JB US Fin-Tech Fund of funds #7, JB US Fin-Tech Fund of funds #8, JB US Fin-Tech Fund of funds #9, JB US Fin-Tech Fund of funds #10, JB US Fin-Tech Fund of funds #11, and JB US Fin-Tech Fund of funds #12 (collectively, the "JBAM Fund Defendants").

36.     Defendant Korea Alternative Investment Asset Management Corp. (KAIC), business registration number 381-87-00031, is a corporation located in South Korea at the address 5F, Mi Sung Bldg., 48, Sapyeong-daero 26-gil, Seochu-gu, Seoul.  KAIC was the fund manager for Fund Defendants KAIC US Fin-Tech Fund of funds #1, KAIC US Fin-Tech Fund of funds #3, KAIC US Fin-Tech Fund of funds #4, KAIC US Fin-Tech Fund of funds #5, and KAIC US Fin-Tech Fund of funds #9 (collectively, the "KAIC Fund Defendants").

37.     GB US Fintech Income Fund of Funds #1 ("GB001") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

38.     GB US Fintech Income Fund of Funds #2 ("GB002") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

39.     GB US Fintech Income Fund of Funds #3 ("GB003") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

40.     GB US Fintech Income Fund of Funds #4 ("GB004") was an investment

fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

41.     GB US Fintech Income Fund of Funds #5 ("GB005") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

42.     GB US Fintech Income Fund of Funds #6 ("GB006") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

43.     GB US Fintech Income Fund of Funds #7 ("GB007") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

44.     GB US Fintech Income Fund of Funds #8 ("GB008") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

45.     GB US Fintech Income Fund of Funds #9 ("GB009") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

46.     GB US Fintech Income Fund of Funds #10 ("GB010") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

47.     GB US Fintech Income Fund of Funds #11 ("GB011") was an

investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

48.     GB US Fintech Income Fund of Funds #12 ("GB012") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

49.     GB US Fintech Income Fund of Funds #13 ("GB013") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

50.     GB US Fintech Income Fund of Funds #14 ("GB014") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

51.     GB US Fintech Income Fund of Funds #15 ("GB015") was an investment fund formed for the purpose of investing in DLIF, with Shinhan acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

52.     GB US Fintech Income Fund of Funds #16 ("GB016") was an investment fund formed for the purpose of investing in DLIF, with Shinhan acting as its trustee, GBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

53.     JB US Fintech Income Fund of Funds #1 ("JB001") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

54.     JB US Fintech Income Fund of Funds #2 ("JB002") was an investment

fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

55.    JB US Fintech Income Fund of Funds #3 ("JB003") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

56.    JB US Fintech Income Fund of Funds #4 ("JB004") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

57.    JB US Fintech Income Fund of Funds #5 ("JB005") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

58.    JB US Fintech Income Fund of Funds #6 ("JB006") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

59.    JB US Fintech Income Fund of Funds #7 ("JB007") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

60.    JB US Fintech Income Fund of Funds #8 ("JB008") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

61.    JB US Fintech Income Fund of Funds #9 ("JB009") was an investment

fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

62.    JB US Fintech Income Fund of Funds #10 ("JB010") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

63.    JB US Fintech Income Fund of Funds #11 ("JB011") was an investment fund formed for the purpose of investing in DLIF, with Kookmin acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

64.    JB US Fintech Income Fund of Funds #12 ("JB012") was an investment fund formed for the purpose of investing in DLIF, with Kookmin acting as its trustee, JBAM acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

65.    KAIC US Fintech Income Fund of Funds #1 ("KAIC001") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, KAIC acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

66.    KAIC US Fintech Income Fund of Funds #3 ("KAIC003") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, KAIC acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

67.    KAIC US Fintech Income Fund of Funds #4 ("KAIC004") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, KAIC acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

68.    KAIC US Fintech Income Fund of Funds #5 ("KAIC005") was an

investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, KAIC acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

69.     KAIC US Fintech Income Fund of Funds #9 ("KAIC009") was an investment fund formed for the purpose of investing in DLIF, with KSFC acting as its trustee, KAIC acting as its fund manager, and had one or more sales agents in Korea that sold the fund to investors.

## **RELATED PARTIES**

70.     DLI was the investment manager of the funds set up by Ross to facilitate the fraud.  DLI was 100% owned by Ross and was the General Partner of DLIF.  As set forth in the diagram below, the DLI entities used a complex master-feeder fund structure, in which DLI was the investment manager of both the Master Fund (DLIC, defined below) and the Feeder Funds (DLIF and DLIFF, defined below).  DLI was



1    located in Glendale, California. The Organizational Chart above was located in the
2    Receivership Entities' business records and sets forth the organizational structure of
3    the Receivership Entities.

4         71.    Direct Lending Income Fund, L.P. ("DLIF" or the "Onshore Feeder
5    Fund") is the entity in which each of the Fund Defendants invested as a limited
6    partner.  As the Onshore Feeder Fund, DLIF was the entity into which funds initially
7    flowed from investors, ostensibly so that those funds could eventually be invested
8    with DLI counterparties, although in reality the funds invested were often used to
9    satisfy redemption requests. DLIF did not make investments directly,[9] but rather
10   funneled investors' money into DLIC, which operated as a master fund.

11        72.    DLIF was organized as a Delaware limited partnership on September 21,
12   2012 to operate as a private investment partnership. DLI was the general partner of
13   DLIF, and Ross was the Managing Member of DLI, which was the General Partner of
14   DLIF. A number of the limited partners of DLIF reside in the State of California, in
15   Los Angeles County.

16        73.    Direct Lending Income Feeder Fund Ltd ("DLIFF" or the "Offshore
17   Feeder Fund;" and together with DLIF, the "Feeder Funds"), a Cayman Islands
18   company, was formed to facilitate investments from non-United States domiciled
19   investors, but otherwise served the same function as DLIF, just for offshore investors.
20   The Complaint does not relate to any transfers to or from DLIFF.

21        74.    DLI Capital, Inc. ("DLIC" or the "Master Fund") was a Nevada
22   Corporation with its principal place of business in Glendale, California and, like the
23   Feeder Funds, was managed by DLI.  The Master Fund was wholly owned by the
24   Feeder Funds.

25        75.    DLI Assets Bravo, LLC ("DLIAB") was a Nevada limited liability

26

27
     ───────────────────
28   [9] DLIF did, however, own DLI TC, LLC, an entity that was set up in connection with
     the realized investment in Talking Capital Partners I, LLC ("Talking Capital"), as that
     investment predated the master-feeder structure.

Case No. 2:21-cv-9197                                          COMPLAINT

company that was a wholly owned subsidiary of the Master Fund.  After money flowed from outside investors to the Feeder Funds to the Master Fund, it was then supposed to flow to DLIAB to hold the actual investment with DLI counterparties. The cash flows generated from those investments were supposed to flow back to the Master Fund and then to the Feeder Funds, but in reality were commingled with new investor money from DLIF.

76.    DLI Assets, LLC ("DLIA") was a Nevada limited liability company that was a wholly owned subsidiary of the Master Fund.  DLIA was formed to hold a portfolio of whole loans that the DLI entities acquired in foreclosure following the default of Dealstruck Holdings, Inc., a former counterparty of the DLI entities.  The cash flows generated from those loans were also supposed to flow back to the Master Fund and then to the Feeder Funds, but in reality those cash flows were also commingled with new investor money from DLIF.

77.    DLI Lending Agent, LLC ("DLILA") is a Delaware limited liability company that served as administrative agent with respect to a number of the credit facilities with counterparties in which DLI entities invested, facilitating the collection of payments, and serving as intermediary between borrowers and lenders.  DLILA held a lending license and was 100% owned by DLI.

78.    Ross was the founder, 100% owner, managing member, and Chief Executive Officer of DLI, and a member of the board of directors. As the managing member of DLI, Ross was able to control DLI and DLIF (as DLI was the general partner of DLIF).  Ross is an individual residing in the County of Los Angeles.

## PROCEDURAL HISTORY

79.    On March 12, 2021, the Receiver filed a Motion for Authority to Pursue Avoidance Actions and for Approval of the Proposed Procedures in the SEC DLI Action (the "Procedures Motion").[10]   The Court granted the motion on April 6,

---

[10] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 356.

18

1    2021.[11]

2         80.    The Procedures Motion sought authority for the Receiver to send demand

3    letters with settlement offers to net winners, which the Receiver did to those net

4    winners over a certain threshold. Over 540 of the over 700 net winners responded and

5    entered into settlement agreements.

6         81.    The Procedures Motion further provided that for any net winner who did

7    not accept the settlement within 60 days of being a demand letter, the Receiver was

8    authorized to file an avoidance action such as the instant action.

9         82.    The Fund Defendants were sent demand letters on April 28, 2021, and

10   the Receiver has sent several follow up communications. The Manager Defendants

11   were also sent separate demand letters in November 2021. Defendants have not

12   accepted the Receiver's settlement offer.

13   **<u>FUND DEFENDANTS' INVESTMENT IN DLI</u>**

14        83.    Each of the Fund Defendants, through its trustee, signed a Subscription

15   Agreement agreeing to invest in DLIF, with dates ranging from January 26, 2016 to

16   May 1, 2017, as set forth in Exhibits "3" through "35" attached hereto.   Ross

17   countersigned the Subscription Agreements on behalf of DLIF.

18        84.    In each of the Subscription Agreements, at § 1(a), the Fund Defendant

19   represented and warranted that the "Partnership Interest is being purchased for the

20   undersigned's own account without the participation of any other person, with the

21   intent of holding the Partnership Interest for investment and without the intent of

22   participating, directly or indirectly, in a distribution of the Partnership interests."

23        85.    In each of the Subscription Agreements, at § 1(e), the Fund Defendant

24   represented and warranted that "the undersigned can sustain a substantial loss of this

25   investment in the Partnership."

26

27   _____

28   [11] *Id.*, Dkt. No. 526.

19

86.     In each of the Subscription Agreements, at § 1(h), the Fund Defendant represented and warranted that the "execution and delivery of this Subscription Agreement by the undersigned has been duly authorized, and this Subscription Agreement constitutes the valid and binding agreement of the undersigned."

87.     The Transfers for each of the thirty-three Fund Defendants, consisting of both the return of that Fund Defendant's Principal and payment of the Fictitious Profits, are set forth in Exhibits "36" through "68" attached hereto.

88.     For each Fund Defendant, the respective Transfers were made in the form of periodic withdrawals or redemptions, to a bank account of that Fund Defendant over which that Fund Defendant exercised full dominion and control.

89.     Between December 8, 2016 and November 27, 2018, each Fund Defendant had received back the full amount of its Principal (see Exhibit "1" for the dates of the return of Principal and payment of Fictitious Profits for each Fund Defendant). The Fictitious Profits were transferred to each of the Fund Defendants on or after December 8, 2016. By December 8, 2016, as set forth below, fraud had pervaded all of DLIF's operations.  By that date, also as set forth below, DLIF was also being operated as part of the larger Ponzi scheme being operated by Ross, and the Transfers to each of the Fund Defendants were in furtherance of that scheme.  DLI and DLIF were also insolvent by that date.

90.     The Transfers to each of the Fund Defendants are avoidable and recoverable transfers pursuant to Cal. Civil Code § 3439 *et seq*.

91.     The Fund Defendants were also unjustly enriched by the transfer of the Fictitious Profits at the expense of DLIF and its creditors.

92.     GBAM acted as the fund manager for each of the GBAM Fund Defendants, acting as authorized signatories on behalf of the GBAM Fund Defendants, providing anti-money laundering certifications,[12] and otherwise directing

---

[12] GBAM certified that it was aware of the name, address, and identity of each investor the GBAM Fund Defendants. DLI was not in possession of this information.

DLI with respect to the GBAM Fund Defendants.

93.    Upon information and belief, a representative from GBAM attended due diligence session about DLI in Pasadena on or about September 22, 2016, at which Brendan Ross was in attendance.

94.    GBAM performed substantial due diligence on DLI in preparation for the GBAM Fund Defendants' investment in DLIF.

95.    GBAM was aware that the GBAM Fund Defendants were investing and becoming limited partners in a fund located in California.

96.    Upon information and belief, GBAM received substantial fees or other payments to the GBAM Fund Defendants.

97.    JBAM acted as the fund manager for each of the JBAM Fund Defendants, acting as authorized signatories on behalf of the JBAM Fund Defendants, providing anti-money laundering certifications,[13] and otherwise directing DLI with respect to the JBAM Fund Defendants.

98.    Upon information and belief, at least two representatives from JBAM attended due diligence session about DLI in Pasadena on or about September 22, 2016, at which Brendan Ross was in attendance.

99.    Upon information and belief, an affiliate of JBAM was also an investor in one or more of the Fund Defendants.

100.    JBAM performed substantial due diligence on DLI in preparation for the JBAM Fund Defendants' investment in DLIF.

101.    JBAM was aware that the JBAM Fund Defendants were investing and becoming limited partners in a fund located in California.

102.    Upon information and belief, JBAM received substantial fees or other payments to the JBAM Fund Defendants.

---

[13] JBAM certified that it was aware of the name, address, and identity of each investor the JBAM Fund Defendants. DLI was not in possession of this information.

103.   KAIC acted as the fund manager for each of the KAIC Fund Defendants, acting as authorized signatories on behalf of the KAIC Fund Defendants, providing anti-money laundering certifications,[14] and otherwise directing DLI with respect to the KAIC Fund Defendants.

104.   Upon information and belief, a representative from KAIC attended due diligence session about DLI in Pasadena on or about September 22, 2016, at which Brendan Ross was in attendance.

105.   KAIC performed substantial due diligence on DLI in preparation for the KAIC Fund Defendants' investment in DLIF.

106.   KAIC was aware that the KAIC Fund Defendants were investing and becoming limited partners in a fund located in California.

107.   Upon information and belief, KAIC received substantial fees or other payments to the KAIC Fund Defendants.

108.   Upon information and belief, each of KSFC, Shinhan, and Kookmin, or their subsidiaries or affiliates, received payments for their role as trustee of the Fund Defendants or otherwise, in amounts according to proof at trial.

### ALLEGATIONS OF THE DLI ENTITIES' FRAUD

**A.   Structure and Stated Purpose of the DLI Entities**

109.   The DLI entities operated as a master/feeder structure, in which investors would first invest in the Feeder Funds, DLIF (onshore investors) and DLIFF (offshore investors). DLIF and DLIFF owned the Master Fund, DLIC, and funds from investors flowed from the Feeder Funds to the Master Fund.  Until DLIFF was formed in 2016, DLIF was the only Feeder Fund. Both Feeder Funds and the Master Fund were all managed by the same investment manager, DLI, which was 100% owned by its managing member, Ross.

---

[14] KAIC certified that it was aware of the name, address, and identity of each investor the KAIC Fund Defendants. DLI was not in possession of this information.

110.   The Master Fund had two wholly owned subsidiaries, DLIA and DLIAB. DLIAB and DLIA used the funds provided by the Master Fund to make loans to various companies.  The purported returns from those loans would then flow back up through the Master Fund to the Feeder Funds, where those proceeds were supposed to be used to pay investors in the Feeder Funds.

111.   The purported initial investment objective of the DLI entities was to net for its investors an annualized 10% to 14% return. DLI, as investment manager, advertised that it could achieve those returns by investing in short-term loans, lines of credit, purchased receivables, or other debt obligations. DLI focused on loans that originated through online lending platforms. As part of the scheme, the Master Funds' portfolio, over time, became concentrated with substantial loans to a small number of highly risky counterparties (the "Counterparties").

112.   In its early private placement memoranda, DLIF stated to potential investors that the loans in which it invested typically had the following qualities: (1) issued by qualified, established businesses; (2) durations of six to eighteen months; (3) fully amortizing over the term through daily or weekly ACH withdrawals from the borrower's account; and (4) may be guaranteed by one or more principals, and may be secured by the assets of the borrower. Contrary to those statements, the nature and quality of the investments changed substantially over time and were not of the nature represented at the time the Transfers were made.

**B.     DLI's Initial Failure to Register with the SEC**

113.   In its initial period of operation, DLI was not registered with the SEC as an investment advisor, and its assets under management fell below the $100 million threshold for registration.  As such, DLI, which supposedly marketed itself to high-net-worth accredited investors, was able to avoid regulatory scrutiny regarding the initial period of its operation.

114.   By December 2014, DLI's assets under management had reached $100 million. By January 1, 2015, the assets under management had grown to $118 million. Yet DLI failed to register with the SEC as a registered investment adviser.

115.   As a result, DLI was able to continue to operate without scrutiny and oversight by the SEC, and its investors were deprived of the protections afforded by the Investment Advisers Act of 1940.

116.   Finally, on February 1, 2016, DLI registered with the SEC as an investment advisor.

## C.   DLI's Communications with Investors

117.   DLI, as the general partner of DLIF, and Ross, DLI's managing member, regularly communicated with the DLIF investors through monthly newsletters distributed through the administrator of DLIF. Ross drafted and signed the monthly newsletters, which included statements about DLI's assets under management and the Master Fund and DLIF's monthly returns, which were often overstated as set forth below.

118.   DLI also provided prospective and current investors with presentation documents that included information about the Master Fund's monthly returns and other material information about the Master Fund's performance, which were often overstated as set forth below.

119.   DLI provided the DLIF investors with monthly account statements, including the account balance and net/profit loss figures for each investor that were derived from the Master Fund's NAV, net interest income, and each investor's percentage allocation; and provided the underlying data for such calculations to the DLIF administrator.  Because the DLIF NAVs were intentionally overstated, as set forth below, the account balances were inflated, and redemptions based on those overstated NAVs were therefore artificially inflated and intentionally fictitious. The Transfers, including the Fictitious Profits, were calculated and made based on

1   fictitious NAVs, and those Transfers were made in furtherance of the fraudulent

2   scheme with actual fraudulent intent.

3       120.   DLI maintained an online investor portal that provided investors with

4   detailed information regarding the Master Fund and its subsidiaries' asset portfolio

5   and specific counterparties, including the valuation of various counterparty positions

6   by unpaid and principal balance and profit and loss information for different periods

7   of time. However, DLI often overstated the valuation with respect to specific

8   counterparties, as set forth below.

9       121.   DLI provided to some prospective and current investors "default

10  sensitivity analysis" spreadsheets that detailed the amount of the Master Fund's

11  historical write downs, and sometimes extensive detail in DLI's individual investment

12  positions such as QuarterSpot, even though DLI intentionally failed to write down its

13  positions in loans it knew to be non-performing, especially with respect to

14  QuarterSpot.

15      122.   DLI provided the Master Fund's audited financial statements to DLIF,

16  which included valuations of the Master Fund's investments as well changes in the

17  depreciation of investments that were impacted by the inclusion of loans that were

18  written off because they were non-performing. Valuations therefore were intentionally

19  and artificially inflated when non-performing and underperforming loans were not

20  properly included.

21  **D.     The Value of the Loans That DLI Chose For Its Funds Were Falsely**
22  **Overvalued**

23      123.   The majority of the assets in which the DLI entities invested, at the

24  direction of DLI, were Level 3 assets, meaning that they were illiquid, and could not

25  be valued through observable measures, such as market prices. The assets were

26  supposed to be valued at fair market value. DLI valued the positions internally, on a

27  monthly basis. Through this internal valuation process, which was largely controlled

28  by Ross, DLI intentionally and artificially inflated the asset values of the Master Fund

and its subsidiaries, and in turn, overvalued DLIF and the NAVs reported to the DLIF investors.

124.   By early to mid-2017, many of DLI's chosen investment platforms were in financial distress, but the resulting looming financial difficulties of DLIF were hidden from DLIF investors.

125.   Ross, DLI, and DLIF operated the DLIF fraudulent investment scheme with fraudulent intent that lured in investors, mislead them to retain their funds invested in DLIF under the guise of promised fictitious returns, and transferred fictitious profits to certain redeeming investors with the actual fraudulent intent of keeping up the façade of a legitimate business.

126.   Central to the operation of the fraud was the concealment by Ross, DLI, and DLIF of the true nature and value of the loans with counterparties, using various deceitful acts to mislead investors into thinking the loans were far more valuable than they were. Some of the more egregious examples of such concealment were prevalent in QuarterSpot, VOIP Guardian, Dealstruck, and LoanHero – plus numerous other investments that had serious differences between the way they were operated and the way they were represented to DLIF investors.

127.   **QuarterSpot**.  One of the most egregious examples of Ross's, DLI's and DLIF's malfeasance was the relationship with QuarterSpot, one of DLI's earliest and largest Counterparties. Through the fraudulent actions of DLI's owner and managing member, Ross, DLI massively overstated the value of its QuarterSpot position. For the period of August 2013 to June 2017, the QuarterSpot loan portfolio was a significant and steadily growing position for DLI. DLI represented to investors that QuarterSpot was one of DLI's best-performing positions. Ross, and therefore DLI and DLIF, knew of serious problems relating to the QuarterSpot loan portfolio and concealed these issues to the detriment of DLIF investors (in part aided and abetted by QuarterSpot itself) by, among other things:

- Falsifying thousands of payments for non-paying or late-paying QuarterSpot borrowers, causing the false appearance that non-paying loans were performing, and funding those payments by rebating QuarterSpot's service fees;

- Affirmatively misrepresenting the status of delinquent and/or non-paying loans to DLI investors and/or prospective investors;

- Falsely inflating QuarterSpot's loan balances, cumulatively, for the period 2014 to 2017, by $53 million;

- Preventing DLI from taking an adequate amount of loan reserves;

- Overstating DLI's valuation of the QuarterSpot Loan Portfolio and the Master Fund;

- Charging excessive performance and management fees;

- Overstating its return by about 2%, on average, for the period 2014 to 2017;

- Collecting over $11 million in excess fees, for the period 2014 to 2017; and

- Undermining the ability of DLIF investors and potential investors to assess whether continued investment in QuarterSpot, or similar assets, was warranted.

128. **VOIP Guardian**. Another example of intentional fraudulent intent in overstating the values of the DLI-managed funds is the VoIP Guardian loan portfolio. DLIF and DLI, through Ross, intentionally misrepresented the risk of that portfolio to its investors. Even though VoIP Guardian's business model was largely factoring invoices of telecommunications carriers in developing countries, which were highly risky Tier 3 companies, DLIF implied to the DLIF investors that the risk of its VoIP Guardian investment was low because of the purported involvement of larger Tier 1 companies such as AT&T and Verizon.

129. As early as February 2017, Ross was also aware that an active criminal investigation was underway in the Netherlands focused on VoIP Guardian's Tier 3 telecommunications business and counterparties, based on evidence that those

27

counterparties appeared to be spoofing minutes to overstate charges and possibly also using those businesses for money laundering. DLIF, through DLI and Ross, concealed that fact from investors, as well as the amounts loaned to VoIP Guardian were against receivables that showed no indicia of legitimacy. The losses in connection with the VoIP Guardian loan portfolio, which had ballooned to over $200 million at one point, will likely be well over $100 million once finalized.

130.   **Dealstruck**. Another example of the fraudulent conduct is the intentional misrepresentation of the value of loans its portfolio from Dealstruck Holdings, Inc. ("Dealstruck"), a company in which Ross held a personal interest. Under Ross's direction and with fraudulent intent, DLI, as the general partner of DLIF, failed to adjust the valuations of the poorly performing portfolio or to disclose the underlying weaknesses in the collateral, but instead took actions that increased the position to protect Ross's individual position at the expense of the investors. DLI was ultimately forced to foreclose on the loan portfolios in December 2016, and the liquidation was not completed until October 2019, after the Receiver was appointed.  The total return was less than 2.8%, far less than the double-digit returns promised to investors. The Dealstruck transactions were orchestrated with the intent to mislead the DLIF investors.

131.   **LoanHero**.  The DLI-managed funds also invested heavily in LoanHero, which was touted by DLI as an early successful consumer loan investment portfolio. DLIF, and later the Master Fund after the 2016 restructuring, provided LoanHero with a loan facility at a 16% interest rate. However, as early as June 2016, DLI's internal analysis showed that the returns from LoanHero were around 6.1%, well below what was needed to make the payments on a 16% loan facility.

132.   Ross had a personal investment in LoanHero. Rather than reduce the funding and the risk, in November 2016 Ross increased the loan commitment to $25 million, and again in October 2017 to $42.5 million. In December 2017, DLI was forced to direct that DLIC foreclose on the LoanHero portfolio. However, DLI failed

1  to disclose that fact in investor letters from December 2017 through March 2018. As
2  with Dealstruck, the liquidation was not completed until after the Receiver was
3  appointed. The total return was less than 3%, far less than the double-digit returns
4  promised to the DLIF investors.

5      133.  The fraud with respect to QuarterSpot, VoIP Guardian, Dealstruck, and
6  LoanHero epitomized the intentional concealment and fraudulent intent of DLI and
7  DLIF, which was pervasive throughout the investment program.

8      134.  Several other investments, including those which have not made part of
9  the public record, have had similar problems. In sum, DLI's limited business
10 investments were overrun by fraudulent conduct that lured and retained investors who
11 would not have invested had they known the true facts. Some of the investments do
12 not appear to have ever been legitimate business operations. Even those that involved
13 nominally legitimate business operations could not support the dramatically
14 overstated returns that DLI and Ross promised to DLIF investors.

15     135.  DLIF continued raising capital and paying fictitious profits to investors
16 like the Fund Defendants, enabling DLIF to continue its fraudulent operations under
17 the guise of a very-successful fund. In order to continue DLI's scheme and attract new
18 investment, DLIF, DLI, and Ross concealed the underperformance of most of its loan
19 portfolio from investors and made the Transfers to each of the Fund Defendants as
20 part of the fraudulent scheme to perpetuate the fraud by repaying the Principal as well
21 as the Fictitious Profits to avoid detection of the fraudulent scheme.

22 **E.    Ross's Secret Ownership of Counterparty Stakes and Other Fraudulent**
23 **Acts**

24     136.  As set forth above, Ross controlled DLI, DLIF and the Master Fund.
25 Ross also held ownership stakes in a number of Counterparties, which were not made
26 public or were concealed through stakes held by family members or family trusts.
27 Because of Ross' equity interests, DLI was not in fact truly independent of these
28 borrowers, and the transactions in which DLI directed the funds under its

management to undertake invested were influenced by Ross's personal interests, to the detriment of the DLIF investors.

137. Ross had as many as eight personal investments in Counterparties, typically not disclosed to investors or disclosed long after Ross's investment had resulted in decisions harmful to DLIF and its investors. Known investments in which Ross had a personal stake include IOU Central, Inc.; LoanHero, LLC; Realty Mogul, Inc.; Nativa Capital Management LLC; Quarterspot, Inc.; Dealstruck Holdings, Inc.; VoIP Guardian Partners I, LLC; and another investment currently being unwound by the Receiver (the "Known Ross Personal Investments").

138. The Known Ross Personal Investments received a total of $647 million out of the $1.9 billion in total loans to Counterparties, or 39%. The Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million as of March 31, 2019, the day before the Receiver was appointed.

139. Ross benefited from the scheme in a number of ways, extracting at least $31.4 million from DLI. Ross charged excessive management fees to DLI, which were based on the intentionally inflated NAVs of the DLI-managed funds. As set forth below, those NAVs were substantially overstated, resulting in overpayments to Ross.

140. Ross also created Robin Hill Investments, LLC ("RHI") with members of his family, which created a subsidiary Robin Hill Services, LLC ("RHS") that had a contract with DLI to provide administrative services. However, RHS entities provided very few services to DLI, far less than the $10 million per year that was contemplated. Most of the funds were paid from RHS to RHI, and to RHI's investors, indicating that the entities were little more than a sham designed to enrich Ross and his family at the expense of DLIF investors.

141. The Receiver's investigation is ongoing and may uncover additional fraudulent activities by DLI, DLIF, and Ross, further demonstrating that DLI was

operating itself and the funds under its management as a fraudulent enterprise, and as a Ponzi scheme.

**F.    DLIF Greatly Overstates Its Net Asset Values**

142.   Ross also caused DLIF to provide reports with inflated NAVs, which served several purposes: (a) the inflated values indicated to investors that the DLI funds were better investments than they were; (b) the management fees charged by Ross, 1% of the Master Fund's gross asset value, were based on the inflated NAVs; (c) the performance fees charged by DLI, 20% of the increased value of the Master Fund, were based on the inflated NAVs; and (d) the commission payments to the brokers dealers and finders that helped Ross facilitate his scheme were based on the inflated NAVs. Because DLI's portfolio was intentionally overvalued, excess fees were charged due to the way that the fees were calculated.

143.   The NAV of DLIF was dramatically overstated beginning in 2016, and the overstatement generally became worse over time. In January 2016, the overstatement was at least $46 million.  By January 2017, the overstatement had increased to at least $191 million.  By January 2018, the overstatement had nearly doubled, to at least $364 million.

**G.    DLIF Commingles Investor Money so that It Can Use Funds by New Investors to Pay Redemptions**

144.   Substantial redemptions and distributions were financed by fundraising efforts and paid from the commingled funds of the victims.

145.   From the inception of DLI and DLIF, investor money was commingled with other investor money and loan portfolio proceeds. Some investor money was directed into the Master Fund's subsidiaries to make actual investments, while some investor money never even made it that far and was used to pay redemptions to other investors before the funds had ever been invested.

146.   For the new investor money that was actually directed to the Master Fund's subsidiaries to make investments, investor money was generally received by

DLIF into subscription bank accounts. Those monies were then generally transferred to the DLIF sweep bank account, then to the Master Fund's sweep bank accounts, and then to the DLIAB sweep account used for funding loans to the Counterparties. Some of those monies that actually made it to DLIAB were just cycled back to the DLIF bank account as purported loan profits from Counterparties, leading to the overstatement of the NAV and fictitious profits paid to DLIF investors, such as the Transfers made to each of the Fund Defendants.

147.   Some of the new DLIF investor monies, however, never made it to the Master Fund bank account. Instead, the DLIF investor funds were deposited directly into the redemption bank account of DLIF to pay prior DLIF investors. Ross, with fraudulent intent, sought new investor monies that were used to pay earlier investors their promised returns.

148.   From inception to March 2019, $945.3 million was paid to investors who redeemed, like the Fund Defendants. However, only $192.4 million of those redemptions, or 20%, came from portfolio investments. Because the funds from new investments and payments from Counterparties were commingled, it would not be reasonably possible to trace the actual funds paid to any of the Fund Defendants to any legitimate business revenue.

149.   Nearly 60% of the monies paid to earlier investors in connection with their redemption and distribution requests ($560.4 million) came from subscriptions from new investors. Another 20% came from the outright sale of participation proceeds.

## H.   Ponzi Scheme Indicia and Badges of Fraud

150.   There are numerous indicia that DLIF was operating as a Ponzi scheme at least as of April 30, 2016. Even if not an established Ponzi scheme, the factors set forth herein constitute sufficient badges of fraud that establish that the Transfers, including the Fictitious Profits, were made by DLIF with actual fraudulent intent.

151.   Although DLI invested some of the DLIF investor funds in loan portfolios that involved some counterparties that had legitimate business operations, the investment in those loan portfolios was overrun by the pervasive fraud run by Ross, DLI, and DLIF in operating an investment scheme that fraudulently lured in investors, made ongoing misrepresentations to try to hold on to investor funds, and paid false returns to investors that sought to redeem to keep the scheme from collapsing. The fraudulent operations by DLI and DLIF directly resulted in the respective Fictitious Profits being paid to each of the Fund Defendants. When each of the Fund Defendants fully redeemed its investment between December 8, 2016 and December 31, 2018 (on the specific dates set forth in Exhibit "1"), DLIF, under the control of Ross, and DLI, paid the respective Fictitious Profits to each of the Fund Defendants with actual fraudulent intent as part of the massive fraudulent enterprise that generated those respective Fictitious Profits.

152.   As set forth above, DLIF, DLI and Ross grossly overstated to investors both the value of the DLI-managed funds and made other material misrepresentations and omissions with the intent to defraud investors. Such misrepresentations and overstatements were made to the Fund Defendants prior to and at the time the Transfers were made.

153.   As set forth above, later DLIF investor funds were used to pay earlier DLIF investors, including each of the Fund Defendants.

154.   As set forth above, funds were commingled, as DLIF failed to maintain separate investor accounts.  DLI even caused DLIF to use new investments to pay old investments without even bothering to direct the monies received to the Master Fund subsidiaries to be invested. The funds used to make the Transfers to each of the Fund Defendants were paid from funds that were commingled with other investors' money.

155.   Later investors generally received lower returns than earlier investors with initial reported net returns as high as 13% and later reported returns as low as 7%, on an annualized basis.

156.   To entice investments, DLI also caused DLIF often to pay 20% commission to broker dealers and finders, generally based on overstated NAVs.

157.   DLIF, through Ross, tried to avoid redemptions by encouraging investors to extend their investments rather than receive back their principal.  The redemptions that were completed, including the Transfers to each of the Fund Defendants, were made in furtherance of DLIF's fraud and Ponzi scheme.

158.   Ross, as DLI's sole member, benefited from his scheme, including by (1) taking payments and allocations of at least $31.4 million from DLI; (2) profiting from investments in companies in the "FinTech" lending space hoping to capitalize on the growth in that sector, while personally aggrandizing himself as an investment guru and claiming to be an expert on investing money through non-traditional loans to new businesses; (3) having DLI receive its own return from its investment of fees of $17.6 million in redemptions in excess of principal invested at a time when DLIF could not even satisfy redemption requests or pay promised returns to legitimate investors; and (4) causing the DLI-managed funds to increase their investment in bad or fraudulent investments in which Ross had a personal stake.

## I.   **DLIF was Insolvent When the Transfer was Made**

159.   As of at least April 30, 2016, DLIF was insolvent. As of April 30, 2016, DLIF had liabilities totaling $483 million and assets of $478 million. Under a balance sheet test, DLIF was insolvent as the sum of its liabilities were greater than the sum of its assets at a fair valuation. It remained insolvent at least from then to April 1, 2019, when the Receiver was appointed.

160.   DLIF was not engaged in profitable activity that could have led to the repayment of all net invested capital of the DLIF investors, let alone the promised returns.

161.   At the time the Transfers were made, DLIF operated with unreasonably small capital, as it did not have the ability to repay investors' capital with promised profits.

162.   In light of the pervasive fraud, all investors of DLIF had a claim of restitution and rescission up to the unpaid amounts of their initial investments, all of which were liabilities of DLIF. Those liabilities were not contingent.

163.   As a Ponzi Scheme, DLIF was inherently insolvent at all times since at least April 30, 2016.

## J.   DLI's Operations Caused Substantial Investor Losses

164.   DLI's overall business operations of the Master Fund caused losses to the investment portfolio and an estimated $250.7 million in aggregate investor cash losses.

165.   The investors who remained in DLIF when the Receiver was appointed have claims in the receivership, generally at the Class 4B level pursuant to the Court-approved distribution plan (the "Distribution Plan").[15] The net proceeds from this lawsuit will to be used to pay those Class 4B investors who have been damaged by the scheme and the Transfers made to each of the Fund Defendants. To date, those creditors have been paid back approximately a minimum 31% of their investment based on the rising tide Distribution Plan, with an additional 12% pending approval by the Court.

166.   The Receiver estimates that investors in Class 4B will have aggregate losses in excess of $100 million even if the entire DLI portfolio is unwound and the Receiver is able to collect all of the fictitious profits that were paid to other DLIF investors.

167.   The Class 4B investors are creditors of DLI and DLIF.

168.   DLI and DLIF currently have one or more creditors whose claim arose

---

[15] *SEC vs. Direct Lending Investments, LLC*, Case No. 2:19-cv-2188-DSF-MRW (C.D. Cal.), Dkt. No. 337 (approving Dkt. No. 321).

before DLIF made payments to each of the Fund Defendants in excess of that Fund Defendant's Principal investment. One such example of such a creditor is identified as Generic Investor I.D. No. 128, who held a claim of $1,000,000 as of May 27, 2014 that grew to $4,000,000 as of July 26, 2016. That claim remained unpaid and outstanding as of the date of the Receiver's appointment.

169.   DLI and DLIF currently have one or more creditors whose claim arose after DLIF made payments to each of the Fund Defendants in excess of that Fund Defendant's Principal investment. One such example of such a creditor is identified as Generic Investor I.D. No. 1831, who held a claim of $5,000,000 as of December 31, 2018. That claim remained unpaid and outstanding as of the date of the Receiver's appointment.

## **FIRST CLAIM FOR RELIEF**

**(For Avoidance and Recovery of Fraudulent Transfers Pursuant to California Civil Code § 3439.04(a)(1), 3439.07(a)(1), and 3439.08(b) and California Common Law against Defendants)**

170.   The Receiver incorporates by this reference paragraphs 1 through 169, above, as though set forth herein in full.

171.   This is a claim to avoid and recover fraudulent transfers pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyance.

172.   The Receiver may recover the Transfers for the benefit of the estate from the Fund Defendants or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (b)(2).

173.   The Fund Defendants began investing in DLIF at various dates between January 26, 2016 and April 28, 2017, as is specified in Exhibit "1," pursuant to the terms of the Subscription Agreements as set forth in Exhibits "3" through "35."

174.   Each of the Fund Defendants received its respective Transfers from DLIF in the amounts summarized in Exhibit "1" and set forth in Exhibits "36" through "68."

175.   As a result of the payments made by DLIF, each of the Fund Defendants received its respective Fictitious Profits in the amounts summarized in Exhibit "1" and set forth in Exhibits "36" through "68."

176.   The Transfers made to each of the Fund Defendants by DLIF were made with the actual intent to hinder, delay, or defraud DLIF's creditors.

177.   The Transfers made to each of the Fund Defendants by DLIF were also made in furtherance of DLIF's fraud and Ponzi scheme.

178.   The Transfers to each of the Fund Defendants was made as a part of DLIF's fraud. DLIF, through the Master Fund and its subsidiaries, entered into the underlying investments in furtherance of the DLIF fraudulent scheme. These sham transactions provided DLIF with the funds it required to satisfy already existing obligations that were part of the fraudulent scheme. Furthermore, DLIF entered into additional transactions with other investors at a later time that ultimately provided DLIF the funds necessary to pay each of the Fund Defendants its respective Transfers. This pattern of conduct of using new money to pay earlier obligations constitutes a Ponzi scheme or similar fraud whereby funds received from later fraudulent transactions were used to fund prior obligations.

179.   As alleged herein, there are a multitude of badges of fraud present with respect to the Transfers made to the Defendant. The existence and sheer number of the badges of fraud present in this matter, present at the time of each of the Transfers to each of the Fund Defendants, indicate that DLIF intended to hinder, delay, or defraud its creditors.

180.   DLIF and the other Receivership Entities had creditors whose claims arose before the Transfers were made to each Fund Defendant.

181.   DLIF had the actual intent to delay, hinder, or defraud creditors, and made

37

the Transfers to delay, hinder, or defraud creditors. Consequently, the Transfers were fraudulent pursuant to Cal. Civil Code § 3439.04(a)(1) and pursuant to California common law on fraudulent conveyances.

182.   Because the Transfers are voidable under Cal. Civil Code § 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver may avoid the Transfers, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent transfers.

183.   The Receiver may recover the Transfers for the benefit of the Receivership Estate from the Fund Defendants or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

184.   As a direct and proximate result of DLIF's fraudulent Transfers to the Fund Defendants, DLIF and the Receivership Estate have been diminished by in excess of $166 million, and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership Entities.

185.   The Receiver is entitled to damages from each Fund Defendant of not less than the following amount for each Fund Defendant, with interest as provided by law from the date of each payment:

| Fund Defendant | Transfers |
| --- | --- |
| GB US Fintech Income Fund of Funds #1 | $7,074,903.98 |
| GB US Fintech Income Fund of Funds #2 | $4,299,659.38 |
| GB US Fintech Income Fund of Funds #3 | $3,931,675.81 |
| GB US Fintech Income Fund of Funds #4 | $2,558,197.55 |
| GB US Fintech Income Fund of Funds #5 | $2,357,997.35 |
| GB US Fintech Income Fund of Funds #6 | $4,270,171.99 |
| GB US Fintech Income Fund of Funds #7 | $4,501,255.99 |
| GB US Fintech Income Fund of Funds #8 | $5,967,517.62 |
| GB US Fintech Income Fund of Funds #9 | $4,336,428.34 |
| GB US Fintech Income Fund of Funds #10 | $1,624,886.09 |
| GB US Fintech Income Fund of Funds #11 | $5,191,820.96 |
| GB US Fintech Income Fund of Funds #12 | $9,032,400.98 |
| GB US Fintech Income Fund of Funds #13 | $6,354,517.17 |
| GB US Fintech Income Fund of Funds #14 | $6,563,149.67 |
| GB US Fintech Income Fund of Funds #15 | $3,888,506.88 |

| Fund Defendant | Transfers |
|---|---|
| GB US Fintech Income Fund of Funds #16 | $3,206,277.73 |
| JB US Fin-Tech Fund of funds #1 | $6,004,437.98 |
| JB US Fin-Tech Fund of funds #2 | $7,194,899.86 |
| JB US Fin-Tech Fund of funds #3 | $4,303,687.46 |
| JB US Fin-Tech Fund of funds #4 | $4,255,862.45 |
| JB US Fin-Tech Fund of funds #5 | $4,893,651.15 |
| JB US Fin-Tech Fund of funds #6 | $4,897,168.64 |
| JB US Fin-Tech Fund of funds #7 | $6,278,224.91 |
| JB US Fin-Tech Fund of funds #8 | $5,766,251.04 |
| JB US Fin-Tech Fund of funds #9 | $3,687,579.92 |
| JB US Fin-Tech Fund of funds #10 | $6,508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $5,091,282.31 |
| JB US Fin-Tech Fund of funds #12 | $3,185,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $6,109,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $12,105,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $2,822,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $5,583,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $2,764,465.74 |
| **Total** | **$166,611,118.64** |

186.   The Receiver is entitled to damages from the Trustee Defendants and the Manager Defendants a sum according to proof of all sums paid to them an account of commissions, fees or other payment, with interest as provided by law from the date of each payment.

**SECOND CLAIM FOR RELIEF**

**(For Avoidance and Recovery of Fraudulent Transfers Pursuant to California Civil Code §§ 3439.04(a)(2), 3439.05, 3439.07(a)(1), and 3439.08(b) and California Common Law against Defendants)**

187.   The Receiver incorporates by this reference paragraphs 1 through 186, above, as though set forth herein in full.

188.   This is a claim to avoid and recover fraudulent transfers, pursuant to Cal. Civil Code, §§ 3439.04(a)(2) and 3439.05 and pursuant to California common law on fraudulent transfers.

189.   The Receiver may recover the Fictitious Profits for the benefit of the estate from the Fund Defendants or from the entity or entities for whose benefit the Fictitious Profits were made, or any immediate or mediate transferee of such initial

transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

190.   DLIF transferred the respective Fictitious Profits to the each of the Fund Defendants.

191.   The respective Fictitious Profits were transferred to each Fund Defendant without each such Fund Defendant giving a reasonably equivalent value to DLIF in exchange for those Fictitious Profits.

192.   At the time the respective Fictitious Profits were paid to each Fund Defendant, DLIF was engaged in or was about to engage in a business or transaction for which DLIF's remaining assets were unreasonably small in relation to the business or transaction.

193.   At the time the respective Fictitious Profits were paid to each Fund Defendant, DLIF was insolvent and/or was engaged or was about to engage in a business or a transaction for which the remaining assets of DLIF was unreasonably small in relation to the business or transaction.

194.   At the time the respective Fictitious Profits were paid to each Fund Defendant, DLIF intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay them as they became due.

195.   The respective Fictitious Profits paid to each Fund Defendant by DLIF were also paid in furtherance of DLIF's fraud and Ponzi scheme.

196.   DLIF and the other Receivership Entities had creditors whose claims arose before the Fictitious Profits were paid to each Fund Defendant.

197.   The transfer of the respective Fictitious Profits to each Fund Defendant are avoidable by the Receiver.

198.   Because the payment of the Fictitious Profits is fraudulent under Cal. Civil Code §§ 3439.04(a)(2) and 3439.05, the Receiver may avoid the payment of the Fictitious Profits, pursuant to Cal. Civil Code §§ 3439.07(a)(1) and 3439.08(b)(2) and pursuant to California common law on fraudulent conveyances.

199.   The Receiver may recover the Fictitious Profits for the benefit of the estate from the Fund Defendants or from the entity or entities for whose benefit the Fictitious Profits were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

200.   As a direct and proximate result of DLIF's fraudulent transfers of the Fictitious Profits to the Fund Defendants, DLIF and the Receivership Estate have been diminished by in excess of $15.9 million and the remaining assets of DLIF and the Receivership Estate are insufficient to pay DLIF's and the Receivership Estate's debts and liabilities, including, most notably, the claims of the investors of DLIF who were defrauded by the Receivership Entities.

201.   The Receiver is entitled to damages from each Fund Defendant of not less than the following amount for each Fund Defendant, with interest as provided by law from the date of each payment:

| Fund Defendant | Fictitious Profits |
| --- | --- |
| GB US Fintech Income Fund of Funds #1 | $609,903.98 |
| GB US Fintech Income Fund of Funds #2 | $370,659.38 |
| GB US Fintech Income Fund of Funds #3 | $324,675.81 |
| GB US Fintech Income Fund of Funds #4 | $200,197.55 |
| GB US Fintech Income Fund of Funds #5 | $181,997.35 |
| GB US Fintech Income Fund of Funds #6 | $334,171.99 |
| GB US Fintech Income Fund of Funds #7 | $352,255.99 |
| GB US Fintech Income Fund of Funds #8 | $467,001.62 |
| GB US Fintech Income Fund of Funds #9 | $338,628.34 |
| GB US Fintech Income Fund of Funds #10 | $126,886.09 |
| GB US Fintech Income Fund of Funds #11 | $405,425.27 |
| GB US Fintech Income Fund of Funds #12 | $694,100.98 |
| GB US Fintech Income Fund of Funds #13 | $488,317.17 |
| GB US Fintech Income Fund of Funds #14 | $504,349.67 |
| GB US Fintech Income Fund of Funds #15 | $291,506.88 |
| GB US Fintech Income Fund of Funds #16 | $200,466.47 |
| JB US Fin-Tech Fund of funds #1 | $499,437.98 |
| JB US Fin-Tech Fund of funds #2 | $1,093,899.86 |
| JB US Fin-Tech Fund of funds #3 | $210,687.46 |
| JB US Fin-Tech Fund of funds #4 | $205,862.45 |
| JB US Fin-Tech Fund of funds #5 | $423,651.15 |
| JB US Fin-Tech Fund of funds #6 | $422,168.64 |
| JB US Fin-Tech Fund of funds #7 | $541,224.91 |
| JB US Fin-Tech Fund of funds #8 | $451,251.04 |
| JB US Fin-Tech Fund of funds #9 | $288,579.92 |
| JB US Fin-Tech Fund of funds #10 | $508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $386,282.31 |
| JB US Fin-Tech Fund of funds #12 | $236,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $1,206,893.77 |

| Fund Defendant | Fictitious Profits |
|---|---|
| KAIC US Fin-Tech Fund of funds #3 | $2,151,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $247,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $943,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $197,465.74 |
| **Total** | **$15,904,295.69** |

202.   The Receiver is entitled to damages from the Trustee Defendants and the Manager Defendants a sum according to proof of all sums paid to them an account of commissions, fees or other payment, with interest as provided by law from the date of each payment.

### THIRD CLAIM FOR RELIEF

### (For Unjust Enrichment against the Fund Defendants and Trustee Defendants)

203.   The Receiver incorporates by this reference paragraphs 1 through 202, above, as though set forth herein in full.

204.   DLIF conferred a benefit on each Fund Defendant when it made the payment of the Fictitious Profits, which were derived from monies invested by the DLIF investors, who were owed fiduciary duties by DLIF.

205.   As a direct and proximate result of each Fund Defendant's retention of the Fictitious Profits transferred to them, DLIF and the Receivership Estate have been diminished and, under the circumstances, equity dictates that each Fund Defendant should return the Fictitious Profits they received from DLIF and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors. Each Fund Defendant had knowledge of the benefit it received from DLIF as a result of the payment of the Fictitious Profits and voluntarily accepted and retained the benefit conferred.

206.   When DLIF made the transfer of the respective Fictitious Profits to each Fund Defendant, that Fund Defendant received fictitious profits in excess over that Fund Defendant's Principal investment.

207.   Those Fictitious Profits were not the result of legitimate business activities, but rather provided to each Fund Defendant in furtherance of the fraud systemic throughout DLI and DLIF.

208.   Had the NAV been correctly stated as of the date each Fund Defendant received the Fictitious Profits, that Fund Defendant would not have received its respective Fictitious Profits.

209.   Each Fund Defendant was therefore unjustly enriched by an overpayment of the amount specified in the amount specified in the "Fictitious Profits" column in Exhibit "1," when Defendant fully redeemed each of those investments.

210.   The overpayment of the Fictitious Profits to each of the Fund Defendants came at the expense of the Receivership Entities.

211.   The Receiver could not and did have any knowledge of the Fictitious Profits before April 1, 2019, the day of his appointment.

212.   As a direct and proximate result of each Fund Defendant's retention of the Fictitious Profits transferred to them, DLIF and the Receivership Estate have been diminished and, under the circumstances, equity dictates that each Fund Defendant should return the Fictitious Profits they received from DLIF and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors.

213.   The Receiver is entitled to damages from each Fund Defendant of not less than the following amount for each Fund Defendant, with interest as provided by law from the date of the full redemption:

| Fund Defendant | Unjust Enrichment |
| --- | --- |
| GB US Fintech Income Fund of Funds #1 | $609,903.98 |
| GB US Fintech Income Fund of Funds #2 | $370,659.38 |
| GB US Fintech Income Fund of Funds #3 | $324,675.81 |
| GB US Fintech Income Fund of Funds #4 | $200,197.55 |
| GB US Fintech Income Fund of Funds #5 | $181,997.35 |
| GB US Fintech Income Fund of Funds #6 | $334,171.99 |
| GB US Fintech Income Fund of Funds #7 | $352,255.99 |
| GB US Fintech Income Fund of Funds #8 | $467,001.62 |
| GB US Fintech Income Fund of Funds #9 | $338,628.34 |
| GB US Fintech Income Fund of Funds #10 | $126,886.09 |
| GB US Fintech Income Fund of Funds #11 | $405,425.27 |

| Fund Defendant | Unjust Enrichment |
|---|---|
| GB US Fintech Income Fund of Funds #12 | $694,100.98 |
| GB US Fintech Income Fund of Funds #13 | $488,317.17 |
| GB US Fintech Income Fund of Funds #14 | $504,349.67 |
| GB US Fintech Income Fund of Funds #15 | $291,506.88 |
| GB US Fintech Income Fund of Funds #16 | $200,466.47 |
| JB US Fin-Tech Fund of funds #1 | $499,437.98 |
| JB US Fin-Tech Fund of funds #2 | $1,093,899.86 |
| JB US Fin-Tech Fund of funds #3 | $210,687.46 |
| JB US Fin-Tech Fund of funds #4 | $205,862.45 |
| JB US Fin-Tech Fund of funds #5 | $423,651.15 |
| JB US Fin-Tech Fund of funds #6 | $422,168.64 |
| JB US Fin-Tech Fund of funds #7 | $541,224.91 |
| JB US Fin-Tech Fund of funds #8 | $451,251.04 |
| JB US Fin-Tech Fund of funds #9 | $288,579.92 |
| JB US Fin-Tech Fund of funds #10 | $508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $386,282.31 |
| JB US Fin-Tech Fund of funds #12 | $236,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $1,206,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $2,151,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $247,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $943,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $197,465.74 |
| **Total** | **$15,904,295.69** |

## FOURTH CLAIM FOR RELIEF

**(For Avoidance and Recovery of Fraudulent Transfers Pursuant to California Civil Code §§ 3439.04(a)(2), 3439.05, 3439.07(a)(1) and 3439.08(b) and California Common Law against the Trustee Defendants and the Manager Defendants)**

214.   The Receiver incorporates by this reference paragraphs 1 through 213, above, as though set forth herein in full.

215.   The Receiver may avoid and recover the Transfers for the benefit of the estate from the Fund Defendants or from the entity or entities for whose benefit the Transfers were made, or any immediate or mediate transferee of such initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (b)(2).

216.   The Transfers, including any other transfers from DLIF to the Fund Defendants discovered after the date of this Complaint, are recoverable from the Fund Defendants.

217.   The GBAM Fund Defendants transferred a portion of the Transfers they

received from DLIF to GBAM as a management fee or otherwise (the "GBAM Subsequent Transfers"), in an amount to be determined at trial.

218.   GBAM did not provide reasonably equivalent value to the GBAM Fund Defendants or otherwise in exchange for that GBAM Subsequent Transfers.

219.   The JBAM Fund Defendants transferred a portion of the Transfers they received from DLIF to JBAM as a management fee or otherwise (the "JBAM Subsequent Transfers"), in an amount to be determined at trial.

220.   JBAM did not provide reasonably equivalent value to the JBAM Fund Defendants or otherwise in exchange for that JBAM Subsequent Transfers.

221.   The KAIC Fund Defendants transferred a portion of the Transfers they received from DLIF to KAIC as a management fee or otherwise (the "KAIC Subsequent Transfers"), in an amount to be determined at trial.

222.   KAIC did not provide reasonably equivalent value to the KAIC Fund Defendants or otherwise in exchange for that KAIC Subsequent Transfers.

223.   Some or all of the Fund Defendants transferred a portion of the Transfers they received from DLIF to Shinhan as a trustee services fee, a sales agent fee, or otherwise (the "Shinhan Subsequent Transfers"), in an amount to be determined at trial.

224.   Shinhan did not provide reasonably equivalent value to any of the Fund Defendants or otherwise in exchange for that Shinhan Subsequent Transfers.

225.   Some or all of the Fund Defendants transferred a portion of the Transfers they received from DLIF to Kookmin as a trustee services fee, a sales agent fee, or otherwise (the "Kookmin Subsequent Transfers"), in an amount to be determined at trial.

226.   Kookmin did not provide reasonably equivalent value to any of the Fund Defendants or otherwise in exchange for that Kookmin Subsequent Transfers.

227.   Some or all of the Fund Defendants transferred a portion of the Transfers they received from DLIF to KSFC as a trustee services fee, a sales agent fee, or

1   otherwise (the "KSFC Subsequent Transfers"), in an amount to be determined at trial.

2   228.   KSFC did not provide reasonably equivalent value to any of the Fund

3   Defendants or otherwise in exchange for that KSFC Subsequent Transfers.

4   229.   Because the GBAM Subsequent Transfers, the JBAM Subsequent

5   Transfers, the KAIC Subsequent Transfers, the Shinhan Subsequent Transfers, the

6   Kookmin Subsequent Transfers, and the KSFC Subsequent Transfers (collectively, the

7   "Manager and Trustee Subsequent Transfers") are voidable under Cal. Civil Code

8   § 3439.04(a)(1) and under California common law on fraudulent transfers, the Receiver

9   may avoid the Manager and Trustee Subsequent Transfers, pursuant to Cal. Civil Code

10  §§ 3439.07(a)(1) and 3439.08(b)(2) and under California common law on fraudulent

11  transfers.

12  230.   The Receiver may recover the Manager and Trustee Subsequent

13  Transfers for the benefit of the estate from the respective Manager and Trustee

14  Defendants or from the entity or entities for whose benefit the Manager and Trustee

15  Subsequent Transfers were made, or any immediate or mediate transferee of such

16  initial transferee pursuant to Cal. Civil Code § 3439.08(b)(1) and (2).

17  231.   Whether each Manager and Trustee Defendant is the first transferee, an

18  immediate or mediate transferee, the Receiver may avoid and recover the amount of

19  the respective the respective Manager and Trustee Subsequent Transfers paid to such

20  Manager or Trustee Defendant pursuant to Cal. Civil Code § 3439.08(b)(1).

21  232.   The Receiver is entitled to damages from the Manager and Trustee

22  Defendants in a sum of not less than the amount of the Manager and Trustee

23  Subsequent Transfers, with interest as provided by law from the date of each such

24  payment received by such Manager or Trustee Defendant.

## **PRAYER FOR RELIEF**

26  WHEREFORE, the Receiver respectfully requests that this Court enter

27  judgment as follows:

28

**On the First Cause of Action:**

1.   For judgment avoiding and recovering the Transfers to each Defendant;

2.   For judgment against each Fund Defendant in the amount as follows:

| Fund Defendant | Transfers |
|---|---|
| GB US Fintech Income Fund of Funds #1 | $7,074,903.98 |
| GB US Fintech Income Fund of Funds #2 | $4,299,659.38 |
| GB US Fintech Income Fund of Funds #3 | $3,931,675.81 |
| GB US Fintech Income Fund of Funds #4 | $2,558,197.55 |
| GB US Fintech Income Fund of Funds #5 | $2,357,997.35 |
| GB US Fintech Income Fund of Funds #6 | $4,270,171.99 |
| GB US Fintech Income Fund of Funds #7 | $4,501,255.99 |
| GB US Fintech Income Fund of Funds #8 | $5,967,517.62 |
| GB US Fintech Income Fund of Funds #9 | $4,336,428.34 |
| GB US Fintech Income Fund of Funds #10 | $1,624,886.09 |
| GB US Fintech Income Fund of Funds #11 | $5,191,820.96 |
| GB US Fintech Income Fund of Funds #12 | $9,032,400.98 |
| GB US Fintech Income Fund of Funds #13 | $6,354,517.17 |
| GB US Fintech Income Fund of Funds #14 | $6,563,149.67 |
| GB US Fintech Income Fund of Funds #15 | $3,888,506.88 |
| GB US Fintech Income Fund of Funds #16 | $3,206,277.73 |
| JB US Fin-Tech Fund of funds #1 | $6,004,437.98 |
| JB US Fin-Tech Fund of funds #2 | $7,194,899.86 |
| JB US Fin-Tech Fund of funds #3 | $4,303,687.46 |
| JB US Fin-Tech Fund of funds #4 | $4,255,862.45 |
| JB US Fin-Tech Fund of funds #5 | $4,893,651.15 |
| JB US Fin-Tech Fund of funds #6 | $4,897,168.64 |
| JB US Fin-Tech Fund of funds #7 | $6,278,224.91 |
| JB US Fin-Tech Fund of funds #8 | $5,766,251.04 |
| JB US Fin-Tech Fund of funds #9 | $3,687,579.92 |
| JB US Fin-Tech Fund of funds #10 | $6,508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $5,091,282.31 |
| JB US Fin-Tech Fund of funds #12 | $3,185,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $6,109,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $12,105,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $2,822,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $5,583,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $2,764,465.74 |
| **Total** | **$166,611,118.64** |

3.   For interest at the legal rate from the date of the Transfers.

**On the Second Cause of Action:**

4.   For judgment avoiding and recovering the Fictitious Profits paid to each Defendant;

5.   For judgment against each Fund Defendant in the amount as follows:

| Fund Defendant | Fictitious Profits |
|---|---|
| GB US Fintech Income Fund of Funds #1 | $609,903.98 |
| GB US Fintech Income Fund of Funds #2 | $370,659.38 |

| Fund Defendant | Fictitious Profits |
|---|---|
| GB US Fintech Income Fund of Funds #3 | $324,675.81 |
| GB US Fintech Income Fund of Funds #4 | $200,197.55 |
| GB US Fintech Income Fund of Funds #5 | $181,997.35 |
| GB US Fintech Income Fund of Funds #6 | $334,171.99 |
| GB US Fintech Income Fund of Funds #7 | $352,255.99 |
| GB US Fintech Income Fund of Funds #8 | $467,001.62 |
| GB US Fintech Income Fund of Funds #9 | $338,628.34 |
| GB US Fintech Income Fund of Funds #10 | $126,886.09 |
| GB US Fintech Income Fund of Funds #11 | $405,425.27 |
| GB US Fintech Income Fund of Funds #12 | $694,100.98 |
| GB US Fintech Income Fund of Funds #13 | $488,317.17 |
| GB US Fintech Income Fund of Funds #14 | $504,349.67 |
| GB US Fintech Income Fund of Funds #15 | $291,506.88 |
| GB US Fintech Income Fund of Funds #16 | $200,466.47 |
| JB US Fin-Tech Fund of funds #1 | $499,437.98 |
| JB US Fin-Tech Fund of funds #2 | $1,093,899.86 |
| JB US Fin-Tech Fund of funds #3 | $210,687.46 |
| JB US Fin-Tech Fund of funds #4 | $205,862.45 |
| JB US Fin-Tech Fund of funds #5 | $423,651.15 |
| JB US Fin-Tech Fund of funds #6 | $422,168.64 |
| JB US Fin-Tech Fund of funds #7 | $541,224.91 |
| JB US Fin-Tech Fund of funds #8 | $451,251.04 |
| JB US Fin-Tech Fund of funds #9 | $288,579.92 |
| JB US Fin-Tech Fund of funds #10 | $508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $386,282.31 |
| JB US Fin-Tech Fund of funds #12 | $236,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $1,206,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $2,151,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $247,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $943,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $197,465.74 |
| **Totals** | **$15,904,295.69** |

6.   For interest at the legal rate from the date of the payment of the Fictitious Profits.

**On the Third Cause of Action:**

7.   For judgment against each Fund Defendant in the amount as follows:

| Fund Defendant | Unjust Enrichment |
|---|---|
| GB US Fintech Income Fund of Funds #1 | $609,903.98 |
| GB US Fintech Income Fund of Funds #2 | $370,659.38 |
| GB US Fintech Income Fund of Funds #3 | $324,675.81 |
| GB US Fintech Income Fund of Funds #4 | $200,197.55 |
| GB US Fintech Income Fund of Funds #5 | $181,997.35 |
| GB US Fintech Income Fund of Funds #6 | $334,171.99 |
| GB US Fintech Income Fund of Funds #7 | $352,255.99 |
| GB US Fintech Income Fund of Funds #8 | $467,001.62 |
| GB US Fintech Income Fund of Funds #9 | $338,628.34 |
| GB US Fintech Income Fund of Funds #10 | $126,886.09 |
| GB US Fintech Income Fund of Funds #11 | $405,425.27 |
| GB US Fintech Income Fund of Funds #12 | $694,100.98 |

48

| Fund Defendant | Unjust Enrichment |
|---|---|
| GB US Fintech Income Fund of Funds #13 | $488,317.17 |
| GB US Fintech Income Fund of Funds #14 | $504,349.67 |
| GB US Fintech Income Fund of Funds #15 | $291,506.88 |
| GB US Fintech Income Fund of Funds #16 | $200,466.47 |
| JB US Fin-Tech Fund of funds #1 | $499,437.98 |
| JB US Fin-Tech Fund of funds #2 | $1,093,899.86 |
| JB US Fin-Tech Fund of funds #3 | $210,687.46 |
| JB US Fin-Tech Fund of funds #4 | $205,862.45 |
| JB US Fin-Tech Fund of funds #5 | $423,651.15 |
| JB US Fin-Tech Fund of funds #6 | $422,168.64 |
| JB US Fin-Tech Fund of funds #7 | $541,224.91 |
| JB US Fin-Tech Fund of funds #8 | $451,251.04 |
| JB US Fin-Tech Fund of funds #9 | $288,579.92 |
| JB US Fin-Tech Fund of funds #10 | $508,222.03 |
| JB US Fin-Tech Fund of funds #11 | $386,282.31 |
| JB US Fin-Tech Fund of funds #12 | $236,587.89 |
| KAIC US Fin-Tech Fund of funds #1 | $1,206,893.77 |
| KAIC US Fin-Tech Fund of funds #3 | $2,151,244.90 |
| KAIC US Fin-Tech Fund of funds #4 | $247,272.44 |
| KAIC US Fin-Tech Fund of funds #5 | $943,018.66 |
| KAIC US Fin-Tech Fund of funds #9 | $197,465.74 |
| **Totals** | **$15,904,295.69** |

8.     For interest at the legal rate from the date of the payment of Fictitious Profits.

**On the Fourth Cause of Action:**

9.     For judgment against Defendant GBAM for the amount of the GBAM Subsequent Transfers.

10.     For judgment against Defendant JBAM for the amount of the JBAM Subsequent Transfers.

11.     For judgment against Defendant KAIC for the amount of the KAIC Subsequent Transfers.

12.     For judgment against Defendant Shinhan for the amount of the Shinhan Subsequent Transfers.

13.     For judgment against Defendant Kookmin for the amount of the Kookmin Subsequent Transfers.

14.     For judgment against Defendant KSFC for the amount of the KSFC Subsequent Transfers.

15.   For interest at the legal rate from the date of the payment of such Subsequent Transfers.

**On All Claims for Relief**

16.   For costs.

17.   For such other and further relief as the Court deems appropriate.

## <u>JURY TRIAL DEMAND</u>

The Receiver respectfully demands a trial by jury of all issues triable to a jury.

RAINES FELDMAN LLP

DATED:   November 23, 2021

By:   */s/ Kathy Bazoian Phelps*
Kathy Bazoian Phelps
David Castleman
Counsel for Bradley D. Sharp,
Permanent Receiver

50