# EXHIBIT 2

KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone: (310) 651-2997

CHRISTOPHER D. SULLIVAN (148083)
*csullivan@diamondmccarthy.com*
STACEY L. PRATT (124892)
*stacey.pratt@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>DIRECT LENDING INVESTMENTS LLC,<br><br>     Defendant. | Case No. 2:19−cv−02188−DSF−MRW<br>Hon. Dale S. Fischer<br><br>**RECEIVER'S REPORT REGARDING THE INVESTIGATION OF THE RECEIVERSHIP ENTITIES' BUSINESS CONDUCT AND RECOMMENDATIONS REGARDING DISTRIBUTIONS**<br><br>[No Hearing Set] |

Attached hereto as Exhibit "1" is Bradley D. Sharp, Permanent Receiver's, Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distributions dated November 13, 2020.

DATED: November 20, 2020            DIAMOND McCARTHY LLP

By:   /s/ *Kathy Bazoian Phelps*
      Kathy Bazoian Phelps
      Counsel for Bradley D. Sharp,
      Permanent Receiver

**BRADLEY D. SHARP**
**COURT-APPOINTED PERMANENT RECEIVER FOR**
**DIRECT LENDING INVESTMENTS LLC, DIRECT LENDING INCOME FUND, L.P.,**
**DIRECT LENDING INCOME FEEDER FUND, LTD., DLI CAPITAL, INC.,**
**DLI LENDING AGENT, LLC, AND DLI ASSETS BRAVO, LLC AND**
**THEIR SUCCESSORS, SUBSIDIARIES AND AFFILIATED ENTITIES**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**DIRECT LENDING INVESTMENTS LLC,**

**Defendant.**

Case No. 2:19−cv−02188−DSF−MRW

United States District Court
Central District of California
Western Division – Los Angeles

Report Regarding the Investigation of the Receivership Entities' Business Conduct and
Recommendations Regarding Distributions

by

Bradley D. Sharp, Permanent Receiver

November 13, 2020

1

**Table of Contents**

I. Summary of Purpose and Conclusions of Report ........................................................... 4

   A.   Summary of Critical Factual Findings ................................................................ 7

   B.   Summary of Conclusions .................................................................................... 9

II. The Engagement ........................................................................................................ 10

   A.   Background ........................................................................................................ 10

   B.   Scope ................................................................................................................. 11

   C.   Limitations of Report ........................................................................................ 11

   D.   Forensic Investigation ....................................................................................... 12

III. Pre-Receivership ...................................................................................................... 13

   A.   Company Overview ........................................................................................... 13

   B.   October 2016 Restructuring ............................................................................... 17

   C.   Change in Investment Focus .............................................................................. 18

   D.   SEC Regulatory Issues ...................................................................................... 21

   E.   QuarterSpot, Inc. Side Pocket ........................................................................... 22

   F.   Events Leading to Brendan Ross Resignation .................................................... 23

   G.   SEC Complaint and the Appointment of a Receiver .......................................... 24

   H.   Investors as of the Receivership Date ................................................................ 24

IV. Post-Receivership ..................................................................................................... 25

   A.   Information Recovery, Review and Analysis ..................................................... 25

   B.   Employees ......................................................................................................... 26

   C.   Leased Premises ................................................................................................ 26

   D.   Opus ................................................................................................................. 27

   E.   Tangible Personal Property ................................................................................ 27

   F.   Litigation Claims ............................................................................................... 27

V. Ponzi Scheme Analysis ............................................................................................. 29

   A.   The Definition of Ponzi Scheme ........................................................................ 29

   B.   Summary of Factors Identified in Receivership Case Demonstrating Ponzi Scheme ....... 31

   C.   Cash Sources and Uses ...................................................................................... 37

   D.   Deeper Discussion of Factors Demonstrating Ponzi Scheme ............................. 39

VI. Loan Portfolio ......................................................................................................... 58

   A.   Introduction ....................................................................................................... 58

   B.   Propped up Loan Values .................................................................................... 60

   C.   Incorrect NAVs in 2016 and 2017 ..................................................................... 63

2

D.   Estimation of Restated Values ............................................................ 64

E.   Misrepresentations to Investors ......................................................... 69

VII. Conclusion.................................................................................................... 73

Exhibits ............................................................................................................... 75

Exhibit 1 Identification of Certain Instances of Fraud ......................................... 76

Exhibit 2 Bank Accounts Included in the Report.................................................. 90

Exhibit 3 DLI's Explanation of the Master-Feeder Structure (October 2016 Restructuring)... 92

Exhibit 4 DLIF and DLIFF's Reported NAV ....................................................... 94

Exhibit 5 Observations Regarding Ross's Personal Interest in Counterparties ....................... 95

Exhibit 6 Talking Capital and VoIP Guardian Overview ...................................... 102

### I. Summary of Purpose and Conclusions of Report

This Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distributions (the "Report") has been prepared by Bradley D. Sharp (the "Receiver"), with the assistance of other professionals at Development Specialists, Inc. ("DSI") and the professional firms employed in this proceeding (together, the "Professionals"), for the purpose of providing the Court and interested parties with the results of his investigation of the facts that led to the substantial losses of investor funds and in assisting the Court in evaluating the Receiver's proposed distribution plan in the Receivership case.

The findings and conclusions in this Report are focused on the conduct of (i) Direct Lending Investments, LLC, which acted as the investment manager and is the defendant in this civil action ("DLI"); (ii) DLI Capital, Inc. ("DLI Capital"), which received capital from certain Feeder Funds (defined and described further below); with its subsidiaries DLI Assets, LLC and DLI Assets Bravo, LLC, both of which made loans and investments to borrowers, as further described below (collectively the "Master Fund"); and (iii) Direct Lending Income Fund, L.P. ("DLIF" or the "Onshore Fund"), which solicited investment from U.S. based investors.  Investment was also sought from non-U.S. investors through Direct Lending Income Feeder Fund, Ltd., a Cayman Islands exempted company ("DLIFF" or the "Offshore Fund," and together with the Onshore Fund, the "Feeder Funds").  While DLIFF is one of the Receivership Entities,[1] the liquidation and distribution of its assets is subject to a separate Cayman Islands liquidation proceeding, which proceeding is governed by Cayman Islands law and is subject to the supervision of the Grand Court of the Cayman Islands.

While the conduct described in this Report may, in certain instances, be applicable to DLIFF and its investors, the rights and potential claims of those investors against DLIFF are a matter of Cayman Islands law.  The distribution to those investors is being undertaken as part of the liquidation of DLIFF in accordance with the laws of the Cayman Islands.  Accordingly, unless otherwise expressly specified to the contrary, any conclusions in this Report in relation to the rights of investors shall mean the rights of the investors of DLIF, and such conclusions are not to be applied to the rights of the DLIFF investors.  Furthermore, this Report distinguishes between the Receivership Entities and those entities excluding DLIFF (the "U.S. Receivership Entities").  Factual statements contained herein which are applicable to the U.S. Receivership Entities are not necessarily applicable to DLIFF.

The Securities and Exchange Commission (the "SEC") filed a complaint against Defendant Direct Lending Investments, LLC ("DLI") on March 22, 2019, alleging fraud by DLI in violation of various federal securities law, including Sections 206(1) and 206(s) of the Advisors Act, Section 10(b) of the Exchange Act and Rule 10(b)(6), and Section 17(a) of the Securities Act, and

---

[1] Pursuant to April 1, 2019 (the "Receivership Date"), the Court entered the Preliminary Injunction Order and Order Appointing Permanent Receiver ("Receiver Order"), Doc. No. 10, the Receiver was appointed as the permanent Receiver over Direct Lending Investments LLC, DLIF, DLIFF, DLI Capital, Inc., DLI Lending Agent, LLC, and DLI Assets Bravo, LLC, and their successors, subsidiaries and affiliated entities (the "Receivership Entities").

Section 207 of the Advisers Act (the "Complaint").[2]  The SEC alleges in the Complaint that "this matter concerns a multi-year fraud perpetrated by DLI, a registered investment adviser, through its then-principal, Brendan Ross ("Ross"), which resulted in approximately $11 million in over-charges of management and performance fees to fund investors, and the inflation of DLI's private funds' returns."

On August 11, 2020, Ross, the former chief executive officer of DLI, was arrested by special agents of the FBI following a grand jury indictment on ten counts of wire fraud filed July 30, 2020. The indictment charges that "[b]eginning no later than in or about December 2013, and continuing to in or about March 2019 . . . defendant Ross, and others known and unknown to the Grand Jury, knowingly with the intent to defraud, devised, participated in, and executed a scheme to defraud the [f]unds, their investors, and Purchaser 1 as to material matters, and to obtain money and property from the victims by means of material, false and fraudulent pretenses, representations and promises, and the concealment of material facts."[3]  Further, "between April 2014 and January 2018, as a result of false and fraudulent monthly reports that Ross caused Company 1 to prepare, Ross caused the Fund's monthly asset values to be cumulatively inflated by over $300 million."[4]

In conjunction with the indictment in the criminal case, the SEC filed a civil complaint in the United States District Court for the Central District of California alleging Ross defrauded investors of DLI, and seeking disgorgement of all funds received from his illegal conduct and civil penalties. The SEC alleges Ross engaged in fraud as an investment adviser; committed fraud in connection with the purchase and sale of securities; and filed false registration forms with the SEC. The civil enforcement action alleges that Ross orchestrated an intricate, multi-year fraud by inflating the value and returns for an investment position held by the investment funds, starting in or around early 2014 through March 2019.[5]

Although the Complaint did not specifically allege that the Receivership Entities were operated as a Ponzi scheme, the Receiver's investigation has uncovered a pervasive fraud that morphed into a Ponzi scheme as the fraud and commingling of funds grew. That fraud, including the fraudulent misrepresentations commencing in 2012 set forth in Exhibit 1, is described in this Report. There are multiple factors revealing that the fraud turned into a Ponzi scheme, including but not limited to the fact that substantial redemptions and distributions were financed by fundraising efforts and paid from the commingled funds of similarly situated defrauded victims, and by early-2016 at the latest DLIF was insolvent.[6] Those Ponzi scheme factors are addressed in this Report for purposes of providing the full picture of the nature and extent of the fraud. The Receiver is not seeking a

---

[2] *Securities and Exchange Commission, Plaintiff, vs. Direct Lending Investments LLC, Defendant,* Case No. 2:19−cv−02188−DSF−MRW; United States District Court, Central District of California, Western Division – Los Angeles District. An organizational chart of relevant entities is included on page 14.
[3] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-00327-CSF, United States District Court, Central District of California, Indictment, at ¶19.
[4] *Id.* at ¶ 20(d)(iii).
[5] *See Securities and Exchange Commission v. Brendan Matthew Ross*, Case No. 2:20-cv-07202, United States District Court, Central District of California, Dkt. No 1, at ¶¶ 4, 6, 8-10.
[6] As discussed further below, the Receiver concludes that DLIF was insolvent as of early 2016 based upon the restitution rights of DLIF's investors against it.  This conclusion is based upon U.S. law applicable to DLIF.  The Receiver reaches no conclusion as to the solvency or insolvency of DLIFF in this Report.

judicial determination of a Ponzi scheme at this time, but reserves the right to do so if and when such a finding becomes necessary.

Aside from the question of when the conduct described in this Report morphed into a Ponzi scheme, there is substantial evidence of actual fraud and badges of fraud from the inception of DLI's operations, including instances of self-dealing and misstatement of financial performance and activities intended to perpetuate an investor fraud. Based on the findings of the investigation, the Receiver describes in this Report the pervasive fraud that was a substantial factor leading to significant losses that in turn impacted investors. The pervasive fraud described in the Report forms a basis for his proposed distribution plan for investors of DLIF to treat similarly situated investors[7] holding interests in the same assets on an equitable basis.

The Receiver has concluded that the actions of Ross were fraudulent and led to substantial misrepresentations made to the investors. Ross and DLI then invested the funds in risky investments[8] that led to losses. Those losses in turn, impacted investors who will suffer cash losses totaling $250.7 million[9] as of March 31, 2019 based on the shortfall between the amount of net invested capital and the estimated future distributions to investors ("Aggregate Investor Cash Losses").

The Receiver also has concluded that there are third parties whose negligent or improper conduct were additional substantial contributing factors leading to the losses described in this Report. The Receiver expects to file lawsuits or try to resolve potential claims with a number of third parties pre-litigation and has filed one lawsuit already, as referenced below. The outcomes of such litigation and pre-suit settlement efforts are uncertain. The Receiver also continues to investigate who in addition to Ross may have engaged in intentional or other misconduct relative to the operations of DLI, its solicitations of investors, and its entering into and managing various portfolio positions. While this investigation is currently ongoing and confidential, further information regarding the results of this investigation will be forthcoming in future reports or in litigation that has been, or may be, filed by the Receiver.

This Report focuses on the fraudulent misconduct of Ross and the consequences of his ability to control the Receivership Entities, which is of central importance to evaluating the best approach for an equitable claims distribution methodology for the U.S. Receivership Entities. The Receiver believes that Ross' misconduct would have been prevented from continuing had certain third party professionals, and/or others, alerted individuals to the true condition of the investment funds and

---

[7] Certain investors may have been aware of the fraudulent scheme or were aware of sufficient red flags that the U.S. Receivership Entities were operating as a Ponzi scheme, which may be addressed through litigation outside of the scope of the distribution plan if necessary.

[8] The terms invested, invest and investment are used interchangeably throughout the Report to mean money loaned as debt or investment in equity vehicles.

[9] Aggregate Investor Cash Losses of $250.7 million is based on the March 31, 2019 estimated investor net recovery (using information available as of July 31, 2020) of $287.8 million and investors' net invested cash of $538.5 million. The estimated net recovery is based on future portfolio recoveries plus cash minus estimated future operating and professional fees minus estimated payments for administrative and priority claims. The ultimate recovery will be subject to the Distribution Plan including competing non-investor claims, increased by any proceeds from litigation that has been and will be filed by the Receiver, and reduced by any unforeseen operating costs, professional fees and expenses or other disbursements.

6

the fraud and misconduct outlined in this report prior to the discoveries in early 2019.  These conclusions and allegations will be presented in connection with further litigation that may be filed by the Receiver.

### A.  Summary of Critical Factual Findings

Some of the more critical factual findings set forth in this Report are as follows:

1. Pervasive fraud and misrepresentations to investors existed in the operations of the U.S. Receivership Entities since inception.

2. Both earlier investors who received a return of some or most of their principal investment and more recent investors who did not receive any cash back were similarly situated as they shared in the same investment assets that were part of the same investment scheme in which their funds were commingled with each other and with proceeds from the loan portfolios.

3. Records of the Receivership Entities show 952 investor accounts with a total investor NAV of $757.5 million across the two Feeder Funds as of November 30, 2018, the last period for which the books were closed.

4. Excluding DLI's investment account and one of Ross's trust's investment accounts, the total net invested capital was $538.5 million as of March 31, 2019.

5. While some of the counterparty loans made by the Receivership Entities were profitable (though several of those loans generally did not generate returns close to what was represented), the Receiver estimates that there was an aggregate underreported allowance for doubtful accounts and bad debt expense of $501.4 million relative to the obligations of loan counterparties as of March 31, 2019[10] ("Net Loan Losses") on account of the overstated nature of the loan portfolio and the generally high risk investments, many of which varied from the type and nature of investments promised to investors.  See page 18 for a discussion of DLI's change in investment focus.  In total, Aggregate Investor Cash Losses are estimated at $250.7 million as of March 31, 2019.

6. Of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been repaid in full, with interest, as of July 31, 2020.  The $72.9 million return on these fully liquidated loans is insufficient to offset the realized and expected shortfall totaling $305.6 million on funding of $1.3 billion for unrecovered loans. As of July 31, 2020, a

---

[10] The last period for which the books were closed was November 30, 2018.  Outstanding loan balances that are presented or used for amounts after this date were prepared in a manner consistent with methodologies used to determine previously reported balances. Estimated amount of $501.4 million is based on the $788.0 million carrying value of the loan portfolio as of March 31, 2019 (using the manner described) less $286.6 million in total actual and estimated future loan recoveries on loan balances as of March 31, 2019, using information available as of the date of this Report.  The Net Loan Losses estimated here reflect a conservative estimate and do not include expenses necessarily incurred by the Receivership Entities to recover additional amounts, among other things.  Further expert development and analysis of the portfolios on a more fact-specific basis may lead to the conclusion that the actual overvaluations were larger.  See Page 59 for a schedule of estimated loan performance by counterparty.

total of $232.6 million in principal funding remains unrecovered when including the $72.9 million return on fully liquidated loans. The Receiver estimates that only $123.5 million of that amount will be recovered. There are also significant expenses that have been incurred in order to allow for the estimated future recoveries.

7. Other than with respect to the division of interests in the Master Fund assets between the two Feeder Funds, no investor held a direct or secured interest in any particular assets of the Receivership Entities.

8. The funds used for payments to any given investor were commingled with other investor funds and, at times, commingled with borrower payments received in connection with the various counterparty loans that were made. Given the commingling of funds and the fungibility of money, it would be a burdensome and costly task to make a specific determination as to whether the source of any given payment made to a particular investor was attributable to funds from later investors or to a payment from a loan portfolio. See page 34 for a discussion of commingled funds.

9. The accounting records, and the account statements delivered to investors, do not reflect appropriate reserves for uncollectable assets and include inflated "mark-ups" relative to appropriate asset valuations, both of which result in a misrepresentation of income, value of assets and net worth as well as overstated net asset values ("NAV").[11]

10. 80% of the payments made to investors since inception, either as redemptions or distributions, were derived from funds from later or existing investors (including participation funds from DL Global, Ltd.) rather than from legitimate and profitable returns from the loans to counterparties.[12]

11. DLI made net payments and allocations of $31.4 million directly or indirectly to or for the benefit of Ross.[13]

12. A total of $647 million was loaned to counterparties in which Ross had or may have had a financial interest. For the purposes of this Report, the Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million relative to the obligations of these loan counterparties as of March 31, 2019.[14] Ross continued to direct new loans to counterparties even when the losses or poor financial condition of the loan portfolio was evident.

---

[11] The net asset value of the Master Fund is calculated by adding the fair value of its investments, cash, and other assets and subtracting its liabilities in accordance with GAAP. See page 60 for a discussion of findings relative to overstated asset valuations.

[12] Based on the methodology discussed on page 46.

[13] See page 51 for a discussion of payments and allocations made directly or indirectly to or for the benefit of Ross.

[14] The last period for which the books were closed was November 30, 2018. Outstanding loan balances that are presented or used for amounts after this date were prepared in a manner consistent with methodologies used to determine previously reported balances. The $343.7 million estimate is calculated by taking the March 31, 2019 principal balance of $398.5 million (using the manner described above) and comparing it to the estimated recoverable balance of $54.8 million (using information available as of July 31, 2020). See page 55 for a discussion of loans to counterparties in which Ross had or may have had an economic interest.

13. 853 DLIF investors received $89.3 million in cash in excess of their investment.[15]

14. Since at least April 30, 2016 forward, DLIF was insolvent[16] when limiting the liability to its investors to the amount of their net invested capital. The fraud and increasingly poor counterparty loans resulted in a financial situation where DLIF was unable to return all invested capital to its investors, let alone generate real profits sufficient enough to keep up with the returns paid and/or reported to investors.

15. Investors were subject to the inflated valuations reported by DLI, the misrepresentations made to investors regarding the nature of the investments made with their funds, and the commingling of their funds with other investor funds and loan portfolio proceeds. They were also all subject to the misappropriation of funds and other misconduct by Ross which was a significant cause of the substantial unrecognized losses.

B.  Summary of Conclusions

Based on these findings, as set forth in more detail in this Report, the Receiver has concluded that there was a fraud from the inception perpetrated by Ross. That fraud has caused similar harm to each of DLIF and DLIFF, which harm will be borne by the investors in each. As noted above, while similar (or possibly materially identical) factual circumstances may apply to the investors of DLIFF, their rights and potential claims as against DLIFF are a matter of Cayman Islands law and conclusions stated herein regarding rights of investors are not references to the rights of DLIFF investors, unless specifically and expressly confirmed as such. The Receiver has also concluded the following:

1.  Under U.S. law, each investor in DLIF (each a "DLIF Investor") is similarly situated and holds the same type of claim for restitution on account of that fraud. The fraud was a substantial factor causing the losses of DLIF Investors.[17]

2.  Irrespective of whether a Ponzi scheme exists, the Distribution Plan should be based on the principal that, for DLIF Investors subject to U.S. rules, similarly situated investors must be treated alike to preserve equity and fairness and that all fraud victims should be treated alike, as is required by applicable U.S. law. The pervasiveness of the fraud and the commingling of assets are sufficient to warrant the pooling of the assets and liabilities for purposes of distributions to be made under any Distribution Plan.

3.  It is unlikely that investors will be repaid in full. It would be inequitable as a matter of U.S. law to distribute assets based on an assumption that an investor should recover both

---

[15] See page 49 for a discussion of net winners.

[16] As used further in this Report, the term "insolvent" refers to an inability of an obligor to satisfy the valid restitution claims of investors and to the operation of a company with unreasonably small capital. See page 39 for a discussion of insolvency and page 68 for a discussion of solvency over time.

[17] The Receiver has run a claim process and has determined which of the DLIF Investors continue to hold claims as of the Receivership Date. Distribution on account of the allowed claims will be made pursuant to a distribution plan that the Receiver will propose and that will be subject to Court approval (the "Distribution Plan").

9

fictitious profits and principal based on a benefit of bargain basis since (a) reports of returns were made to all investors based on misrepresented NAV figures; and (b) earlier investors were repaid at the expense, and to the detriment, of the similarly situated later investors.

4. The best way to put the DLIF Investors on equal footing is to treat the prior payments made to these investors, whether as distributions or redemptions, as a return of principal, so that the DLIF Investors who receive a distribution through the Distribution Plan may share on a *pro rata* and equitable basis.

5. The assets and liabilities of the Receivership Entities must be pooled together in order to equitably and sensibly account for all of the assets of the Receivership Entities and to fairly make distributions to DLIF Investors and other creditors of the Receivership Entities who will receive a distribution pursuant to the Distribution Plan.[18]

6. Because investors have received differing levels of returns, a distribution method that seeks to equalize returns to the DLIF Investors would be most equitable.

## II. The Engagement

### A. Background

On April 1, 2019 (the "Receivership Date"), the Court entered the Preliminary Injunction Order and Order Appointing Permanent Receiver ("Receiver Order"), Doc. No. 10, appointing Bradley D. Sharp as permanent receiver over the Receivership Entities

The Receiver has been granted the full powers of an equity receiver over all funds, property and assets belonging to, being managed by or in the possession of or control of, the Receivership Entities.  (Receiver Order, Section VI).  In addition, among other things, the Receiver Order provides that the Receiver has been granted specific powers to make such payments and disbursements from the funds and assets taken into custody, control, and possession or thereafter received by him, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his duties as permanent receiver. (Receiver Order Section VI.F).

Some of the entities comprising the Receivership Entities were operating businesses.  Their assets consist of portfolios of loans and investments made by certain Receivership Entities to third parties, with loans and investments ranging in size from $1 to $2 million to approximately $200 million.  DLI obtained investors for its loan portfolios through two "feeder" funds, one Delaware limited partnership soliciting investment from United States investors (DLIF) and one Cayman Islands-exempted company soliciting funds from outside the United States (DLIFF).

Based on the information provided in the Complaint filed by the SEC on March 22, 2019 and the books and records of the Receivership Entities, the Receiver determined November 1, 2012

---

[18] The only exception that arises is with respect to the assets and liabilities of DLIFF, which are subject to a separate liquidation proceeding in the Cayman Islands.

through March 31, 2019 to be the most relevant time period (the "Relevant Time Period") for his Investigation.  This Report covers the transactional history of the Receivership Entities for the Relevant Time Period and summarizes the Receiver's findings based on the accounting work performed to date.  The Receivership Entities and bank accounts covered by this Report are listed on Exhibit 2.  In furtherance of his responsibilities in the investigation, the Receiver has prepared this Report to assist the Court and the interested parties in evaluating the facts of this case and focusing on the appropriateness of the Distribution Plan proposed by the Receiver.

  B. Scope

The Receiver Order directs the Receiver "to make an accounting, as soon as practicable, to this Court and the SEC of the assets and financial condition of the Receivership Entity, and to file the accounting with the Court and deliver copies thereof to all parties."  As discussed below, the Receiver has (a) reviewed and analyzed the Receivership Entities' bank records and books and records of the various Receivership Entities, (b) evaluated the Receivership Entities' sources of funds, and (c) evaluated the Receivership Entities' use of funds.

The primary objectives of the Report are to: (1) identify the sources and uses of investor funds; (2) reach a conclusion with respect to whether fraud was a cause of the losses; (3) establish the factual basis on which to structure the most equitable distribution plan in this case; and (4) determine the amount received for the personal benefit of Ross.

The Receiver believes the present accounting is complete and further analysis will not appreciably change the findings herein, which are geared to the purposes of the Report.

Informal and formal fact discovery in this case has been substantial and the Receiver believes that the information discovered to date forms a sufficient basis for the conclusions in this Report. The Receiver notes, however, that fact discovery has not concluded as of the filing of this Report, so this Report is based upon the information presently available and reviewed to date. The Receiver reserves the right to supplement or amend this Report in the event additional material information becomes available for review or if it is determined that any part of this Report is materially inaccurate.  In addition, in the context of filed litigation pursued by the Receiver, it is expected that additional analysis will supplement many of the conclusions in this Report and the losses to the Receivership Entities, which in turn impacted the investors.

  C. Limitations of Report

The information contained herein has been prepared based upon financial and other data obtained from the Receivership Entities' books and records and provided to the Receiver, DSI, Diamond McCarthy LLP ("Counsel"), from the staff employed by the Receivership Entities, third parties, or from public sources.

The Receiver has not subjected the information contained herein to an audit in accordance with generally accepted auditing or attestation standards or the Statement on Standards for Prospective Financial Information issued by the American Institute of Certified Public Accountants ("AICPA"). It does not constitute an audit of financial condition and is intended only to provide

11

information for use by the Court in aiding in evaluation of a distribution plan and in litigation related to this case.  Further, the work involved so far did not include a detailed review of all transactions, and cannot be expected to identify all errors, irregularities or illegal acts, including fraud or defalcations that may exist. Accordingly, the Receiver cannot express an opinion or any other form of assurance on, and assumes no responsibility for, the accuracy or correctness of the historical information or the completeness and achievability of the projected financial data and valuations upon which the following Report is rendered.

    D.   Forensic Investigation

A forensic investigation requires professional judgment regarding, among other matters, the nature, timing and extent of procedures to be performed; the weight, quality and reliability of evidential matter; and the cost versus benefit of acquiring and testing evidence.

The information supporting the Receiver's analysis was obtained from company records and through discussions with investors, management, employees and other parties. Unless otherwise noted herein, the Receiver has not necessarily corroborated the completeness or accuracy of the information or the explanations provided to him.

The forensic investigation of the Receivership Entities conducted by the Receiver and his staff has involved extensive review of the individual portfolio positions, and the flow of money through the investor accounts.  The Receiver's initial focus was on assessing the status of the various portfolio positions in an effort to maximize the value and monetize, to the extent possible, the existing positions for the benefit of the Receivership Entities.  Through this process, the Receiver has succeeded in recovering a net amount of $177.4 million[19] from the loan portfolio through July 31, 2020.

In addition to the detailed analysis of the portfolio positions that was instrumental to the optimization of recovery for the estate, the Receiver has conducted extensive analysis of the books and records of the Receivership Entities for the purpose of evaluating the reasons for the deterioration of the financial position of the Master Fund[20] (and the weaknesses in the Master Fund that were hidden from the start), which conditions were in place before the Receivership.

Furthermore, the Receiver also performed an analysis of DLIF investors' positions (including insiders and potential insiders) who received payment in excess of their respective investments. This "net winner" analysis was necessary to provide data regarding the existence and extent of net winners.  This data and the product of other analyses conducted will be utilized in fashioning the Distribution Plan to be proposed to this Court.

The Master Fund's investments encompassed various loans, loan portfolios, and other complex credit facilities.  As set forth below, the Receiver and his Professionals have conducted extensive analysis of all 29 investments.  The records were often spotty and incomplete, difficult to locate, and in some instances inaccurate.  The existence of underlying fraudulent acts and the type and

---

[19] Net of additional loan fundings and participation collections on behalf of third parties.

[20] In this reference and in certain other references to the Master Fund, the Receiver's intent is to also include DLIF, which was the investing fund prior to the October 2016 restructuring which created the Master Fund.

nature of the transfers involved within each position was not discoverable until the Receiver and his Professionals reviewed and analyzed the voluminous accounting records and files, which is part of an ongoing investigation even as of the date of this Report.

The most significant hurdle that the Receiver faced in conducting the forensic accounting analysis was the fragmented and incomplete state of the accounting records.  Upon investigation, the Receiver learned that the accounting records were not maintained in a traditional way on a centralized accounting software system.  Instead, the accounting records used to track the financial activity existed across numerous Excel documents with a significant amount of accounting entries having not been completed (e.g., recording the breakdown between interest and principal components from payments received from counterparties), all of which resulted in significant time and effort to reconstruct a more accurate record of the cash activity across all entities and bank accounts.  Once the accounting records were reconstructed, the Receiver was ultimately able to more readily discover the nature of the underlying acts, transfers and other activity of the Receivership Entities.

### III. Pre-Receivership

A. Company Overview

DLI was founded in 2012 "during a post-financial-crisis surge of interest in what was then called peer-to-peer (P2P) Lending."[21]  As an SEC-registered investment adviser with its principal place of business in Glendale, California, DLI was the general partner and investment manager of two investment "feeder" funds through which funds from investors were obtained.  The Feeder Funds consist of DLIF, which is the entity that came to obtain investments from persons domiciled in the United States, while the offshore investment entity, DLIFF, a Cayman Islands Exempted Company formed in 2016, obtained overseas investor funds.

Subsequent to the October 2016 restructuring, DLIF and DLIFF used these investor funds to make debt and equity investments into DLI Capital, which contributed capital to DLI Assets, LLC and DLI Assets Bravo, LLC, among others, which made loans to third parties.  In some cases, the Master Fund entered into a co-lending relationship with another lender to make the loan to the third party.  The borrowers, or counterparties, were lending companies, some of which made loans to small businesses or consumers, with those loans becoming the collateral for the Master Fund's loans.  Below is an organizational chart prepared by DLI's management showing the Feeder Funds and other related entities under its control as of January 2019.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[21] As discussed in the December 2017 investor letter.



Ross is the sole member of and was, until March 18, 2019, the chief executive officer of DLI.

The organizational chart prepared by DLI's management shows the Feeder Funds and the Master Fund (together, the "Funds"), which DLI advised, and the other entities under DLI's control. The following is a summary of those entities, including those not pictured, and their role in the business enterprise or relationship to DLI.

1. <u>Direct Lending Investments, LLC</u>: Direct Lending Investments, LLC (f/k/a Direct Lending Income Fund Advisors, LLC) is a California limited liability company and is an SEC registered investment advisor that advises a private investment fund structure which invests in various companies, instruments and counterparty lending platforms. DLI provides investment advisory services to a private investment fund structure, comprised of the Feeder Funds and the Master Fund. DLI is the investment manager of DLI Capital, the general partner and investment manager of DLIF and the investment manager of DLIFF. DLI has no clients other than the Master Fund and the Feeder Funds and does not offer any investment management services to any other person or entity.

DLI was formed by a merger on April 27, 2016 between Direct Lending Income Fund Advisors, LLC and a previously existing Direct Lending Investments, LLC entity. The

previously existing Direct Lending Investments, LLC entity shut down in connection with the merger as Direct Lending Income Fund Advisors, LLC was the surviving entity that was renamed Direct Lending Investments, LLC.  DLI's only assets as of the date of the Receivership included cash, its investment account with DLIF,[22] ownership of DLI Lending Agent, LLC, office equipment and furniture, wall art and office leasehold improvements.

2.  <u>Direct Lending Income Fund, L.P.:</u> Direct Lending Income Fund, L.P., a Delaware limited partnership, was the original entity that obtained investments from all investors, with DLI as its general partner.  Subsequent to the restructuring in October 2016, discussed below, DLIF became the Feeder Fund that obtained investments from only those persons domiciled in the United States.

3.  <u>Direct Lending Income Feeder Fund, Ltd.:</u> Direct Lending Income Feeder Fund, Ltd., Cayman Islands Exempted Company formed in 2016, is the offshore investment entity that obtained overseas investor funds.  DLIFF is presently in an official liquidation proceeding in the Cayman Islands. On May 14, 2019, following an order from the District Court dated the same day, the Receiver, on behalf of DLI, passed a unanimous written resolution to place DLIFF in voluntary liquidation. The voluntary liquidators (Mr. Sharp and Mr. Christopher D. Johnson) subsequently filed an application by way of petition in the Grand Court of the Cayman Islands (the "Cayman Court") under Cause No. FSD 108 of 2019 (NSJ) for the liquidation to continue under the supervision of the Cayman Court.  Pursuant to the Official Liquidation Order, liquidation of DLIFF ("Cayman Liquidation") is to be continued under the supervision of the Cayman Court, and Mr. Johnson and Mr. Sharp were appointed as the Joint Official Liquidators of DLIFF (the "Joint Official Liquidators" or "JOLs").   Accordingly, all assets and liabilities of DLIFF will be administered in the Cayman proceeding.

4.  <u>DLI Lending Agent, LLC:</u>   DLI Lending Agent, LLC ("DLILA"), a Delaware limited liability company previously known as Blackbird Financial Group, LLC ("Blackbird"), is owned 100% by DLI and holds a lending license. Prior to DLI's ownership, Blackbird was owned by Dealstruck Holdings, Inc., which is the parent of Dealstruck, Inc. and MyBusinessLoan, LLC.  Blackbird held a California lending license issued September 18, 2014.  As part of the strict foreclosure of the Dealstruck investment in December 2016, Dealstruck Holdings, Inc. transferred ownership of its assets, including Blackbird, to Dealstruck Holdco (ABC), LLC ("Dealstruck ABC") as assignee for the benefit of its creditors.  DLI purchased Blackbird from Dealstruck ABC via an asset purchase agreement dated as of March 21, 2017 for a price of $150,000, and shortly thereafter changed its name to "DLI Lending Agent, LLC."  On May 10, 2017, the California Department of Business Oversight issued an amendment to Blackbird's lending license changing the licensee name to DLI Lending Agent, LLC, and changing its address to DLI's business address.  DLILA was generally used as the agent for loans made to counterparties. DLILA does not own any assets other than the lending license.

---

[22] DLI's investment account with DLIF, described more fully on page 50, is not expected to result in an allowed claim. Intercompany claims will be adjudicated as part of the yet-to-be-determined Distribution Plan.

15

5.  <u>DLI Capital, Inc.</u>: DLI Capital, Inc. is a Nevada corporation. DLI Capital is wholly owned by DLIF and DLIFF through its Class D and Class O share classes, respectively. It is the Master Fund, capitalized by the two Feeder Funds through a mix of equity and debt, with DLI Capital in turn investing through its equity in DLI Assets Bravo, LLC and DLI Assets, LLC.

6.  <u>DLI Capital Partner, Inc.</u>: DLI Capital Partner, Inc., a Nevada corporation, commenced operations on October 1, 2016 and was owned 100% by DLI Capital and once owned a 0.01% interest in each of DLIAB and DLI Assets, until being dissolved on December 31, 2018.

7.  <u>DLI Assets Bravo, LLC</u>: DLI Assets Bravo LLC ("DLIAB"), a Nevada limited liability company, is wholly owned by DLI Capital. The capital investments made by DLI Capital in DLIAB were used by DLIAB to make investments. Those investments by DLIAB often generated funds from principal and interest payments that flowed back to the Master Fund. Such funds were commingled with investor funds from the Feeder Funds and became available for payments to investors in DLIF and DLIFF.

8.  <u>DLI Assets, LLC</u>: DLI Assets, LLC ("DLI Assets"), a Nevada limited liability company, is also wholly owned by DLI Capital. DLI Assets holds a portfolio of whole loans originated by a former DLI investment counterparty (Dealstruck), and which loans DLI subsequently acquired in a foreclosure following that counterparty's default. The funds from principal and interest payments from the whole loans acquired by DLI Assets were an additional source of funds that flowed back to the Master Fund. Such funds were commingled with investor funds from the Feeder Funds and became available for payments to investors in DLIF and DLIFF. During the Receivership, the Dealstruck portfolio was sold to a third party, leaving DLI Assets with no activity or assets.

9.  <u>DLI TC, LLC</u>: DLI TC, LLC is wholly owned by DLIF and is an affiliated entity of the named Receivership Entities. This entity was established in connection with the realized Talking Capital Partners I, LLC ("Talking Capital") investment which predates the master-feeder restructure and is the subject of pending litigation. The Talking Capital litigation is currently stayed as to the Receivership Entities. This entity is currently dormant aside from being a defendant in the litigation. See <u>Exhibit 6</u> for further discussion of Talking Capital.

10. <u>DLI SPV I, LLC</u>: DLI SPV I, LLC ("DLI SPVI"), a Delaware limited liability company, is owned by DLIAB as its sole member and is managed by DLI. DLI SPVI was formed as part of a strategy to obtain debt financing from a division of Pacific Western Bank called CapitalSource (referred to internally at DLI as "CapSource") in late 2018. Assets that would have been included in the contemplated facility's borrowing base would have been transferred to this entity. This entity has no activity.

11. <u>DL Capital, Inc.</u>: DL Capital, Inc., a Nevada company, was intended to be the sole limited partner in DLIF. This entity was dissolved on January 10, 2018.

12. <u>Direct Lending Capital Partners, Ltd.</u>: Direct Lending Capital Partners, Ltd., a British Virgin Islands company, was formed for the purpose of raising institutional capital to become the sole limited partner and acquire all the assets of DLIF. At the time of formation, the group was structured as DLIF managed by DLI and Ross was exploring new fund structures, possibly to accommodate foreign and/or institutional investors. Direct Lending Capital Partners, Ltd. and Direct Lending Income Fund (DE Statutory Trust) were apparently contemplated to be foreign and domestic feeder funds, respectively, managed by Direct Lending Services, Inc. as the general partner. It appears these entities were never used. The entity was dissolved on November 1, 2018.

13. <u>Direct Lending Income Fund (DE Statutory Trust)</u>. See notes directly above regarding this entity which was dissolved on August 14, 2017.

14. <u>Direct Lending Services, Inc.</u>: Direct Lending Services, Inc., a California corporation, was intended to be the general partner and manager of DLIF before being dissolved on July 31, 2017.

B.   October 2016 Restructuring

Prior to a restructuring of the fund structure in October 2016, all domestic and foreign investors invested through DLIF which then invested its funds in DLIAB and DLI Assets. In October 2016, DLI moved to a two-feeder fund structure with the formation of DLIFF, the offshore exempted company in the Cayman Islands, along with DLIF serving as the Onshore Fund. DLI Capital served as the Master Fund through which investor funds obtained from DLIF and DLIFF were contributed and deployed. DLI formed DLIFF to solicit investments from non-United States investors. The funds from the Feeder Funds were used as loans initially by DLI Capital to its wholly owned subsidiary DLI Assets, and later to DLIAB, another subsidiary. The funds were ultimately loaned to third party borrowers, and the third party borrowers in turn were generally lenders which made loans or extensions of credit to others (the "subsequent loans").

The new structure was formalized in two Loan and Security Agreements each dated as of October 1, 2016 ("LSA"), one with DLIF as lender and one with DLIFF as lender, and with Millennium Trust Company, LLC as the custodian for the benefit of each of the lenders. Under each of the LSAs, the Feeder Funds agreed to lend money to DLI Capital as borrower under a revolving loan facility. In fact, the two Feeder Funds typically sent investment capital to the Master Fund in the following manner: up to 80% of the capital is in the form of debt and 20% or more of the capital in the form of equity. DLI Capital in turn would use the invested funds to make equity investments in two subsidiaries DLI Assets and DLIAB, and those entities typically made loans to third party borrowers (the "subsequent loans" referred to above) generally on a secured basis. The LSAs by their terms granted DLIF and DLIFF security interests in the loans and equity investments made by DLI Capital. The collateral for the loans under the LSAs is described as all the "Collateral Assets" of DLI Capital, including all the loans made and collateral received by DLI Capital, along with DLI Capital's ownership interests in any subsidiaries, funds in a control deposit account for the deposit of the underlying loan payments received by DLI Capital, and all other assets of DLI Capital.

17

DLIF and DLIFF also entered into an Intercreditor Agreement dated as of September 30, 2016, which provided for the lenders DLIF and DLIFF to have *pari passu* rights in the loans made to DLI Capital. The *pari passu* rights were stated to extend to the notes in favor of DLIF and DLIFF by DLI Capital, the collateral for the notes, and all payments and collections or proceeds of enforcement of the loans received by either DLIF or DLIFF.

DLI served as the investment manager for both DLIF and DLIFF. DLI represented that the loan/investment portfolios in turn would generate an income and payment stream for DLIF and DLIFF, and DLI and Ross charged substantial management and administrative fees for their services in operating the investment structure. The movement of funds back and forth between DLI, Ross and the Master Fund under the guise of management fees and investments is described more fully on page 51.

The restructuring of DLI's investment vehicles also purported to accomplish certain tax objectives as explained in the October 2016 investor letter, an excerpt of which is included in Exhibit 3.

    C.  Change in Investment Focus

The Master Fund invested in loans, receivables and other debt obligations purchased from various loan originators. It also originated loan facilities to special purpose vehicles collateralized by loans, receivables and other debt obligations. In addition, it provided limited financing in 2015 to non-bank lenders by investing in equity interests of special purpose vehicles, the purpose of which was to acquire and hold loans to small- and medium-sized businesses or consumers.

DLI's investment strategy initially focused on the purchase of small business whole loans to generate current income for investors. DLI communicated its strategy and made representations to investors through investor letters sent periodically to investors, which are addressed in more detail on page 69 of this Report. In 2013 and 2014, DLI's investor letters described the investment strategy as utilizing a fixed income approach with ownership of loans with consistent payment and default characteristics. These descriptions by themselves were often misleading and omitted material facts. Ross did not disclose his QuarterSpot, Inc. ("QuarterSpot") reporting fraud, which began by no later than late 2013, misrepresented the true investment returns, and falsely claimed that DLI did not invest in "start-up companies," among other falsehoods. By 2015, the investment strategy itself had begun to shift fundamentally to setting up financing structures with lenders that purportedly paid a fixed return on the investment, and for which the lender's individual loans served as collateral assets. Not until the July 2016 investor letter, however, did DLI disclose to investors that it was now financing loans by funding facilities where the underlying lenders were in a "first loss position."[23]

The shift in investments was material and resulted in increased risk exposure to investors which, if known, could have resulted in a significant exodus of investors and invested capital. DLI moved away from purchasing whole loans that supposedly paid on a consistent, monthly basis to making loans that by their terms did not require the borrowers to make regular monthly payments. For example, in 2015, DLI began lending large sums of money to Investment T pursuant to a credit

---

[23] The first loss position is an investment that will suffer the first economic loss if the underlying asset loses value. The first loss position generally carries a higher risk and a higher yield.

facility (the "Investment T Facility"). The loans to the Investment T Facility were for the purchase and rehabilitation of residential real estate in the Los Angeles area ("fix and flip" residential real estate loans). The substantial departure from DLI's described objectives of investing in short-term consumer loans through the real estate loans was not disclosed in early investor letters. The loans to the Investment T Facility caused a large percentage of DLI's investor's funds to be indirectly invested in real estate, contrary to the purported objective of short term, stable cash returns. In fact, though this investment was expressly built on DLI capitalizing interest due from the borrower, rather than cash interest being paid, investor letters during this period continued to emphasize current income and the attractiveness of "'cash flow based' liquidity that …comes from actual repayment." The Receiver has concluded that the misrepresentations and non-disclosures were intentional on the part of Ross and were made by him in order to continue to attract investments from a similar pool of investors that invested based on the promises of stable, immediate cash returns from investing in whole loans.

As another example, despite the fact that DLI continued to assure investors that it owned "loans and not equity" (*see, e.g.,* its July 2016 investor letter), by 2015, DLI invested in a substantial equity position involving Investment H.[24]

The continuing departure by DLI from the investment strategy that was represented to investors is also illustrated by the fact that in the spring of 2017, DLI started investing in a company that acquires and enforces patent rights through litigation. While the company's efforts were initially confined to the United States, shortly after it began its relationship with DLI, it shifted its patent enforcement strategy almost entirely to China. This was a dramatic departure from the direct lending strategy. Between May 2017 and September 2018, DLI lent almost $60 million to this entity pursuant to a credit agreement that called for 15% interest payments. Although in 2017 investor letters began to disclose DLI's shift from small business loans to different types of receivables, and in April 2018, DLI disclosed that it was making loans to SPEs holding financial and non-financial assets representing "highly illiquid investments," it was not until the July 2018 investor letter that DLI disclosed information about investing in "intellectual property," more than a year after that investment activity had begun.

In a December 2017 letter to investors, DLI presented to its investors the following chart of asset allocation by asset type over a 3-year period, which begins to illustrate the impact of the change over time:

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[24] See Notice of Motion and Motion of Receiver for Order Approving: (1) Settlement and Restructuring Agreement with Investment H and Related Entities; (2) Payment of Raymond James & Associates, Inc. Fees; and (3) Form and/or Limitation of Notice Under Local Civil Rule 66-7 (Doc. No. 222) for additional information.

19



Source: Image extracted from the December 2017 DLI Investor Letter.

The chart, however, was misleading in several material respects. For example, the chart obscured investment types being made with significant portions of investor capital. DLI categorized investments by asset type, but did not define what each type was comprised of nor did it expressly state that all asset types listed are types of private credit. Further, the growth of the "other" category over time is troubling, as the chart does not disclose what is included in this category, which could include investments such as Investment M and the equity investment in Investment H. Similarly, "Receivables" includes loans to VoIP Guardian Partners I, LLC against receivables owed to parties that operated overseas, used foreign bank accounts, and had no indicia of legitimacy (see discussion on page 61). At the outset, the representation to investors regarding investment criteria was that DLI invested in whole loans that generated current cash income (see brown area in chart above). The portion of DLI's portfolio that was actually invested in this loan type eventually drifted down toward 10% with updated representations to investors being made late to investors after such shifts had already happened.

In the chart above which was shared with investors, at the direction of Ross, DLI intentionally used four deceptively similar shades of blue to portray the changing percentages of the Master Fund's investments in (1) receivables, (2) "consumer", (3) "real estate", and (4) "other" assets. Moreover, the legend is placed over the "other" category, further visually obscuring the extent of the trend over time. The footnote with the following explanation creates further doubt as to accuracy of the asset allocation the chart purports to depict - the "classification of our investments includes subjective judgments. Reasonable parties might classify these assets differently which would likely result in different allocation percentages in this chart."

### D.  SEC Regulatory Issues

DLI was the subject of regulatory scrutiny for most of the time it acted as an investment advisor to DLIF and DLIFF.  In December 2015, DLIF filed a Form N-2 registration statement with the SEC.  In addition, on February 1, 2016, well after assets under management exceeded $100 million, DLI for the first time registered with the SEC as an investment adviser under the Investment Advisers Act of 1940.  On February 8, 2016, the SEC replied to DLIF's Form N-2 registration statement with a number of questions concerning DLIF's business.

Those concerns included well-founded questions about whether DLIF's name ("Direct Lending") implied that it was an originator of loans; whether DLIF would rely on information provided by the various lending platforms without verifying that information; what types of leverage DLIF would use; the process for selecting individual loans and whether the underwriting process was sufficient; whether DLIF would finance the lending platforms directly; DLIF's procedures for monitoring the lending platforms; whether DLIF would enter into any preferential access agreements with the lending platforms; and whether DLIF was implementing proper valuation procedures, among others.  DLI engaged its then-usual compliance counsel to send a response to the SEC.  DLIF withdrew its registration request on June 1, 2016 rather than undertaking to satisfy all of the SEC's questions.

On October 11, 2016, the SEC initiated a limited scope examination regarding DLI's compliance with federal laws and regulations, and requested information from DLI regarding its operations and investments.  The SEC conducted an interview of DLI in October 2016 and reviewed certain DLI marketing materials.

In February 2017, the SEC sent an exam request letter to DLI, for a period that initially covered January 1, 2015 to January 31, 2017, but was later extended to May 2018.  On March 28, 2017, the SEC conducted an extensive three-day onsite examination of DLI.  DLI was required to produce voluminous documents to the SEC over the course of the examination.  DLI also provided a number of written responses to the SEC's inquiries over the examination period.

On July 25, 2018, the SEC sent a 40-page deficiency letter to DLI as a result of its lengthy examination, identifying numerous problems.  The main areas of concern identified by the SEC included: (1) misleading statements and deceitful acts with respect to Dealstruck; (2) misleading statements and omissions regarding consumer loan platforms; (3) misleading and false returns and manipulation of loan loss reserves; (4) misleading statements regarding asset composition and duration; (5) misleading statements regarding conflicts of interest in connection with consumer platforms; (6) misleading statements and deceitful acts related to fee sharing arrangements; (7) concerns about the sufficiency of DLI's compliance; (8) concerns about the potentially misleading nature of certain advertisements; and (9) the failure to register under the Investment Advisers Act of 1940 until 2016.

The SEC noted that under Rule 203A-1, an adviser is required to register once it obtains $110 million of assets under management, and that by January 1, 2015, DLI had $118 million of assets under management.  But DLI did not register for another year, until January 2016, when at that point DLI had approximately $450 million under management.  In its registration memo, DLI

21

argued that its only client prior to registration was DLIF, and therefore did not provide advice regarding the purchase or sale of securities.  But the SEC found that because the business model was to invest in special purpose vehicles that own the notes, DLIF had invested in securities of Investment I, which meant that DLI had clearly provided advice regarding the purchase of securities.  As such, the SEC found that DLI's failure to register until January 2016 was a violation of Section 203(a) of the Adviser Act.

In addition to the support of DLI's compliance counsel as discussed above, DLI engaged Paul Hastings on March 27, 2017, and other law firms, in attempting to respond to the SEC concerns.  After extensive efforts, on October 1, 2018, DLI through Paul Hastings provided the SEC with a 125-page response attempting to respond to each of the specific issues raised by the SEC.  The response also represented that DLI had undertaken efforts to improve its compliance programs and attached an exhibit purporting to detail the various compliance milestones.  The SEC responded in early 2019 asking DLI's counsel for clarification on Ross's future role in DLI.  As described further below, in March 2019, Ross resigned from DLI.

E.  QuarterSpot, Inc. Side Pocket

In mid-2017, as part of implementing a new valuation policy, DLI employees analyzed the QuarterSpot loan portfolio and discovered various issues, including that a large number of loans had small payments, and that many loans' maturity dates were extended beyond the maximum 18-month term.  The issues were significant enough for DLI to conclude that many QuarterSpot loans were significantly impaired, that the portfolio's value needed to be reduced by $35-$36 million, and that DLI needed to take additional reserves.  Due to difficulty in obtaining a clear understanding of QuarterSpot's financials and reporting, DLI decided to side-pocket its QuarterSpot assets until DLI could obtain a proper valuation and determine an appropriate value for the portfolio.  The portion of each investor's capital account allocable to the QuarterSpot portfolio was allocated to the side pocket account, which resulted in investors receiving two statements for each month of the side pocket.

Without a quick resolution of the side pocket, the Feeder Funds could have experienced reductions in subscriptions to and increases in redemptions from the Feeder Funds which would in turn have reduced the size of the Master Fund.  DLI took a few notable steps in order to quickly resolve the side pocket account, including:

1.  amended the QuarterSpot agreement to gain access to additional underwriting and servicing data with respect to the underlying loans;
2.  engaged a valuation consulting firm to provide an independent valuation opinion of the QuarterSpot portfolio; and
3.  entered into an agreement to sell loan participations in QuarterSpot to DL Global, Ltd. ("DL Global" or "DLG").[25]

---

[25] DL Global, Ltd. is a Cayman Islands exempted company formed in the summer of 2017 for the purpose of purchasing $232.1 million in loan participations from the DLI entities.  DLG's principal at the time of the transaction was an investment advisor specializing in placing investments by investors in Korea.

22

As a result, by the end of August 2017, the side pocket was dissolved and its remaining assets merged back with the other investments.

In September 2017, before the valuation consulting firm could evaluate the portfolio, DLI closed on DL Global's purchase of approximately $55 million in loan participations in QuarterSpot at 100% of the principal balance.  Considering DL Global's commitment to purchase the vast majority of DLI's impaired QuarterSpot loans, the valuation consulting firm was able to value those assets at par, as if they were performing loans.  Thus, the valuation consulting firm gave a favorable valuation to the QuarterSpot loan portfolio relying on the DL Global purchase price to value the loans at par rather than the underlying loan performance.  Ross caused misleading reports to be presented to DL Global when DL Global was conducting due diligence in connection with its purchase of QuarterSpot participations.

DLI's sale of QuarterSpot participations and other assets to DL Global had the following effects:

1. Allowed DLI to resolve the side pocket of the QuarterSpot portfolio that threatened DLI's viability;
2. Ensured that DLI would be able to pay $201 million in redemptions that were due to Korean investors, which Ross and DLI knew needed to be paid between September 2017 and October 2018 on a predetermined schedule; and
3. Allowed DLI to avoid recognizing any losses on the sold QuarterSpot loans.

Without the sale of the QuarterSpot loans, the timing and ultimate resolution of the side pocket would have been questionable.  In all likelihood, however, the alternative outcome would have been a lower valuation of the QuarterSpot investment which would have raised significant concerns regarding the Master Fund's investments and DLI's ability to manage the Master Fund and the Feeder Funds, which might have led to an exodus of investors and a potential collapse of the structure.

F.   Events Leading to Brendan Ross Resignation

On February 11, 2019, DLI announced to investors that the Feeder Funds had suspended withdrawals and redemptions because one of DLI's largest counterparties, VoIP Guardian Partners I, LLC ("VoIP Guardian"), had ceased making payments on a $192 million loan.  DLI indicated in its announcement that it suspected that the cessation of payments was likely a result of undetermined misconduct and that a substantial portion of the outstanding $160 million loan balance may not be recoverable.

In and around late February of 2019, during an unrelated email review relating to VoIP Guardian, DLI employees discovered emails that indicated Ross: (a) directed QuarterSpot to rebate their service fees and falsely report them as small payments made by late and/or non-paying borrowers, and (b) conspired with QuarterSpot to hide his involvement in manipulating QuarterSpot's reporting.

On March 6, 2019, DLI removed Ross from its premises.  On March 19, 2019, DLI announced to investors that another position, QuarterSpot, may have been materially overstated for a period of

23

years, and that, following the request of DLI's management committee that he take a leave of absence, Ross had formally resigned all positions at DLI on March 18, 2019 and had ceded control to its management committee.

### G.  SEC Complaint and the Appointment of a Receiver

After the resignation of Ross, the SEC filed the Complaint in the United District Court for the Central District of California (the "Court" or the "Receivership Court"), Case No. 2:19−cv−02188−DSF−MRW.  The SEC sought the appointment of a receiver, and the Receiver was appointed as of April 1, 2019, commencing the receivership (the "Receivership").  Following the filing of the Complaint, the Receiver entered into a stipulation with the SEC, consenting to the entry of the Preliminary Injunction and Order Appointing Permanent Receiver entered by the Court in April 2019 and agreeing to, among other things, the disgorgement of ill-gotten gains and civil penalties determined by the Court upon motion by the SEC. Based on the financial information available and interviews with DLI employees and professionals, the Receiver, on behalf of the Receivership Entities, agreed to the entry of a consent judgment which was entered by the Court on June 14, 2019 (the "Judgment").  The Judgment, among other things, permanently restrained DLI, and its officers, agents, servants, employees, attorneys, successors, subsidiaries and affiliates, and those persons in active concert or participation with any of them, from, employing any device, scheme or artifice to defraud any client or prospective client; and from engaging in any transaction, practice, or course of business that would operate as a fraud or deceit upon any client or prospective client; in violation of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2). (Section III.)  The Judgment further provided, among other things, that DLI shall pay disgorgement of ill-gotten gains and a civil penalty, in amounts to be determined by the Court upon motion by the SEC. (Section V.)  DLI consented to this procedure, and agreed that it would be precluded from arguing that it did not violate the federal security laws alleged in the Complaint, and that it would not challenge the validity of the Consent or Judgment.  (Consent, ¶ 4.)

The Receiver has filed pre-Receivership tax returns for 2018 and the stub period through March 31, 2019, and he has filed a qualified settlement fund ("QSF") tax return for the Receivership stub period of April 1, 2019 through December 31, 2019, consistent with the provisions of Treasury Regulation § 1.468B(1)(c) and based on his understanding that criteria mandating the establishment of a QSF were present in this case.

### H.  Investors as of the Receivership Date

Records of the Receivership Entities show 952 investor accounts with a total investor NAV of $757.5 million across the two Feeder Funds as of November 30, 2018.[26]

---

[26] The number of investor accounts and total investor NAV amount include all investment accounts with NAV balances, including DLI's investment account and one of Ross's trust's investment account.  See Exhibit 4 for DLIF and DLIFF's NAV presented on a monthly basis from inception through November 30, 2018.

| Reported Investor NAV and Count as of November 30, 2018 | | |
|---|---|---|
| | Reported Investor NAV | Investor Count |
| DLIF (Onshore) | $577,949,793 | 898 |
| DLIFF (Offshore) | $179,581,078 | 54 |
| Total Combined | $757,530,871 | 952 |

After November 30, 2018, DLI received $34.1 million in subscriptions and paid out $34.6 million in redemptions.  This would have resulted in a reported NAV of $757.0 million as of the Receivership Date assuming everything else is held constant.

Excluding DLI's investment account and one of Ross's trust's investment accounts, the total net invested capital[27] was $539.0 million as of November 30, 2018 and $538.5 million as of March 31, 2019.

| Subscriptions and New Investors after November 30, 2018 | | |
|---|---|---|
| | 12/1/18-2/1/19 Subscriptions | New Investor Count |
| DLIF (Onshore) | $23,638,525 | 19 |
| DLIFF (Offshore) | $10,456,900 | 4 |
| Total Combined | $34,095,425 | 23 |

Since inception, the Receivership Entities raised a total of $1.5 billion from 1,843 investor accounts.[28]

## IV. Post-Receivership

### A. Information Recovery, Review and Analysis

The Receivership Entities' books and records are almost entirely held in electronic form, including the document/data management and email records.  The Receiver took steps necessary to preserve the electronic records, including instructing the third parties managing the cloud databases and email records to preserve the electronic backup data and to ensure the data is not overwritten or deleted.  The Receiver and his Professionals identified hundreds of thousands of documents, from multiple sources.  There are very few hard copy records, and the Receiver has been able to obtain and secure all such records.

---

[27] Net invested capital represents investors' total net cash invested with DLIF and DLIFF based on the total of subscriptions less redemptions less distributions.  The net invested capital amount does not include the purported returns on investments that were reflected in the reports to investors as to the supposed value of their investments on their individual investor account statements.

[28] Excludes $161.6 million in total of (a) DLI's investment account, (b) non-cash transfers and (c) non-cash switches.  The words switch or switches are used to describe an event whereby an investor closes their account with one fund (e.g., DLIF) in order to open a new account with the other fund (e.g., DLIFF).

Upon taking possession of DLI's offices, the Receiver's team performed a cursory review of all records located on the premises and available electronically.  The team specifically sought out and reviewed in greater detail records pertaining to existing assets, accounting, investors/fundraising, acquisition/disposition of assets, and other related matters.  All pertinent records and data were reviewed in detail as appropriate during investigation and administration of the Receivership. The universe of third-party records continues to grow as other investigations continue.

In addition, the Receiver has received and reviewed investor tips; evaluated the claims and contentions of counterparties during settlement negotiations, as reflected in various refinancing and settlement agreements as approved by the Court; met with current and former DLI employees; and considered input from counsel that reflects attorney opinion work product based on counsel's interviews of numerous witnesses, review of documents produced by many third parties, and factual and legal research.

While the Receiver found a plethora of documentation and information, the records of DLI were deficient with respect to management level reports that would allow someone to quickly and easily understand the loan underwriting process, financial activity by counterparty, and uses of investor funds, among other key aspects of DLI's business.  During the Receivership, the Receiver and his team have worked with DLI employees to gather relevant information and documents, reconstruct loan activity, analyze all disbursements and conduct other analyses in connection with this Report.

Shortly after the initial entry, the Receiver also took control of the bank accounts of the Receivership Entities and a bank account in the name of DLI Assets, LLC.  All bank accounts have been secured, and the Receiver has opened new accounts as appropriate.

### B.  Employees

As of April 1, 2019, when the Receiver made his entry, DLI had 16 employees and one temporary/contract employee.  In addition to the management team, the employees included accounting personnel, employees assigned to investor relations who respond to investor inquiries, personnel involved in loan and related collections, and legal personnel.

With the authority granted to the Receiver based on the Court's order granting the Receiver's Motion for Instructions re Scope of Receivership (Doc. No. 57) ("Additional Receiver Authority Order"), by the end of third quarter 2019 the Receiver was able to address overstaffing by reducing the number of DLI staff from 16 to six employees and one temporary employee.  By early October, the Receiver arranged for the remaining employees to work remotely to allow the Receiver to vacate the DLI leased office premises in Glendale.

As of the date of this Report, there are four employees, all of which work remotely.

### C.  Leased Premises

Pursuant to the authority granted in the Additional Receiver Authority Order, the Receiver successfully subleased the DLI office space effective October 7, 2019, resulting in significant

savings to the estate as the scheduled sublease payments covered almost all of the monthly lease payments due under the Master Lease.  Subsequent to the sublease, the Receiver was able to reach an agreement with the landlord to effectively buy out of the office lease which resulted in the termination of the office lease, termination of the sublease and release of funds used as collateral for the letter of credit held by the landlord.

D.  Opus

Beginning in August 2019, the Receiver shifted the investor noticing work from Opus Fund Services (Bermuda) Ltd. ("Opus") to the Receiver's Court-approved claims agent Bankruptcy Management Solutions dba Stretto ("Stretto") in anticipation of the termination of Opus as an ongoing service provider.  Under the terms of the service agreement with Opus, the Receiver terminated the services of Opus effective September 26, 2019.  As part of the termination of the services of Opus, the Receiver explored alternatives for all of the historical data and communications held by Opus to be transferred to the Receiver. Based on logistical issues with the transfer of the records, Opus instead acknowledged and agreed in writing to comply with the provisions of its service agreement that obligate Opus to maintain, at Opus's expense, all documents, records, communications, and other investor data and to provide such data from time to time that the Receiver may request, at Opus's expense. Opus continues to maintain records and provide the Receiver access to its portal.

Since the termination of services of Opus, Stretto has taken primary responsibility for communications with investors.  The Receiver's team and DLI employees are also providing standardized information to investors about the status of DLI, its funds and the Receivership, including through the Receiver's website that was established for the purpose of keeping investors informed of developments in the case.

E.  Tangible Personal Property

In addition to the cash on hand and loan portfolio at the commencement of the Receivership, the estate included personal property and furnishings located at the DLI offices in Glendale, California.  The Receiver inventoried the personal property assets and, in connection with the office sublease, the Receiver negotiated a sale of miscellaneous office furniture, office equipment, and office supplies to the new subtenant.  The sale produced $20,000 in additional proceeds for the estate in addition to enticing the subtenant to move into the office space.  The sale of the goods in place avoided the expenses of moving and attempting to liquidate this miscellaneous property that would have had little or no net value if it had not been sold in place.

The Receiver has also sold all seven wall art pieces for $74,000 to two buyers following an order entered on June 1, 2020.

F.  Litigation Claims

The other significant assets of the estate are potential litigation claims.  The Receiver and his litigation counsel have concluded that improper and/or negligent conduct by certain third party professional service advisors and individuals were also substantial factors contributing to, or

27

directly, causing losses to the Receivership Entities. The Receiver and counsel are investigating those claims further, as well as additional potential claims, including potential claims against other professional advisors, fraudulent transfer and related claims, claims against third parties that may have conspired with Ross or aided and abetted improper conduct, as well as potential claims against former officers and directors of the Receivership Entities, which may be covered by the directors and officers liability insurance policy ("D&O Policy"). The investigations are at different stages, and the Receiver will provide additional reporting to the Court on those potential claims as settlement efforts are undertaken, as litigation unfolds and is proposed, and as additional information is developed.

In the course of the investigation, the Receiver's Counsel has issued more than sixty (60) subpoenas to third parties for the production of records -- including subpoenas to legal, accounting, valuation professionals, and financial institutions. Counsel has reviewed and analyzed a significant volume of the documents and records produced. These subpoenas, and voluntary productions by other entities, resulted in the production of more than 750,000 pages of documents. The Receiver continues to receive further productions from third parties, and the review process of these voluminous productions continues. Many of the third party productions are covered by a protective order in place that limits the use of certain confidential information.

From the DLI servers the Receiver: secured and is analyzing over 1.5 terabytes of electronic material; secured and is reviewing the information on 25 company laptops and tablets; and migrated over 480 gigabytes of email archives to a robust and efficient e-discovery platform. Counsel for the Receiver has isolated more than 100,000 key communications between Ross, and other DLI employees, with counterparties; investors; and regulators to review in-depth and use the information to further the investigation.

To date, the Receiver's Counsel has participated in extensive meetings and undertaken witness interviews with more than seventeen persons employed by or affiliated with DLI. The Receiver's Counsel has conducted in depth investigations and interviews of several counterparties, including three principals of counterparties with substantial positions related to DLI, and has gained valuable knowledge of the counterparties' business and financial positions from participating in negotiations with counterparties as the portfolio has been liquidated. Counsel has interviewed witnesses from third party service providers for DLI and obtained additional facts and perspective. In addition, Counsel has spoken to many investors and discussed the circumstances related to how these investors decided to invest with DLI and what representations were made to them. These meetings and interviews have provided valuable information regarding DLI, the investments with and relationships with the counterparties, the reasons for the investments' success or failure, the events leading up to the resignation of Ross, and the circumstances that led to the commencement of the Receivership.

The Receiver and his Professionals have engaged in a comprehensive analysis of the factual and legal foundation for a number of potential claims, and legal issues germane to the evaluation of such claims and defenses, including statute of limitations issues, potential application of the discovery rule, and choice of law considerations. This work product and the active work underway will provide the basis for recommendations concerning whether or not to initiate litigation against potential defendants. Further investigation of the facts and circumstances relevant to the basis to

assert those claims or may provide evidence of defenses to the claims, precluding or limiting their assertion.  The Receiver has entered into confidential tolling agreements with a number of key parties where counsel identified a possible statute of limitations period that could have expired before April 30, 2020, and has entered into tolling agreements with other parties as well, in order to allow him and his counsel to fully investigate and analyze potential claims.

To promote the goal of resolving potential claims against third parties where possible without the expense of litigation, the Receiver has reached an agreement with the audit firm Deloitte & Touche LLP, to pursue a settlement process, including selecting a team of well-qualified mediators.  Certain investors and their lawyers will also participate in the process subject to confidentiality agreements.  It is expected that this process will unfold over the coming months as information is exchanged between the parties pursuant to the settlement protocol.

The Receiver, as well as DLIFF through the Joint Official Liquidators, filed a lawsuit against Duff & Phelps, LLC on September 3, 2020, which is pending before the Receivership Court.[29]

Efforts also are underway to explore the possibility of mediating a number of other potential claims as well.  The Receiver will update the Court and the parties in interest on his progress.

With respect to potential litigation, the Receiver, in his capacity as U.S. Joint Official Liquidator in the Cayman Proceeding, and the Cayman JOL, Christopher D. Johnson, agreed that it would be most efficient and cost-effective to use a single law firm, Diamond McCarthy, LLP, to pursue claims on behalf of the off-shore Feeder Fund DLIFF alongside the Receiver's claims.  A conflict resolution protocol (the "Protocol") was submitted to the Cayman Court and was approved by that court on July 16, 2020.  The Receivership Court subsequently also approved the Protocol.  (Doc No. 293).  The Receivership Court also approved the Receiver entering into an engagement letter with Diamond McCarthy which will permit the firm to serve as counsel for the JOLs for the limited purpose of investigation and evaluation of potential claims of DLIFF under United States law.

**V. Ponzi Scheme Analysis**

　　A.  The Definition of Ponzi Scheme

No single definition of a Ponzi scheme exists.[30]  In general, courts have stated that Ponzi schemes exist when "returns to investors are not obtained by any business venture but are taken from monies received from later investors."[31]  Other courts have concluded that the existence of some legitimate business operations does not preclude a determination of the existence of a Ponzi scheme when it

---

[29] *Bradley D. Sharp, as the Permanent Receiver for the Estate of Direct Lending Investments, LLC, et al. v. Duff & Phelps, LLC,* Case No. 2:20-cv-08069, United States District Court, Central District of California.

[30] *SEC v. Management Solutions, Inc.*, 2013 U.S. Dist. LEXIS 120277 (Aug. 22, 2013 D.Utah) (citing cases on Ponzi scheme definitions); *Gold v. First Tenn. Bank (In re Taneja)*, 2012 WL 3073175 *4-6 (Bankr. E.D. VaA. July 30, 2012) (quoting various Ponzi scheme definitions and case citations).

[31] *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993) (citing *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988)); *See also, Auza v. United Dev., Inc. (In re United Dev., Inc.)*, 2007 Bankr. LEXIS 4857, at *14 (9th Cir. BAP 2007).

29

deviated thereafter.[32] Some courts have stated that Ponzi schemes, by their very nature, are insolvent from inception of the scheme and become increasingly more insolvent as the scheme progresses.[33]

The SEC defines a Ponzi scheme as follows:[34]

A Ponzi scheme is an investment fraud that involves the payment of purported returns to existing investors from funds contributed by new investors. Ponzi scheme organizers often solicit new investors by promising to invest funds in opportunities claimed to generate high returns with little or no risk. In many Ponzi schemes, the fraudsters focus on attracting new money to make promised payments to earlier-stage investors to create the false appearance that investors are profiting from a legitimate business.

The Forensic & Valuation Services Practice Forensic Accounting – Fraud Investigations, published by the AICPA, defines a Ponzi scheme as follows:[35]

A Ponzi or pyramid scheme is usually a venture wherein earlier investors are repaid principal plus interest with funds provided by later investors. There may or may not be a legitimate business purpose for the venture, but the need for capital creates and continues the scheme. Often, unusually high investment returns or other inducements are offered by the promoters to attract investors.

The Ninth Circuit Court of Appeals has described a Ponzi scheme as:[36]

…an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists where in fact no such opportunity exists.

---

[32] *See, e.g., Auza v. United Dev., Inc*. (*In re United Dev., Inc.*), 2007 Bankr. LEXIS 4857, at *16 (9th Cir. BAP 2007); *In re Bonham*, 251 B.R. 113, 136–137 (Bankr. D. Alaska 2000); *In re Taubman*, 160 B.R. 964, 973 (Bankr. S.D. Ohio 1993); *Gillman v. Geis* (*In re Twin Peaks Fin. Servs.*) 516 B.R. 651, 655 (Bankr. D. Utah 2014) ("The fact that an investment scheme may have some legitimate business operations is not determinative. If the debtor's legitimate business operations cannot fund the promised returns to investors, and the payments to investors are funded by newly attracted investors, then the debtor is operating a Ponzi scheme."); and *Wing v. Dockstader*, 2010 WL 5020959 at *4 (D. Utah 2010).

[33] *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011) (additional citations omitted); and *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

[34] Source: U.S. Securities and Exchange Commission website at https://www.sec.gov/fast-answers/ answersponzihtm.html under *What is a Ponzi scheme?* (last visited July 10, 2020).

[35] Source: Forensic & Valuation Services Practice Aid Forensic Accounting – Fraud Investigations, published by the American Institute of Certified Public Accountants 2014, page 58 – Ponzi.

[36] Sources: *Auza v. United Dev., Inc.* (In re United Dev. Inc.), 2007 Bankr. LEXIS 4857 at *14; *Hayes v. Palm Seedlings Partners (In re Agric Research)* 916 F.2d 528, 531 (9th Cir. 1990) (Citing, *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S.Ct. 424, 425, 68 L. Ed. 873 (1924); see also *Wyle v. C. H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 590 n. 1 (9th Cir. 1991).

"By its very nature, a Ponzi scheme will eventually collapse. Perpetrators therefore know that the investors at the end of the line will lose their investment."[37]

"As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse."[38]

  B.   Summary of Factors Identified in Receivership Case Demonstrating Ponzi Scheme

The facts considered by courts to determine whether or not a Ponzi scheme exists range in scope. One court created a four-factor analysis that many other courts have relied upon, including: [39]

  1.   deposits were made by investors;

  2.   the Debtor conducted little or no legitimate business operations as represented to investors;

  3.   the purported business operations of the Debtor produced little or no profits or earnings; and

  4.   the source of payments to investors was from cash infused by new investors.

There are additional factors that have been found to weigh in favor of applying a presumption of fraud in a Ponzi case.  "These badges are, however, merely characteristics of many Ponzi schemes but a Ponzi scheme can exist without them."[40] Some courts find that a "'clear pattern of purposeful conduct' will support a 'finding of actual intent to defraud.'"[41]

The additional factors will be discussed below and following each factor is a summary of corresponding findings in this Receivership case. The Receiver's findings are discussed in more detail starting on page 39.

---

[37] *Ivey v. First Citizens Bank & Trust Co.* (*In re Whitley*), 2013 Bankr. LEXIS 521, at *31 (Bankr. M.D.N.C. Feb. 7, 2013) (citing *Martino v. Edison Worldwide Capital* (*In re* Randy), 189 B.R. 425, 438 (N.D. Ill. 1995)).

[38] *Gold v. First Tenn. Bank, N.A.* (*In re Taneja*), 2012 Bankr. LEXIS 3554, at *20 (Bankr. E.D. Va. July 30, 2012), *aff'd*, 743 F.3d 423 (4th Cir. 2014) (citing *In re C.F. Foods, L.P.,* 280 B.R. 103, 110 n.15 (Bankr. E.D. Pa. 2002)).

[39] *Rieser v. Hayslip* (*In re Canyon Sys. Corp.*), 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006) (citation omitted); *Wiand v. Waxenberg,* 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009)*; Forman v. Salzano (In re Norvergence, Inc.),* 405 B.R. 709, 730 (Bankr. D.N.J. 2009); *see also United States v. Sudeen,* 434 F.3d 384, 386 (5th Cir. 2005) (describing several interdependent fraudulent schemes as "a fairly elaborate Ponzi scheme" where perpetrators represented to potential investors, among other things, "that their money would be placed in 'high yield investment programs that would generate profits for them at greater-than-market rates of return.")*.*

[40] *Gowan v. Amaranth Advisers L.L.C. (In re Dreier LLP),* 2014 Bankr. LEXIS 11, at *30 (Bankr. S.D.N.Y. Jan. 2, 2014).

[41] *Pereira v. Checkmate Commc'ns Co. (In re Checkmate Stereo & Elecs., Ltd.),* 9 B.R. 585, 612-13 (Bankr. E.D.N.Y. 1981) (citing *In re Freudmann,* 495 F.2d 816, 817 (2d Cir. 1974)).

31

*1.* Limited legitimate business investments were overrun by fraudulent operations.

*The Ponzi perpetrator did not have any legitimate business operation to which its alleged investment program is connected.[42]*

The Master Fund initially invested investor funds in a variety of loans, many of which involved legitimate business operations. However, fraudulent conduct permeated these operations and investments from inception. The Receiver has concluded that at some point, it was no longer possible for the Master Fund to operate legitimately to generate sufficient returns to pay repay the Feeder Funds and permit the Feeder Funds to repay their investors at the NAV that had been reported to those investors.  Further, the Receiver has concluded that Ross, with fraudulent intent, sought new investor funds that were used to pay earlier investors their promised returns.

Since no investor held interests in a specific asset or loan portfolio, the fraud tainted each investor's investment equally. Ross caused DLI to provide investor reports with inflated NAVs and other misrepresentations to all investors, regardless of the nature of the investments made with their funds.  DLI thereafter caused the funds raised from investors to be commingled with other investor funds and loan portfolio proceeds. Investors were also all subject to the misappropriation of funds and other misconduct by Ross described in this Report, which caused the incurrence of substantial unrecognized losses. Therefore, despite some underlying legitimate investments, the overall business operations of the Master Fund have caused losses to the investment portfolio and an estimated $250.7 million in Aggregate Investor Cash Losses.

For a detailed description of the performance of the loan portfolio, see pages 58 and 68, respectively.

2. Misrepresentations to investors.

*The Ponzi perpetrator made unrealistic promises of returns on their investments.[43]*

---

[42] *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that matter all of the investor's profit may have come from 'legitimate' trades made by the [corporations owned by the debtor]. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations."); *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 590 n.1 (9th Cir. 1991) (describing the Ponzi scheme's purported "profit-making business opportunity" as "an illusion"); *In re Vaughan Co. Realtors,* 500 B.R. 778, 789 (Bankr. D.N.M. 2013) ("[R]eturns to investors are not financed through the success of the underlying business venture, if any, but are taken from principal sums received from newly attracted investments.").

[43] *O'Halloran v. First Union Nat'l Bank of Fla.,* 350 F.3d 1197, 1199 (11th Cir. 2003) (noting that 100% return was promised to those investors who were able to find two additional investors); *United States v. Benson,* 79 Fed. App'x 813, 817 (6th Cir. 2003) (noting that perpetrator promised 138% and 181% return with no risk); *Canyon Sys.,* 343 B.R. at 624-25; In re Taubman, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993); *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs. LLC),* 2011 Bankr. LEXIS 2394, at *15 (Bankr. M.D. Fla. June 24, 2011) ("The debtor and the Netschi Companies conned people into making a purchase they believed would generate a future income stream based on the perpetrators' misrepresentations about the amount of withdrawal fees each ATM could earn. The ATM purchasers were therefore no different from investors hoping to make above market returns based on phony investments, and the monies they transferred to the debtor and the Netschi Companies were functionally equivalent to investments.").

*The perpetrator overstated its investment returns and understated its losses.*[44]

*"[T]he debtor induces investments through an illusion of paying returns to investors from legitimate business activities.*[45]

*The perpetrator "mischaracterize[s] the nature of the . . . investment opportunities and any risk associated with making an investment."*[46]

*The perpetrator failed to invest all of the investors' funds in promised investments.*[47]

*There were inconsistencies between debtors' bank statements and "false statements issued to customers."*[48]

The six factors listed above, and that are commonly found in Ponzi scheme cases, share the common theme where the reality of the failed investments are very different than what was represented or promised to investors.  Similar facts exist in this case.  Unrealistic promises of consistent and high returns guided by specific loan criteria involving supposedly little risk were made.  This certainly encouraged new investors to invest and existing investors to maintain their investments.  In reality, Ross failed to fulfill his promises.  Instead of exposing the truth about loan underperformance or losses, Ross: (a) covered up his inability to identify sound investment opportunities at a pace consistent with the overwhelming inflow of investor funds, (b) hid the losses associated with underperforming loans in order to report high and consistent returns to investors, and (c) increased his opportunity to extract investor funds for his personal benefit.

Ultimately, Ross misrepresented the nature of the investment opportunities, the risk associated with making an investment, and the performance of the loan portfolio and the returns to investors.  The result of Ross's efforts is that later investors were persuaded to invest and earlier investors were discouraged from redeeming their investments.  The impact of the losses will inequitably be felt most by the investors that remained through the Receivership Date.

      3.   Funds from later investors used to pay earlier investors.

      *"[N]ew investor money was being used to pay old investors."*[49]

Since inception, a total of 80% of the funds paid to earlier investors in connection with their redemption and distribution requests came from funds from later investors and DLG. The returns actually paid to investors largely did not come from any profitable business operations; rather, the scheme perpetuated itself because investors could comfortably redeem so long as new money came in from later investors. Ultimately, the Master Fund did not have sufficient funds or value from its investments to repay the net invested capital of the Feeder Funds in full.  For every dollar that was paid out to a redeeming investor, DLI created a further divide between the obligations to repay

---

[44] *Id.*
[45] *Id.*
[46] *Wing v. Dockstader,* 2010 U.S. Dist. LEXIS 128571, at *11 (D. Utah Dec. 3, 2010) (noting that "investors were told their investment was secured by real property, including a first position trust deed when they were not").
[47] *Id.*
[48] *Id.*
[49] *Wing v. Williams,* 2011 U.S. Dist. LEXIS 25607, at *10 (D. Utah Mar. 11, 2011).

33

investors and the bag of assets available to repay investors.  See page 37 for an overview of the sources and uses of cash for further detail regarding the use of funds from later investors used to pay earlier investors.

> 4.  The Master Fund, Feeder Funds and other Receivership Entities did not maintain a proper separateness as investor funds were commingled.

> *"Money was commingled."*[50]
>
> *Investors' monies were transferred among related entities without regard to separate corporate identities.*[51]
>
> *The perpetrator failed "to maintain separate investor accounts."*[52]

Although there was an obligation to limit redemptions when money was not available to both support operations and to repay investors, and promised investors that DLI would pay redemptions only when there was available funds to support redemptions, Ross routinely used money from new subscriptions to repay investors when there were not enough receipts from operations to fund redemptions.[53]  To make matters worse, even when funds from subscriptions were used to pay redemptions, Ross also directed new subscription funds to be used to fund loan portfolio positions that were overvalued and only losing money.

Funds from investors were always commingled with other investor funds and, to the extent funds were not used to repay earlier investors directly, they would be commingled further with proceeds from the loan portfolio.

The undisputed facts surrounding the investment program reflect that: (a) investor subscriptions (or deposits) were made by investors; (b) investor subscriptions (or deposits) were commingled with proceeds from the loan portfolios or other investor funds in accounts where the money was then used to repay old investors; (c) investor subscriptions (or deposits) were commingled with proceeds from the loan portfolios and virtually all investor redemptions were paid from commingled funds; and (d) the source and destination of each investor's funds cannot be meaningfully disentangled.

See page 47 for a more detailed discussion of the commingling of funds.

---

[50] *Id.*

[51] *Id.* at *12 ("[W]hen there wasn't enough money in one account to satisfy one entities' obligations, [the Ponzi scheme orchestrator] would transfer money between accounts in order to meet [the corporations'] obligations.").

[52] *In re NJ Affordable Homes Corp.,* 2013 Bankr. LEXIS 4798, at *74 (Bankr. D.N.J. Nov. 8, 2013)

[53] Professional third party advisors, and others, whose work should have alerted individuals within and connected to the Receivership Entities, failed to properly comply with the applicable standard of care and/or engaged in other misconduct.  There were individuals within the Receivership Entities and connected to the Receivership Entities that would have taken action to protect the interests of the Receivership Entities and would have implemented changes to prevent them from sustaining the full extent of the damages suffered by the Receivership Entities, which in turn impacted the investors.  Unfortunately, they were not aware of and/or alerted to the intentional improper acts and/or the full facts and circumstances described in the Report.

34

    *5.*   Lower returns to later investors.

    *Later investors received lower returns than earlier investors.*[54]

Later investors generally received lower returns than earlier investors with initial reported net returns as high as 13% and later reported returns as low as 7%, both on an annualized basis. Earlier DLIF investors received $89.3 million in payments in excess of their investments ("net winnings"), so earlier investors profited at the expense of the later investors. See page 49 for analysis of net winnings paid to DLIF investors over time. Investor claimants will bear the full brunt of the unrealized losses. See page 48 for a more detailed description of the reduction of returns to investors over time.

    6.   Perpetrator benefiting from scheme.

    *Excessively large fees were taken by the perpetrator from the customers' "investment" funds.*[55]
    *The perpetrator used customer funds "for non-customer purposes."*[56]

Excessive fees were taken by DLI in connection with the previously discussed QuarterSpot overvaluation and with the general practice of falsely inflating NAVs and loan balances. These fees were an important part of the fraud. The higher the falsified NAVs and loan balances were, the greater the fee that Ross could justify having the investors pay DLI. The greater the fee paid to DLI, the more opportunity to remove funds for Ross's benefit. Ross benefited from the scheme in at least the following ways:

    (a) Ross took payments or allocations in the amount of at least $31.4 million from DLI, including through Robin Hill Investments, LLC and Robin Hill Services, LLC, as discussed more fully on page 51.

    (b) Ross tried to profit from investments in, and ingratiate himself to, risky startup companies in the "FinTech" lending space hoping to capitalize on the growth in that sector, while personally aggrandizing himself as an investment guru and claiming to be an expert on investing money through non-traditional loans to new businesses. The amount of profits Ross made from such personal investments in entities that borrowed from the Master Fund is unknown at this time.

    (c) Ross arranged for DLI to invest in the Master Fund the management and performance fees paid to it. As a result, DLI recorded its own return from its investment of fees to the tune of a $17.6 million[57] in redemptions in excess of principal invested at a time when the Feeder Funds could not even satisfy redemption requests or pay promised returns to legitimate investors without using new investor funds. This was a significant contributor to the $31.4 million that was taken out of DLI as discussed above. In written materials generally sent to investors, Ross did not promote the fact that DLI

---

[54] *Taubman*, 160 B.R. at 973.
[55] *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993).
[56] *Id.; World Vision*, 275 B.R. at 657.
[57] DLI's investment return of $17.6 million includes $14.4 million in cash redemptions and $3.2 million in non-cash allocations from DLI's investment account to Ross's investment account.

invested in the Master Fund as might be expected to encourage investors to invest because he also had "skin in the game," perhaps because the DLI investment was the primary mechanism for him to remove money from the scheme. He may, however, have covered this in his many oral presentations to investors or in emails that the Receiver has not yet identified. The DLI investment was reflected in audited financial reports for the Master Fund in Statements of Changes in Partner's Capital which included investment activity for DLI and the limited partners, so the information was available to investors as audited financial reports were shared with investors.

       7.   Use of broker dealers and finders.

> *The perpetrator recruited agents to sell its products and pays commissions to perpetuate the scheme.[58]*
>
> *The perpetrator paid the brokers high commissions to induce them to continue the sales and keep the cash flowing in.[59]*
>
> *The commission structure with the sales people provided incentives "to discourage investors from requesting withdrawals."[60]*

DLI paid a 20% commission to broker dealers and finders, including at least 9 current DLIF investors, on both management fees and performance fees on a periodic basis in order to induce other parties to bring new investors and new funds into the Feeder Funds.[61] Since the commissions were paid on an ongoing basis, as long as the investors maintained their investments with the Feeder Funds there was an incentive for the agents and finders to discourage investors from redeeming their investments from the Feeder Funds.

       8.   False incentives to investors.

> *Investors were encouraged to roll over or extend their investments rather than receive back their principal.[62]*

Ross ensured that investor relations employees were constantly aware of when investors were requesting redemptions and what might be done to persuade them from redeeming. Ross would then insist that he be the one to communicate further with the investors. In particular, during the summer of 2017 with the QuarterSpot side pocket and the threat of wholesale redemptions, Ross made sure that all investor questions were funneled to him. Ross put tremendous efforts into shaping the messaging in the investor letters during the late summer of 2017, even noting in one email that the August 2017 investor letter "might be the most expensive in history" given his painstaking efforts to spin the messages being delivered to the investors in that critical time period.

---

[58] *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002).
[59] *Id.*
[60] *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 440 (Bankr. S.D. Tex. 2009).
[61] Certain limited exceptions to this commission structure have been identified, including commissions based on a percentage of investor subscription amounts.
[62] *Id.*

36

Ross had DLI employees track and notify him of redemption requests and would undertake efforts to dissuade investors, where possible, from actually redeeming.

9.   Fraudulent conduct of the promoter of the scheme.

As an overlay to all of these hallmark signs of a Ponzi scheme, the Receiver's investigation has revealed fraudulent conduct which helps to explain why the irregularities and losses have occurred in this case. The fraudulent conduct detailed in this Report is summarized at a high level as follows:

(a)  The falsification of loan values and NAVs that were done to (i) misrepresent information to investors to perpetuate the scheme and (ii) allow Ross to increase the management fees to his wholly-owned DLI that were then misappropriated by him;

(b)  Ross misappropriated at least $31.4 million from DLI; and

(c)  The substantial and blatant ongoing misrepresentations to investors.

Ponzi schemes must ultimately fail because the returns promised to investors exceed any legitimate business profits and the scheme is dependent on new investor funds to pay promised returns to earlier investors. The existence of some legitimate business activities does not preclude the determination of a Ponzi scheme, nor do they eliminate the damage caused by the fraudulent activity. The fraudulent conduct in this case, on top of the commingling and grossly insufficient legitimate loan performance, makes clear that the fraudulent scheme became a Ponzi scheme.

The factors summarized in this section are detailed more fully following the summary presentation of all Receivership cash sources and uses in the next section.

C.   Cash Sources and Uses

Prior to exploring each Ponzi scheme factor in further detail, this section provides an overview of all of the cash sources and uses of the Receivership Entities.  On the following page is a summary of the sources and uses broken down by five key categories: (a) investor activity, (b) DL Global activity, (c) loan activity, (d) operating activity, and (e) Brendon Ross activity.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

37

| Receivership Entities - Cash Sources & Uses (Inception – 3/31/19) ($M) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 1Q19 | Total |
| **Cash - Beginning Balance** | - | $0.0 | $0.0 | $0.5 | $1.3 | $20.1 | $60.3 | $2.9 | - |
| Investor Activity | | | | | | | | | |
| Funds Received from Investors | 1.0 | 16.0 | 87.0 | 299.8 | 515.2 | 350.1 | 174.5 | 23.3 | 1,466.8 |
| Investor Redemptions & Distributions | - | (0.1) | (2.6) | (27.6) | (152.3) | (376.0) | (356.2) | (13.6) | (928.3) |
| Net Investor Activity | 1.0 | 15.8 | 84.4 | 272.2 | 362.9 | (25.9) | (181.7) | 9.7 | 538.5 |
| DLG Participation Activity [1] | | | | | | | | | |
| DLG Participation Proceeds | - | - | - | - | - | 170.3 | 61.8 | - | 232.1 |
| Passthrough Receipts | - | - | - | - | 0.0 | 6.1 | 36.9 | 7.9 | 50.9 |
| Participation Payouts | - | - | - | - | - | (4.6) | (37.9) | (7.9) | (50.5) |
| Net DLG Participation Activity | - | - | - | - | 0.0 | 171.7 | 60.8 | (0.0) | 232.5 |
| Net Investor & DLG Participation Activity | 1.0 | 15.8 | 84.4 | 272.2 | 362.9 | 145.8 | (120.9) | 9.7 | 771.0 |
| Loan Activity | | | | | | | | | |
| Portfolio Receipts - Principal [2] | - | - | 5.1 | 27.4 | 190.9 | 282.9 | 231.7 | 42.3 | 780.2 |
| Portfolio Receipts - Interest | - | - | 9.6 | 16.5 | 53.5 | 115.3 | 119.2 | 12.0 | 326.1 |
| Loan Fundings | (1.0) | (15.9) | (97.0) | (308.1) | (569.1) | (468.2) | (263.3) | (25.8) | (1,748.4) |
| Other Passthrough Receipts [3] | - | - | - | - | - | 1.5 | 2.4 | 0.5 | 4.4 |
| Other Passthrough Payments [3] | - | - | - | - | - | (1.5) | (2.4) | (0.5) | (4.4) |
| Net Loan Activity [4] | (1.0) | (15.9) | (82.3) | (264.2) | (324.7) | (70.0) | 87.6 | 28.5 | (642.0) |
| Operating Activity [5] | 0.1 | 0.0 | (1.0) | (3.6) | (12.4) | (22.6) | (17.8) | (9.3) | (66.6) |
| Ross Activity | | | | | | | | | |
| Ross DLIF Investment Acct. Funding | - | 0.2 | - | - | 0.7 | - | - | - | 0.9 |
| Ross DLI Advances & Repayments | - | - | 0.0 | 0.1 | 8.9 | 3.2 | 0.3 | 0.5 | 12.9 |
| Ross DLIF Redemptions & Distributions | - | (0.0) | (0.0) | (0.2) | (1.0) | (1.3) | (0.2) | - | (2.8) |
| Ross Net Payments via RHS / RHI / RAA [6] | - | - | (0.2) | (0.1) | (9.3) | (9.1) | (5.3) | - | (24.1) |
| Ross Payroll Related Payments via DLI / RAA | (0.1) | (0.1) | (0.3) | (0.7) | (0.5) | (0.3) | (0.3) | (0.0) | (2.5) |
| Ross DLI Withdrawals & Distributions | - | - | (0.1) | (2.7) | (5.7) | (5.4) | (0.7) | - | (14.6) |
| Net Ross Activity | (0.1) | 0.1 | (0.7) | (3.7) | (7.0) | (12.9) | (6.3) | 0.5 | (30.2) |
| **Cash - Ending Balance [7]** | **$0.0** | **$0.0** | **$0.5** | **$1.3** | **$20.1** | **$60.3** | **$2.9** | **$32.1** | **$32.1** |

1) DLG paid $232.1 million for loan participation interests in certain counterparty loans, including QuarterSpot, Investment T, Investment S and Forward Financing. DLI subsequently collected $50.9 million in passthrough receipts from these counterparties on behalf of DLG (see passthrough receipts) and forwarded $50.5 million to DLG. The remaining $0.4 million ($50.9 million collected minus $50.5 million forwarded) was sent to DLG in 2020.

2) Amounts include $38 million in receipts from Quanta's direct purchase of Investment S loans.

3) Passthrough receipts include $3.7 million in Investment S proceeds for Quanta and $0.7 million in interest passthrough payments to CPH2, a CarePayment Technologies affiliate. The timing of the receipts has been scheduled to match the timing of the payments for simplification purposes. The actual timing of these receipts may be slightly earlier than presented.

4) The $642.0 million net cash outflow, or deficit, as of the Receivership Date will ultimately be reduced by post-Receivership portfolio recoveries. Through July 31, 2020, the Receiver has collected $177.4 million from the loan portfolio, net of additional loan fundings and participation collections on behalf of third parties, with expectations to recover an additional $109.2 million, net of any additional loan fundings, for a total post-Receivership recovery of $286.6 million. If this total post-Receivership recovery is realized, the $642.0 million deficit would turn into a $355.4 million deficit. The Receiver estimates that Net Loan Losses will be $501.4 million.

5) Amounts include $4.4 million that went to Robin Hill Investments, LLC, Robin Hill Services, and LLC Ross Asset Advisors, Inc. which is in addition to the amounts that ultimately reached Ross through the same entities.

6) Amounts represent payments by Robin Hill Services, LLC, Robin Hill Investments, LLC and Ross Asset Advisors, Inc. to Ross (less amounts received from Ross) from funds received from Direct Lending Investments, LLC.

7) The March 31, 2019 cash balance of $29.7 million as reported in First Status Report (Doc. No. 15) had a mathematical error and should have shown a total of $32.3 million. The difference between the $32.3 million book balance as reported in the First Status Report versus the $32.1 million bank balance shown above about is equal to (a) omission of the $285 thousand cash balance associated with a letter of credit for the office lease from the First Status Report and (b) $500 thousand in timing differences between book to bank balances.

While at first glance it may appear that in each year there were sufficient funds from portfolio receipts (first two lines under Loan Activity) to pay investor redemptions and distributions (second line under Investor Activity), the timing of portfolio receipts and investor payments did not allow

38

for that to actually happen.  See page 46 for a discussion regarding the analysis conducted to determine source of funds used to pay investors.

     D.   Deeper Discussion of Factors Demonstrating Ponzi Scheme

       1.   Limited legitimate business investments were overrun by fraudulent operations which led to certain insolvency.

The law does not require 100% fraud to establish a Ponzi scheme.[63]  This is a situation where some of the underlying loan investments were legitimate but the overall business operations of the U.S. Receivership Entities were permeated with fraudulent inducement, misappropriation of funds, improper commingling, and related fraud.[64]  See Exhibit 1 for a more detailed discussion of findings related to the pervasive fraudulent misrepresentations.  In addition to the fraud from the inception, the facts also demonstrate that fraud necessarily resulted in a financial situation where since at least April 30, 2016, there is no evidence that the U.S. Receivership Entities in the aggregate were engaged in profitable economic activity that could have led to the repayment of all net invested capital for Feeder Fund investors, let alone pay the promised returns to investors.  DLIF was undeniably insolvent from at least April 30, 2016 forward, if not earlier, based on the restitution claims of the DLIF Investors.

There are several reasons for this conclusion.  First, given the Receiver's determination that the investors were defrauded into entering into the investments through the DLIF limited partnership, the investors would "have claims for restitution and rescission against [DLIF] up to the amount of their initial investments."[65]  Counting the amount of the restitution claims as liabilities renders DLIF insolvent on a balance sheet basis[66] as of at least April 30, 2016 forward.  It is well-recognized that liability on such claims should be considered as debts for the purpose of considering balance sheet insolvency.[67] The debts were non-contingent, since all the events giving

---

[63] *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("It is no answer that some or for that matter all of [the investor's] profit may have come from 'legitimate' trades made by the corporations [owned by the debtor]. They are not legitimate. The money used for the trades came from investors gulled by fraudulent representations."); *Wyle v. C.H. Rider & Family* (*In re United Energy Corp.*), 944 F.2d 589, 590 n.1 (9th Cir. 1991) (describing the Ponzi scheme's purported "profitmaking business opportunity" as "an illusion"); *Santa Barbara Capital Mgmt. v. Neilson* (*In re Slatkin*), 525 F.3d 805, 816 (9th Cir. 2008) ("Further, that Slatkin may have invested a small percentage of the funds he received from investors, and may have received a profit from such investments, does not create a genuine issue of material fact as to the actual existence of the Ponzi scheme.").

[64] The discussion in this section intentionally excludes consideration of DLIFF, but said exclusion should not be deemed to be a conclusion as to whether these facts and conclusions also apply to DLIFF.

[65] *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).

[66] Under the balance sheet test, a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.  *E.g., In re Bayou Group, LLC*, 438 B.R. 284 (S.D.N.Y. 2010) ("Insolvency is generally analyzed using the 'balance sheet test,' [which focuses on] whether the debtor's assets were exceeded by [its] liabilities . . ." (quoting *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2nd Cir. 2006) (in turn citing 11 U.S.C. § 101(32(A)) and citing *In re Centennial Textiles, Inc.*, 220 B.R. 165, 174 (Bankr. S.D.N.Y. 1998), and *In re Durso Supermarkets, Inc.*, 193 B.R. 682, 701 (Bankr. S.D.N.Y 1996)).

[67] *See, e.g., Travellers, Int'l v. Transworld Airlines, Inc. (In re Transworld Airlines, Inc.)*, 134 F.3d 188, 197 (3d Cir. 1998); *Loya v. Rapp (In re Loya)*, 123 B.R. 338, 340 (B.A.P. 9th Cir. 1991); *see generally* Ratner, Stein & Weitnauer, Business Valuations and Bankruptcy (2009), at 128-32 (Insolvency Test: Valuation of Debts).   The issue of when restitution claims arise was addressed specifically in the case of *In re Bayou Group, LLC*, 432 B.R. at 335 (quoting *In*

rise to liability occurred at or before the time investors made the investments.[68]  As of at least April 30, 2016, DLIF had liabilities totaling $483.0 million which exceeded the assets of $478.0 million based on an estimated restated total value[69] as identified in the chart on page 68.

Second, since DLIF did not have an ability to repay investors' capital with profits that were likely to be generated from the portfolio investments, DLIF was operating with unreasonably small capital and thus was insolvent on this basis as well.

Although the phrases "unreasonably small capital" and "unreasonably small assets" are not defined in the Uniform Voidable Transfer Act or in the Bankruptcy Code, courts focus on the financial stability of the company, based on the company's ability to generate sufficient profits to sustain operations, pay its debts and remain financially stable.[70]  The fact-based test focuses on whether a company's cash flow forecasts combined with its assets or capital are reasonable and leave enough margin for error to account for reasonably foreseeable difficulties.[71]  The term "unreasonably small assets" denotes a financial condition short of balance sheet insolvency, and the Unreasonably Small Assets Test of financial condition is aimed at transfers that leave the transferor technically balance sheet solvent but likely doomed to fail.[72]  The facts in this case demonstrating Unreasonably Small Assets include:

(a) Many of the counterparty loans would require a regular influx of additional funding from DLI in order to maintain an ability to repay the existing loans in full and on schedule.  Just as DLIF did not have the ability to repay investors' capital with profits that were likely to be generated from the portfolio investments, it was also dependent upon new investment capital to further fund the counterparty loans so that certain counterparties might be able to repay the loans.

---

*re Bayou Group, LLC*, 396 B.R. 810, 838 (Bankr. S.D.N.Y. 2008) ("*Bayou III*").  In *Bayou III*, the court found that, because the Bayou hedge funds were a fraudulent scheme, they "'were not ordinary corporations [and] the tort liability of the Bayou hedge funds to their investors based upon rescission for fraud was not analogous to shareholder equity interests in a corporation, and this was not an ordinary corporate solvency analysis.'" *Id.* (quoting *Bayou III*). The *Bayou III* court further explained: "'Unlike a corporation which has no liability to its shareholders, it is a given . . . that the Bayou hedge funds had a legal tort liability to their investors for the full amount of their investment based on rescission for fraud.  As such, the investors were and are creditors…'" *Id.*  "[I]n tort cases[,] the relationship of debtor and creditor arises the moment the cause of action accrues." *Id.* (citations omitted).

[68] See *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306-07 (9th Cir. 1987); *In re Loya*, 123 B.R. at 340.

[69] Estimated restated total value is equal to the estimated restated carrying values of the counterparty loans (discussed and identified above) plus the reported non-portfolio components of NAV which consists of cash on hand, plus receivables and prepaid expenses less accrued management fees, accrued performance fees and other payables.

[70] *Moody v. Sec. Pac. Bus. Credit, Inc.* 971 F.2d 1056, 1070 (3rd Cir. 1992) (discussing "unreasonably small capital" in the context of the Uniform Fraudulent Conveyance Act); *Liebersohn v. Campus Crusade for Christ (In re C.F. Food, L.P.)*, 280 B.R. 103, 116 (Bankr. E.D. Pa. 2002) (because the ability of a Ponzi scheme to generate cash flow can only come from the continuation of the fraudulent scheme, the operation could never be 'financially stable,' since its collapse is inevitable).

[71] *See Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1071-1076 (3d Cir. 1992) (discussing 'unreasonably small capital' under the circumstances of the failure of a company following a leveraged buyout); and *Credit Managers Ass'n v. Federal Co.*, 629 F. Supp. 175, 184-188 (C.D. Cal. 1985)(discussing 'unreasonably small capital' under the Uniform Fraudulent Conveyance Act).

[72] *Kipperman v. Onex Corp.,* 411 B.R. 805, 836 (N.D. Ga. 2009).

40

(b) DLIF's dependency on new investor capital to pay redemptions and to fund additional amounts to the counterparties left it at risk if there were to be a wave of redemptions, as it would have only two months to generate sufficient new investments or obtain large loan recoveries.

(c) The fraudulent nature of DLI's investment scheme left the Receivership Entities vulnerable to substantial, possible legal liabilities and expense (from governmental authorities, loan counterparties, investors, and others) and, with respect to DLIF, an inability to pay investor claims for rescission, which had accrued even though largely undiscovered by the investors.

Indeed, Ponzi schemes are considered inherently insolvent as a matter of U.S. law.[73]  See page 68 for a discussion of solvency over time.

By 2015, DLI's portfolio became increasingly concentrated in larger and riskier investments,[74] and since at least April 30, 2016 forward, DLIF was insolvent.  To conceal this insolvency, the actual financial condition of and activities undertaken were not accurately disclosed to investors. At a time when these issues were known by Ross, he was able to manipulate DLI into continuing to lure in new investors with false promises and representations.

Factoring in the information known as of the date of this Report, the Receiver compared reported principal balances to estimated recoverable amounts in order conservatively estimate the extent to which DLI underreported allowance for doubtful accounts and bad debt expense to investors. Based on this analysis, as of the Receivership Date, DLI had underreported allowance for doubtful accounts and bad debt expense of $501.4 million as summarized in the schedule below.  While the general practice of falsely inflating NAVs and loan balances started earlier than December 2015, based on the conservative approach used here, the current analysis does not yet show that the Master Fund reported loan values above estimated recoverable amounts when the portfolio is evaluated as a whole under the methodology used for this Report prior to that period.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[73] *Scholes v. Lehman*, 56 F. 3d 750, 755 (7th Cir. 1995); *In re Independent Clearing House*, 77 B.R. 843, 871 (D. Utah 1987).
[74] See page 18 for a discussion of the change in DLI's investment focus over time.

41

### Estimated Allowance for Doubtful Accounts and Bad Debt Expense
### (Inception – 3/31/19)

| ($ in millions) | Since Inception Ending 11/30/15 | 5 Mos. Ending 4/30/16 | 8 Mos. Ending 12/31/16 | FY17 | FY18 [1] | 1Q19 [1] |
|---|---|---|---|---|---|---|
| Reported Loan Balance [2] | $362.3 | $519.6 | $810.0 | $848.4 | $793.8 | $788.0 |
| Beg. Est. Allowance for Doubtful Accts | - | - | (45.3) | (158.8) | (376.0) | (475.3) |
| Est. Bad Debt Expense [3] | - | (45.3) | (113.5) | (217.3) | (99.2) | (26.1) |
| End. Est. Allowance for Doubtful Accts | - | (45.3) | (158.8) | (376.0) | (475.3) | (501.4) |
| Est. Restated Loan Balance | 362.3 | 474.4 | 651.2 | 472.4 | 318.5 | 286.6 |
| Other Components of Loan Portfolio [4] | 4.6 | 15.5 | 15.0 | (8.4) | (2.9) | (10.5) |
| **Est. Restated Loan Portfolio Balance** | **$366.9** | **$489.9** | **$666.2** | **$464.0** | **$315.6** | **$276.1** |
| Feeder Funds' Net Invested Capital [5] | $333.8 | $483.0 | $731.4 | $704.2 | $536.4 | $534.0 |
| **Est. Surplus/(Deficiency) Amount** | **$33.1** | **$6.9** | **($65.2)** | **($240.2)** | **($220.8)** | **($258.0)** |
| *Est. Surplus/(Deficiency) Margin* | *9.9%* | *1.4%* | *(8.9%)* | *(34.1%)* | *(41.2%)* | *(48.3%)* |

1. The last period for which the books were closed was November 30, 2018. The amounts shown for reported loan balances after this date were prepared in a manner consistent with methodologies used to determine previously reported balances. The November 30, 2018 amount for Ending Estimated Allowance for Doubtful Accounts is $465.7 million ($788.3 million reported portfolio NAV less $322.6 million estimated recovery).
2. The amounts shown for reported loan balances are based on the ending principal balances as prepared and reported by DLI, except for FY18 and 1Q19 (see footnote above). The March 31, 2019 par debt amount of $789.6 million as first reported in the Second Status Report (Doc. No. 83-2) should have been reported as $788.0 million. The difference of $1.6 million is a result of reflecting certain payments from counterparties as principal paydowns instead of interest payments and including capitalized interest reserves.
3. Estimated bad debt expense was determined by comparing the reported loan balances with the estimated restated value (discussed on page 64) in order to estimate the extent to which DLI underreported allowance for doubtful accounts and bad debt expense to investors.
4. Amounts include cash set aside for loan fundings in future periods, amortized discounts, interest receivable, servicing fees payable, amounts due to/from counterparty, loans in funding, and principal and interest reserves.
5. Feeder Funds' net invested capital represents investors' total net cash invested (based on the total of subscriptions less redemptions less distributions) with DLIF prior to the October 2016 restructuring and DLIF and DLIFF's total net cash invested at the Master Fund subsequent to the October 2016 restructuring. Amounts exclude Direct Lending Investments, LLC activity and do not necessarily reflect the invested capital at the Master Fund.

On those loans where DLI has collected in full, either pre- or post-Receivership, the effective internal rate of return ("IRR") was 19.4% (on $465.2 million invested), which could have supported a profitable operation when ignoring written off loans (-40.3% estimated IRR on $430.1 million invested) and outstanding loans (-3.3% estimated IRR on $854.0 million invested).[75] However, incorporating the estimated bad debt expenses that should have been recognized during pre-Receivership periods shows a very different picture with respect to the profitability of the Master Fund. As shown in the schedule below, the Master Fund faced steep losses after 2015.

---

[75] See page 59 for a schedule of internal rate of returns by counterparty.

**Profitability Analysis ($M)**
**(Inception – 3/31/19)**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 1Q19 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Sources: | | | | | | | | | |
| Interest Income [1] | - | - | $9.6 | $16.5 | $53.5 | $115.3 | $119.2 | $12.0 | $326.1 |
| Uses: | | | | | | | | | |
| Fund Expenses (excl. DLI Fees) [1] | - | (0.1) | (0.3) | (0.8) | (3.2) | (7.3) | (6.4) | (1.7) | (19.9) |
| DLI Fees [1] | - | (0.1) | (0.5) | (2.3) | (7.0) | (28.2) | (21.9) | (4.4) | (64.3) |
| Total Uses | - | (0.1) | (0.8) | (3.2) | (10.2) | (35.5) | (28.3) | (6.1) | (84.2) |
| Net Activity Before Est. Bad Debt Expense | - | (0.1) | 8.8 | 13.3 | 43.3 | 79.8 | 90.9 | 5.9 | 241.9 |
| Estimated Bad Debt Expense [2] | - | - | - | (13.3) | (145.5) | (217.3) | (99.2) | (26.1) | (501.4) |
| **Net Activity After Est. Bad Debt Expense** | - | ($0.1) | $8.8 | $0.0 | ($102.2) | ($137.4) | ($8.3) | ($20.2) | ($259.5) |
| Feeder Funds' Net Invested Capital [3] | $1.0 | $16.8 | $100.6 | $372.8 | $731.4 | $704.2 | $527.2 | $534.0 | |
| *Return Available to Feeder Funds* | - | *(0.8%)* | *8.7%* | *0.0%* | *(14.0%)* | *(19.5%)* | *(1.6%)* | *(3.8%)* | |

1) Activity is reported on a cash basis.
2) Estimated bad debt expense was determined by comparing the reported principal balance to the estimated restated value (discussed on page 64) in order to estimate the extent to which DLI underreported allowance for doubtful accounts and bad debt expense to investors.
3) Feeder Funds' net invested capital represents investors' total net cash invested (based on the total of subscriptions less redemptions less distributions) with DLIF prior to the October 2016 restructuring and DLIF and DLIFF's total net cash invested at the Master Fund subsequent to the October 2016 restructuring. Amounts exclude Direct Lending Investments, LLC activity and do not necessarily reflect the invested capital at the Master Fund.

Given the insolvency of DLIF, Ross needed new investor funds in order to support the longevity of his scheme. The Master Fund did not have sufficient assets or the ability to generate profits to sustain its business and, without new investors provided through the Feeder Funds, the scheme would have collapsed.

2. Misrepresentations to investors.

a. Investment misrepresentations.

DLI marketed and reported consistent and high returns available to and earned by investors. In order to support this façade, Ross manipulated the true state of the loan portfolio to prop up NAVs and loan balances and reported such overstated values to investors. This overstating of investment and loan values resulted in the Master Fund, and DLIF before it, understating its losses. As shown in the schedule above in paragraph 1, the Receiver identified significant underreported allowance for doubtful accounts and bad debt expense that would have resulted in sizeable losses being reported to Feeder Fund investors had DLI appropriately recorded and reported the underlying loan portfolio performance. All of the returns that were reported as far back as at least November 2015 were overstated because they were a function of the inaccurate loan values and understated losses.

As evidenced by DLI's marketing material, consistency of high returns was paramount. Presentations to potential investors in 2015 and 2016 indicated that investments in the Feeder Funds generated "10-12% returns" or "double-digit returns net to investors with no down months."

43

In a presentation titled April 2016 Private Credit Strategy in Short-Term Small Business Loans, DLI indicated that it was "unique in its ability to deliver double-digit, unlevered returns."

DLI also featured the consistency of its historical performance on documents and other material at some or all of the over 120 conferences and industry events attended by Ross and/or other DLI employees since 2014 as well as in letters, fact sheets and presentations to existing and prospective investors. As seen in the December 2018 investor letter published January 29, 2019, DLI presented 74 historical monthly net returns to investors all within a surprisingly tight range of 51 basis points or between 0.59% to 1.10%.

### Net Returns to Investors as Reported in the December 2018 Investor Letter

**Net Returns to Investors** (net of fees)

|      | Jan   | Feb   | Mar   | Apr   | May   | Jun   | Jul   | Aug   | Sep   | Oct   | Nov   | Dec   | YTD    |
|------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|--------|
| 2018 | 0.66% | 0.61% | 0.70% | 0.66% | 0.67% | 0.64% | 0.70% | 0.75% | 0.71% | 0.75% | 0.77% | 0.77% | 8.70%  |
| 2017 | 0.81% | 0.73% | 0.81% | 0.72% | 0.59% | 0.75% | 0.74% | 0.64% | 0.66% | 0.62% | 0.64% | 0.66% | 8.66%  |
| 2016 | 0.86% | 0.84% | 0.86% | 0.85% | 0.85% | 0.85% | 0.86% | 0.85% | 0.85% | 0.83% | 0.83% | 0.80% | 10.61% |
| 2015 | 0.90% | 0.90% | 0.93% | 0.90% | 0.89% | 0.86% | 0.88% | 0.88% | 0.86% | 0.87% | 0.88% | 0.86% | 11.14% |
| 2014 | 0.92% | 0.89% | 0.87% | 0.91% | 0.89% | 0.89% | 0.92% | 0.92% | 0.93% | 0.94% | 0.91% | 0.90% | 11.45% |
| 2013 | 1.03% | 0.93% | 1.10% | 1.00% | 0.98% | 0.99% | 0.99% | 0.98% | 0.90% | 0.91% | 0.88% | 0.89% | 12.22% |
| 2012 |       |       |       |       |       |       |       |       |       |       | 1.01% | 0.99% | 2.01%  |

Performance numbers are shown net of all fees based on Class A interests in Direct Lending Income Fund, L.P. assuming a 1% management fee and a 20% performance fee. However, your actual returns may vary. YTD performance is geometrically linked from the beginning of the year. Past performance is not indicative of future performance. See Important Disclosures below, including "Fund Performance". December 2018 and full-year 2018 performance and allocations provided in this document are unaudited and estimated internally by DLI. Estimates may be subject to change in the future. Please see Estimated Performance and other entries in Important End Notes and Important Disclosures below.

Source: Image extracted from the December 2018 investor letter published January 29, 2019. This is the last known reporting of net returns to investors.
Note: The return presented for December 2018 is an estimate provided by DLI.

Of the 74 reported months, 28 (or 39%) of the monthly returns were within an extremely tight band of 10 basis points between 0.8% and 0.9%. While this shows how incredibly consistent the reported returns were, the truth was that the actual returns varied greatly and should have turned negative in 2015 and beyond.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK



Ross also marketed higher yielding returns than comparable investments. In a December 2017 letter to investors, DLI presented this summary of weighted average interest rates compared to key market returns:

**DLIF Reported Net Returns to Investors vs. Benchmarks as Reported in the December 2018 Investor Letter**

Illustrative Index Performance

|  | 2018 Selected Index Performance* | | |
|---|---|---|---|
| Index | 5-Year | 3-Year | 1-Year |
| DLIF Class A Interests | 10.1% | 9.3% | 8.7% |
| Barclays U.S. High Yield Index | 5.5% | 7.2% | -2.1% |
| S&P/LSTA Leveraged Loan Index | 3.1% | 4.8% | 0.4% |
| Palmer Square CLO Debt Index (CLODI) | 4.6% | 6.4% | 0.1% |
| Barclays U.S. Aggregate Index | 2.5% | 2.1% | 0.0% |

*Please see Important Disclosures in the back of this investor letter for a description of the DLIF performance provided in this chart and each index included herein, and in particular our disclosures therein titled Fund Performance, Illustrative Index Performance, and Time Weighted Returns. Performance returns in this chart are as of December 31, 2018. All figures are annualized. Performance for DLIF Class A Interests are shown net of all fees based on Class A Interests in Direct Lending Income Fund, L.P. assuming a 1% management fee and a 20% performance fee and includes estimated performance for the month of December 2018.

Source: Image extracted from the December 2018 investor letter published January 29, 2019.  This is the last known reporting of net returns to investors.

45

      b.   DLI, DLIF and the Master Fund failed to invest all of the investors' funds in promised investments.

DLI made material shifts in the investment strategy and investments of DLIF and the Master Fund without advanced or proper notice to investors.   As a result of the shift in investment strategy over time and the poor quality of investments made, DLI's actual performance was volatile and far below what was required in order to provide returns to investors and repay investor capital.   To make matters worse, Ross extracted investor funds by charging excess fees and funneling such funds through a variety of newly created entities.  See page 18 for a discussion of DLI's investment strategy and investments relative to the representations made to investors.

      c.   Other misrepresentations.

In general, DLI was operated as a fairly broad fraudulent business scheme by Ross, given the manipulation of the QuarterSpot reported loan repayments and the other material, substantial issues with the underlying portfolios, which appear to go beyond mere serious business errors in loans to counterparties.  The misrepresentations to investors and others as to the nature and quality of the DLI investments and loan portfolios were pervasive.  See page 69 for a detailed discussion of such misrepresentations to investors.

      3.   Funds from later investors used to pay earlier investors.

Monthly redemptions and distributions were paid primarily from funds contributed by later investors.  Of the $945.3 million that was paid to investors, 80% came from funds provided by DLG[76] and later investors as reflected in the following chart.[77]

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[76] The funds received from DL Global are viewed in a similar way as new investor money largely because the principal of DL Global represented a large number of Korean investors that needed to receive scheduled redemptions over the coming months and were essentially "taken out" by the new Korean investors that were investing through DL Global.
[77] Includes DL Global participation proceeds.  Findings are based on a month-by-month analysis of historical financial activity and, due to commingling and the fungibility of money, the following assumptions to identify the source of funds for all disbursement have been made for purposes of analysis only:

    1) Cash on hand is used to fund non-investor disbursements first and in the following order: (a) cash on hand at inception, (b) portfolio receipts, (c) DL Global receipts, (d) money market interest income and (e) investor subscriptions.

    2) Cash on hand is used to fund investor disbursements second and in the following order: (a) cash on hand at inception, (b) portfolio receipts, (c) DL Global receipts, (d) money market interest income and (e) investor subscriptions.

Disbursements to investors are assumed to be made after all non-investor uses each month which is generally consistent with actual activity given that DLI generally paid all redemptions and distributions at the end of the month.

46



**Sources of Payments to Investors (Inception-3/2019)**

DL Global Receipts, $192.5M, 21%

Portfolio Receipts, $192.4M, 20%

Subscriptions, $560.4M, 59%

Source: Company records.
Note: Total of all sources is $945.3 million. See footnote 77 for discussion regarding assumptions.

To further illustrate this point, the first time that monthly portfolio net cash flow[78] was positive was not until March 2017. Prior to that month, a total of $234 million had already been disbursed to investors in the form of redemptions and distributions, none of which, on a monthly basis, could have been paid exclusively from net recoveries from portfolio investments. In other words, prior to that period, the only way that every investor was able to receive payment of profits or a return of their invested capital in any given month was necessarily from funds from later investors.

> 4. The Master Fund, Feeder Funds and other Receivership Entities did not maintain separateness as investor funds were commingled.

At no point in time were any investor funds deposited by the Receivership Entities into segregated accounts specific to the investors nor were any investments set aside for a specific investor or group of investors. Each investor had only their interest in the Feeder Fund through which they invested their funds.

To further illustrate the movement of investor funds throughout the Receivership Entities, subsequent to the October 2016 restructuring, the general flow of new investor money was such that investor funds either went directly into the redemption bank account to pay old investors or to the Master Fund. When there were not sufficient funds in the Master Fund to pay redemption requests at the Feeder Funds, new investor funds into the Feeder Funds would not be invested in the Master Fund but would make a u-turn and go back out to pay earlier investors.

---

[78] Portfolio net cash flow is equal to loan funding (negative; cash outflow) plus principal repayments, participation proceeds and cash interest received (positive; cash inflow). A negative amount indicates a period in which there was a net cash outflow in connection with loans. In other words, more funds were put into funding loans than were generated from loans during the given period. Positive net cash flow does not, however, imply that the loan portfolios were operating on a profitable basis since DLIF and the Master Fund were operating with annual losses on a restated basis consistently since late-2015, and perhaps earlier.

47

If the new investor funds were actually directed to the Master Fund for funding loans to counterparties, it would generally be in the following manner:

1.  investor funds received by DLIF and DLIFF subscription bank accounts;

2.  funds transferred from DLIF/DLIFF subscription accounts to DLIF/DLIFF sweep bank accounts;

3.  funds transferred from DLIF/DLIFF sweep accounts to DLIC sweep bank account; and

4.  funds transferred from DLIC sweep account to DLIAB sweep account and used for funding loans to counterparties.

The commingling of funds was happening since inception. The cash management practice turned into fraudulent fund commingling as new investor dollars were needed to satisfy redemption requests from earlier investors. New investor money should have been invested in the Master Fund instead of paying old investors in full, including false profits at inflated NAVs.

Further, the investor funds that actually reached the DLIAB sweep account were primarily first directed to the counterparties, which may have led to both DLI fraudulently reporting inflated NAV values and that money being improperly cycled back to the Feeder Funds as purported returns from the portfolios and then returned to investors as supposed profits. In other words, investor funds were commingled with other investor funds and proceeds from loans along every step of DLI's money movement process for its investment activities including from receiving investor funds, investing investor funds, redeploying proceeds from loans, and repayment of investor capital.

5.  Lower returns to later investors.

Net returns reported to investors started off as high as 13% and generally trended downward over time to as low as 7%, both on an annualized basis.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

48



**Net Returns Reported to Investors (Inception-12/2018) ($M)**

Source: Data from the December 2018 investor letter published January 29, 2019. This is the last known reporting of net returns to investors.
Note: The return presented for December 2018 is an estimate provided by DLI.

In reality, and as discussed on page 43, when adjusted for bad debt expenses, the Receivership Entities were operating with annual losses consistently since 2016. Investor claimants will bear the full brunt of the unrealized losses that were not reported to investors prior to the Receivership.

Since inception, a total of 853 investor accounts[79] received payments from DLIF in excess of their respective investments. Of the $824.5 million that was paid to such investors, $735.2 million was return of funds invested and $89.3 million was in excess of funds invested by these DLIF "net winners." These net winnings were paid at a time when DLIF did not even have sufficient assets or cash flow to satisfy the repayment of investors' net invested capital without consideration to promised returns. The following chart shows the cumulative cash payments to DLIF investors in excess of their invested capital amounts over time.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[79] The amount of investor accounts merely captures the unique investor accounts as identified from DLI's books and records, not the number of unique investors. The net winner analysis excludes DLI's investment account.

49



Note: Excludes DLI's investment account.  There were no redemptions prior to December 2013 or after February 2019 which gave rise to net winner activity.  Cumulative net winner amount is $89.3 million as of February 2019, including non-cash transfers and switches.

The redemptions and distributions paid to investors include payments to insiders and employees and are summarized as follows:

a.  $58.1 million of redemptions and distributions to 36 insiders, including $6.0 million in excess of principal invested for 13 accounts.[80]

b.  $0.8 million of redemptions and distributions to 4 employees (excluding Ross), including $0.1 million in excess of principal invested.

    6.  Perpetrator benefiting from scheme.

        a.  Excess DLI management and performance fees.

A total of $80 million in management and performance fees were received by DLI from (a) the $64 million in payments of fees, and (b) the purported earnings from the investment of such fees. These fees were important for Ross as this was the primary mechanism he used to remove a net total of $31.4 million from DLI.

---

[80] Excludes $17.6 million in DLI redemptions and distributions in excess of cash or fees invested that were paid to DLI or allocated to Ross.  Note: The Report uses the word "principal", "interest" and "returns" but the Receiver does not concede those characterizations from the DLI records. Any such determination will be governed by the Court approved Distribution Plan.



DLI was generating increasing management fees and performance fees with a peak of over $8 million in 3Q17, while the financial condition of the Master Fund was simultaneously worsening. As long as Ross was able to maintain the façade of successful and profitable investing, the continued growth in investor funds and the inflated NAVs allowed DLI to extract a significant amount of fees from investors at the same time it was digging a deeper and deeper hole with bad investments and using funds from later investors to pay earlier investors in full. The extent to which Ross covered up underperforming loans to prop up loan values and facilitate the payment of excess management and performance fees to DLI is discussed on page 60, including the egregious actions to manipulate loan payment history for the QuarterSpot portfolio and other overvaluations.

In addition to ensuring the overpayment of fees to DLI, Ross directed the Master Fund, and DLIF before it, to invest such fees for DLI in order to generate an additional $17.6 million in reported returns that were ultimately paid out in the form of redemptions and/or distributions to DLI and Ross as discussed directly below.

> b. Ross extraction of DLI funds.

A significant amount of the DLI management and performance fees were ultimately extracted by Ross. Net payments and allocations totaling at least $31.4 million went directly and indirectly to or for the benefit of Ross and his relatives from the Receivership Entities. The net payments and allocations of $31.4 million are based on $44.4 million in gross payments and allocations from DLI less $13.0 million in payments from Ross.

51

**DLI Direct and Indirect Payments to Brendan Ross (Inception-3/19) ($M)**

|  | Total |  |
|---|---|---|
| DLI to Robin Hill Investments, LLC to Ross | $22.9 | (1) |
| DLI to Ross | $20.3 | (2) |
| DLI to Robin Hill Services, LLC to Ross | $0.6 |  |
| DLI to Ross Asset Advisors, Inc. to Ross | $0.6 |  |
| **Total to Ross** | **$44.4** |  |
| Ross to DLI | ($13.0) |  |
| **Net to Ross** | **$31.4** | (3) |

Note: Payments made directly from non-DLI entities to Ross were funded by payments made from Receivership Entities to third parties controlled by Ross. Additional payments not reflected herein could have reached Ross or could have been made for his personal benefit and an investigation into such activity is ongoing.
1) The $22.9 million that reached Robin Hill Investments, LLC was first received directly from DLI by Robin Hill Services, LLC before being sent to Robin Hill Investments, LLC.
2) Total includes (a) $2.5 million in payroll, bonus, retirement contributions and distributions during the Relevant Time Period and expense reimbursements for 2014-2018, (b) $3.2 million in non-cash allocations from DLI's investment account to Ross's investment account, and (c) $0.65 million in distributions from DLI to Ross by way of a cash investment from DLI to Ross's investment account.
3) The $31.4 million in net cash and non-cash payments to Ross from DLI can be bridged to the $30.2 million of net Ross activity in the cash sources and uses for the Receivership Entities by subtracting the $3.21 million in non-cash allocations from DLI's investment account to Ross's investment account and adding the net investment activity of $1.9 million ($2.8 million in cash redemptions less $0.9 million in cash subscriptions).

The majority of the payments from DLI that ultimately reached Ross and his relatives were paid from Robin Hill Investments, LLC ("RHI") in the amount of $22.9 million.  RHI and its subsidiary, Robin Hill Services, LLC ("RHS"), were formed by Ross, with Ross and his immediate family as owners, in September 2016 shortly before DLI entered into an Investment Management Services Agreement with RHS (the "RHS Agreement") on September 27, 2016.  The RHS Agreement provided for $10.3 million in annual service fees to RHS.

Under the RHS Agreement, RHS was to provide certain services to DLI.  However, every RHS employee was also a DLI employee and the salaries for each employee were split 80% to DLI and 20% to RHS.[81]

For the first 16 months of its existence, RHS was paid a total of $20.4 million by DLI.  Of that amount, $18.0 million went to RHI which ultimately paid $17.9 million to Ross and his relatives.  A diagram of the payments between Ross, DLI, RHS and RHI for 2016-2017 is presented below.

---

[81] From November 1, 2016 to January 31, 2019, DLI and RHS paid $1.5 million and $0.3 million respectively in connection with bonus, severance and allocated salary payments to shared employees.  The overall allocation does not reflect an 80/20 split because different allocations were used for severance payments and bonuses.

52



The timing and manner of payments from DLI to Ross are highly unusual.  For example, during the first 10 months of 2016, DLI paid $8.3 million to Ross directly.  During the remainder of 2016, Ross paid $8.3 million along with another $0.7 million back to DLI for a total of $8.9 million. These funds were subsequently used by DLI to pay a total of $9.9 million to RHS, which then paid a total of $9.3 million to RHI, which then paid a total of $9.1 million to Ross, all during the 4th quarter of 2016.

In 2017, a similar pattern of payments went from DLI to Ross to DLI to RHS to RHI to Ross whereby Ross received another $8.8 million in payments for a total of $17.9 million during 2016 and 2017.

Of the DLI funds that ultimately reached Ross, $11.4 million was then sent by the Ross Family Trust to a Hungarian bank for the benefit of the Strawberry Peak Trust ("SPT") which was created by Ross on June 8, 2017 for his children as the beneficiaries.

It is notable that Ross created the SPT and began moving funds offshore as DLI faced two expanding problems: (1) the bankruptcy of Dealstruck and DLI's foreclosure on the underlying loans and the slow pace of recovery on those loans, which was dragging returns down significantly, and (2) the continued deterioration of the QuarterSpot loan portfolio performance, which was being masked through greater and more desperate efforts by Ross to manipulate the false payment reporting.

The use of the Robin Hill entities by Ross is evidence of his elaborate schemes to manipulate DLI's books and records, in this instance by including fraudulent transactions, to hide or shelter compensation the Receivership Entities paid to him.

First, the agreement with RHS was not arms-length.  Ross was on both sides of the transaction, representing both DLI and RHS.  Without justification, DLI and RHS "contemplated" that RHS

53

would provide approximately $10 million in services to DLI per year.  Financial documents show that RHS invoiced, and DLI subsequently paid, approximately $20.4 million from October 2016 to December 31, 2017.[82]

Second, there is no indication that RHS provided any meaningful service to DLI at all.  For example, on October 28, 2016, just one month after DLI and RHS entered into the Agreement, DLI transferred funds to RHS and in amounts of approximately $2.2 million and $0.6 million.  Just one month later, on November 10, 2016 and November 23, 2016, DLI transferred approximately $2.5 million and $1.9 million to RHS, respectively.  Despite that, RHS's audited financials for 2016 state that, "[RHS] recognizes revenue in the form of management service fees earned as a result of providing its services to DLI.  These fees are recorded in the period in which the services are provided. . . ."  RHS's audited financials show a 2016 year-end total revenue of approximately $9.9 million (in RHS's first four months of existence).  To emphasize the discrepancy between RHS's revenue and its actual services provided, its year-end salaries and wages for 2016 was just $28,167.  By year-end 2016, RHS distributed approximately $9.0 million of its revenue to its members (i.e., to Ross and his family).

Third, while the Agreement between DLI and RHS provided that RHS was to furnish "streamlined and professional management services, marketing and entrepreneurial services . . . so as to permit [DLI] to devote its concentrated and continuous efforts to providing investment management services at peak efficiency," that never happened.  As mentioned above, all of RHS's employees were also employees of DLI.[83]  Specifically, RHS and DLI "shared" between five and seven employees.  DLI paid each of those employee's 80% of their salary, while RHS would pay 20%.  In other words, RHS was paying DLI employees, to do DLI-related tasks, to justify charging DLI exorbitant "service" fees, all while directly contradicting the purpose of the Agreement.  Some RHS employees had no understanding that they were employed by RHS and did not know why their W-2 statements reflected separate wages from different employers.

While there is evidence that Ross extracted additional funds disguised as operating expenses, the magnitude of such findings is small.  Most notably, there were $90 thousand in payments to Ross's wife from January 2015 to August 2015 even though there is no evidence to suggest she provided any services for DLI and $25 thousand in car lease payments from November 2013 to April 2016.  Investigation into this and other possible payments to or for the benefit of Ross that were disguised as operating expenses is ongoing.

c.  Ross extraction of DLIF investment account funds.

Ross was able to extract reported returns on his personal investments in DLIF as well as from the $3.2 million in DLI's investment account that was transferred to his investor account. In total, $2.8 million in redemptions and distributions went to trusts held by Ross and/or relatives from a total of $0.9 million in principal invested.[84]

---

[82] See 2016 RHS Audited Financials and 2017 RHS Audited Financials.
[83] See 2016 RHS Audited Financials, page 12.
[84] In addition to the $0.9 million in cash investments from Ross, $3.2 million was re-allocated from DLI's investor account balance to Ross.

54

d.  Ross's personal interest in counterparties.

In addition to the fees that Ross was able to extract from DLI, Ross may also have benefited from DLI's business decisions to make loans to certain counterparties as Ross had a financial interest in as many as 8 counterparties which received a total of $647 million, or 39%, out of the $1.7 billion in total loan funding to all counterparties, furthering his ability to extract even more funds from unsuspecting investors.

Certainly, in the case of QuarterSpot where the ultimate goal was to maintain high management fees and performance fees, Ross was able to leverage his personal interest in the counterparty to direct QuarterSpot management to manipulate loan histories based on the false data he provided.

Ross made factually inaccurate statements and misrepresentations to DLI's investors, employees, the SEC, and others about how he obtained the economic interests and the nature of his interests with the counterparties. Ross represented that (a) he paid for his investments in the counterparties and (b) the purpose for this was to get a "foot-in-the-door" to build a lending relationship between the counterparty and DLI.  Ross noted only one exception, VoIP Guardian, LLC, the sole member of the borrower VoIP Guardian.  Ross, though, later maintained he never obtained an interest in VoIP Guardian, LLC because he claimed the deal was never consummated.  However, Ross's supposed personal ownership interest in VoIP Guardian, LLC was communicated repeatedly to the SEC.  DLI amended its written response to the SEC about Ross's ownership in VoIP Guardian, LLC, contending that Ross's disclosures and DLI's response #7 was "an inadvertent mistake: an agreement giving Ross such an interest was contemplated but never consummated, and Ross never received any payment or other benefit in connection with an ownership interest in VoIP Guardian, LLC." Ross also made factually inaccurate statements to investors about his ownership interests to investors. For example, when an investor or prospective investor asked about Ross's personal interests in January 2017, he stated that he paid for such interests and did not receive any favorable pricing or treatment.

While the investigation into Ross's personal interests in counterparties is ongoing, the Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million relative to the obligations of these loan counterparties to the Master Fund as of March 31, 2019,[85] as set forth in the chart below.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[85] The last period for which the books were closed was November 30, 2018.  Outstanding loan balances that are presented or used for amounts after this date were prepared in a manner consistent with methodologies used to determine previously reported balances.  The $343.7 million estimate is calculated by taking the March 31, 2019 principal balance of $398.5 million (using the manner described above) and comparing it to the estimated recoverable balance of $54.8 million (using information available as of July 31, 2020).

55

**Estimated Recoveries on Loans to Counterparties as of Receivership Date in Which Ross Had or May Have Had a Financial Interest**

| ($ in millions) | Book Based | | |
| --- | --- | --- | --- |
| | 3/31/19 Principal Balance | Act./Est. Book Gain/(Loss) | Estimated Recoverable Balance |
| VoIP Guardian | $191.7 | ($191.7) | - |
| Investment H/I | $193.4 | ($151.2) | $42.2 |
| LoanHero | $11.0 | ($2.5) | $8.5 |
| QuarterSpot | $2.4 | ($0.9) | $1.5 |
| Realty Mogul | - | - | - |
| IOU | - | - | - |
| Nativa | - | - | - |
| Dealstruck | - | $2.6 | $2.6 |
| **Total** | **$398.5** | **($343.7)** | **$54.8** |

Note: Counterparties listed represent those borrowers where Ross is known or believed to have a financial interest. The last period for which the books were closed was November 30, 2018. Outstanding loan balances that are presented or used for amounts after this date were prepared in a manner consistent with methodologies used to determine previously reported balances.

See Exhibit 5 for additional information regarding Ross's personal interest in counterparties.

   e.   Ross suspicious activity – false identities

In November 2018, if not earlier, it appears that Ross took steps to establish a false identity: Brandon Rosen. Ross contacted a Spain-based company La Tinta Hopper, S.L., which operates the www.hopper-ink.com website, to prepare a fake California driver's license for a "Brandon Rosen" with his picture on it, and the address 409 Robin Hill Ln., Escondido, CA 92026, which does not appear to be a valid address. When the name Rosen was misspelled as Rossen, Ross instructed them to correct it to Rosen, as that name was more common. In addition, he contacted Linked Jetpak requesting a LinkedIn profile for "Brandon Rosen." He also created a fake email address for Brandon Rosen: "brandonrosen@mail.com."

La Tinta Hopper, S.L. is the graphic designer that created the artwork for most of DLI's marketing materials, including logos, banners, presentations, fact sheets, website, organizational charts, gift packaging, business cards, etc. The company received a total of $106,898 from Robin Hill Services, LLC across 24 wire payments between February 2017 and February 2019. It is unclear how much was paid or who paid for the services related to the Brandon Rosen driver's license. A review of the invoices associated with payments made after October 2018 did not indicate that the driver's license services were paid for by Robin Hill Services, LLC. A review of the cash activity for the Receivership Entities and for other Ross entities did not identify any other payments that were made to La Tinta Hopper, S.L.

Investigation into this and other possible false identities is ongoing.

56

    f.   Ross suspicious activity – other

Ross undertook efforts at DLI to maintain control, silence dissenting voices, and silo employees on certain occasions from having full access to information. In addition, he tried to shield his communications with investors from discovery and full disclosure.  As noted above, he often used his Gmail account to privately communicate outside the DLI email system.  He also pushed employees of the Receivership Entities to use (and he frequently used himself) a private messenger application called Signal Messenger, that causes messages to disappear allowing Ross to try and hide his tracks.  Ross discouraged employees from communicating directly with one another and often instructed them to instead communicate through him. Ross often became frustrated, angry, and annoyed when employees questioned his authority or were asking too many questions regarding DLI's investments. Ross threatened to terminate employees, seemingly because they made inquiries about the valuation of the loans in the portfolio. In a similar vein, Ross reduced the pay of his employees and threatened their job security, when he felt that they were not performing in the way Ross desired.

Ross by far was the DLI representative that most frequently communicated directly with investors, despite the company having an investor relations department and/or employees solely dedicated to working with investors. He often communicated with investors without other DLI employees on the phone or copied on any correspondence. Ross would send potential and existing investors private placement memorandums and information related to the various loan portfolios. Ross also advertised demo tours of Investment E/D and IOU Central platforms to investors through investor letters, and would personally walk investors through the two portfolios using examples that he had reviewed in advance.

When Ross was confronted with evidence of his wrongdoing in the spring of 2019, on several occasions he made statements seemingly designed to imply that others were guilty as well.  For example, Ross commented to one DLI employee that he always thought the employee knew certain QuarterSpot payments from borrowers were fake.

    7.   Use of broker dealers and finders.

        a.   Broker dealers.

DLI relied on registered broker dealers to raise the vast majority of investor funds.  Of the $1.5 billion raised from 1,843 investor accounts, $1.0 billion (71% of total) was raised from 1,142 accounts (62%) associated with a broker dealer.

Since inception, DLI paid $7.3 million in commissions to broker dealers in furtherance of the scheme.  The overwhelming majority of commissions and fees paid were based on agreements that provided for payment in arrears equal to 20% of management fees and performance fees paid to DLI by eligible investors. The more inflated the loan values and NAV, the more inflated the management fees and performance fees, and therefore the more inflated the commissions were.

        b.   Finders.

In addition, DLI had arrangements with 16 finders that were paid finder's fees for new investment

57

funds that they were responsible for directing to the Feeder Funds, accounting for an additional
$135 million in investor funds raised (9% of total).  Such finders included a mix of Feeder Fund
investors,[86] DLI employees, and consultants.  Since inception, DLI paid $2.4 million to finders in
furtherance of the scheme.

In the case of DLI employees providing services in a dual role under independent consultant
agreements, when DLI realized that having its employees paid finders' fees might give rise to
reporting issues and problems with unlicensed brokers receiving commissions, it chose to address
the problem by having them assume a dual role and work for a brokerage firm that was licensed
to receive commissions.  The last period for which there is evidence that finder fees were paid,
other than through a registered broker, was December 2016. In late 2018, DLI decided to disclose
the employees having received undisclosed commissions after-the-fact and to offer investors who
had invested based on being solicited by DLI employees the right to rescind their investments.

c.  Incentives.

While a 20% commission or finder's fee on both management fees and performance fees is
considered a common structure for investment firms to offer to third party marketers, it was a
sizeable commission sufficient to induce broker dealers and "consultant investors" to find ways to
bring new money to and keep funds from earlier investors.  These commissions and fees gave
broker dealers and finders an incentive to discourage investors from requesting withdrawals given
that they were paid a periodic commission or fee based on total investments retained with DLI.

To support their efforts to raise new investor funds, DLI spent at least $0.9 million to participate
in conferences and industry events, $0.5 million on public relations and $0.4 million in travel and
entertainment.

## VI. Loan Portfolio

### A.  Introduction

As previously mentioned, the Receiver estimates that Net Loan Losses will be $501.4 million,
which is a book-based shortfall relative to the obligations of the loan counterparties including
accrued and unpaid interest and other items in excess of net cash funding.  In terms of cash-based
shortfalls, of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been
repaid in full, with interest, as of July 31, 2020.  The $72.9 million return on these fully liquidated
loans is insufficient to offset the realized and expected shortfall totaling $305.6 million on funding
of $1.3 billion for unrecovered loans. As of July 31, 2020, a total of $232.6 million in principal
funding remains unrecovered when including the $72.9 million return on fully liquidated loans.
The Receiver estimates that only $109.2 million of that amount will be recovered.  A review of
the loans made to 29 counterparties shows that 10 have been fully liquidated, 9 have been written
off with no or negligible recovery expectations and 10 are still outstanding.

---

[86] The finders or their principals include at least 9 remaining investors, some of whom are also ex-employees of DLI.

### Estimated Loan Performance by Counterparty – Cash Basis ($M)

| | Investment Period [1] | A Total Invested | B Total Recovery from Counterparty [2] | C Total Recovery from Third Party Participations [2] | D=A+B+C Actual Net Recovery/ (Loss) [2] | E Estimated Future Recoveries [2] | F=D+E Estimated Final Net Recovery/ (Loss) [2] | Internal Rate of Return [3] |
|---|---|---|---|---|---|---|---|---|
| **Fully Liquidated Loans** | | | | | | | | |
| Talking Capital | 10/14 to 5/16 | $ (62.5) | $ 68.9 | $ - | $ 6.4 | $ - | $ 6.4 | 15.9% |
| Forward Financing SPV, LLC | 4/15 to 3/19 | (64.5) | 33.5 | 44.0 | 13.0 | - | 13.0 | 18.5% |
| Bay Point Capital Partners, LP | 9/15 to 12/18 | (101.0) | 112.9 | - | 11.9 | - | 11.9 | 20.8% |
| Nativa Capital Partners, LP | 12/15 to 3/16 | (3.7) | 3.8 | - | 0.1 | - | 0.1 | 13.2% |
| CarePayment Technologies, Inc. | 3/16 to 8/18 | (71.0) | 89.0 | - | 18.0 | - | 18.0 | 27.3% |
| Origin SPE, LLC (Mepco) | 5/17 to 5/19 | (92.0) | 107.7 | - | 15.7 | - | 15.7 | 16.3% |
| LiftForward SPV III, LLC | 5/17 to 7/18 | (35.3) | 38.7 | - | 3.5 | - | 3.5 | 16.4% |
| The Mane Choice Hair Salon, LLC | 9/17 to 9/18 | (2.1) | 2.6 | - | 0.5 | - | 0.5 | 24.5% |
| Fast Pay Partners, LLC | 3/18 to 8/19 | (30.8) | 28.5 | 6.0 | 3.7 | - | 3.7 | 14.8% |
| FPP, LLC (Multistream Capital) | 12/18 to 5/19 | (2.3) | 2.4 | - | 0.1 | - | 0.1 | 20.2% |
| **Subtotal - Fully Liquidated Loans** | | **(465.2)** | **488.1** | **50.0** | **72.9** | **-** | **72.9** | **19.4%** |
| **Written Off Loans (No or Negligible Expected Recovery)** | | | | | | | | |
| IOU Central Inc. | 11/12 to 9/16 | (31.6) | 39.9 | - | 8.3 | - | 8.3 | 15.0% |
| DealStruck Funding | 2/14 to 10/19 | (74.3) | 77.3 | - | 3.0 | - | 3.0 | 2.7% |
| Realty Mogul, Co. | 9/14 to 3/19 | (7.2) | 7.7 | - | 0.5 | - | 0.5 | 5.7% |
| StreetShares, Inc. | 11/14 to 12/15 | (1.2) | 1.2 | - | 0.0 | - | 0.0 | 5.7% |
| LoanHero, LLC | 5/15 to 7/20 | (41.4) | 43.2 | - | 1.9 | - | 1.9 | 2.9% |
| VoIP Guardian Partners 1, LLC | 10/15 to 2/19 | (250.6) | 101.4 | - | (149.2) | - | (149.2) | (73.9%) |
| OLP – Sequoia Funding SPV1, LLC | 6/16 to 11/18 | (10.5) | 9.9 | - | (0.6) | - | (0.6) | (4.2%) |
| Investment K | 4/17 to 5/20 | (10.1) | 0.8 | - | (9.4) | - | (9.4) | (87.2%) |
| Morrison Oil, LLC | 6/17 to 7/20 | (3.4) | 0.2 | - | (3.2) | - | (3.2) | (98.7%) |
| **Subtotal - Written Off Loans** | | **(430.1)** | **281.5** | **-** | **(148.6)** | **-** | **(148.6)** | **(40.3%)** |
| **Outstanding Loans** | | | | | | | | |
| QuarterSpot | 8/13 to Current | (120.8) | 102.5 | 54.2 | 36.0 | 0.1 | 36.1 | 13.9% |
| Investment E/D | 3/14 to Current | (75.2) | 91.6 | - | 16.4 | 0.2 | 16.6 | 9.8% |
| Investment N | 11/14 to Current | (80.0) | 46.0 | - | (34.0) | 53.9 | 19.9 | 9.1% |
| Investment P | 2/15 to Current | (44.6) | 37.7 | - | (6.9) | 12.6 | 5.7 | 12.4% |
| Investment H/I | 2/15 to Current | (171.0) | 79.0 | - | (92.0) | 6.1 | (85.9) | (25.4%) |
| Investment S/T | 8/15 to Current | (234.5) | 68.9 | 171.6 | 5.9 | 10.3 | 16.2 | 4.5% |
| Investment R | 12/16 to Current | (27.5) | 16.9 | - | (10.7) | 13.0 | 2.3 | 3.5% |
| Investment F/G | 3/17 to Current | (13.6) | 5.0 | - | (8.7) | 1.1 | (7.6) | (51.4%) |
| Investment M | 5/17 to Current | (59.3) | 17.3 | - | (42.0) | 1.0 | (41.0) | (54.7%) |
| Investment L | 10/18 to Current | (27.4) | 6.5 | - | (20.9) | 10.9 | (10.0) | (24.6%) |
| **Subtotal - Outstanding Loans** | | **(854.0)** | **471.2** | **225.8** | **(157.0)** | **109.2** | **(47.8)** | **(3.3%)** |
| **Total** | | **$ (1,749.4)** | **$ 1,240.9** | **$ 275.8** | **$ (232.6)** | **$ 109.2** | **$ (123.5)** | **(5.5%)** |

1) The investment period identifies the first month that funds were loaned out and the last month that funds were received from each counterparty.
2) As of July 31, 2020.
3) Assumes all estimated future recoveries occur on December 31, 2020 for simplicity purposes.

The primary assets of the estate consist of the various investment instruments, loans, and loan portfolios into which funds generated from investors through the Feeder Funds were invested.

The March 31, 2019 outstanding loan balance was $788.0 million.[87]  After considering amounts collected to date by the Receiver since his appointment and the likely future collections, the

---

[87] The last period for which the books were closed was November 30, 2018.  Outstanding loan balances that are presented or used for amounts after this date were prepared in a manner consistent with methodologies used to determine previously reported balances.

Receiver estimates a $286.6 million recovery on the loan portfolio (or about 36% of the March 31, 2019 book value), before expenses.  Of course, this is only an estimate and the ultimate recovery is not certain. Of the 10 remaining outstanding loan and investment portfolios, most are in some form of financial distress or subject to disputes that may affect the timing and extent of recoveries on those portfolios.

DLI investors were led to believe throughout the entire pre-Receivership period that they were investing in a strong loan portfolio that would earn positive returns and were backed by solid assets providing collateral for the loans.  The reports and verifications of auditors and valuation firms reinforced these beliefs.  Unfortunately, the forensic analysis of the Receiver and the related investigations reveals a far different picture.

     B.  Propped up Loan Values

The Receiver's investigation to date has revealed many of the reasons for the magnitude of the loss in the value of the investments, which the Receiver understands is surprising to the investors in light of misrepresentations made to them. The Receiver's investigation has revealed the nature of the DLI investments; the true likely value of the investment positions; the real returns on the investments to DLI; and the inaccurate reporting of investments results and the performance and financial position of counterparties.  In the judgment of the Receiver and his Counsel, there is overwhelming evidence to support the allegations related to the fraudulent misreporting of borrower repayments by QuarterSpot, as alleged in the SEC Complaint.  In addition, the Receiver has identified strong support for many of the other allegations in the SEC Complaint of improper conduct by DLI.

The Receiver has observed previously that DLI's investments were generally poorly underwritten; inadequately documented, often without proper credit agreements and security interests; and inconsistently administered.  The significant projected shortfall on expected recoveries on DLI's investment portfolio is very consistent with the Receiver's initial observations and subsequent experience.  The Receiver is now able to conclude that the issues were more than merely bad management and bad business.  The actions of Ross, including manipulating loan payment histories, propping up loan values, charging excessive fees, and extracting tens of millions of dollars for personal benefit, constituted fraudulent activity.

As shown in the Profitability Analysis schedule on page 43 and the Estimated Restated Values vs. Reported Portfolio NAVs chart and schedule on page 67, the issue of overvalued portfolio positions began in 2015.  By the end of 2015, overvalued loans accounted for an estimated 36%[88] of the reported loan portfolio balance, which contributed to an estimated 6% overstatement of the portfolio NAV.  By November 30, 2018, the last period for which the books were closed, loans that accounted for 77% of the stated investment value were overvalued, which contributed to an estimated 144% overstatement of the portfolio NAV.  DLI's investment returns were consistently

---

[88] Percentage calculations in this paragraph are based on the reported NAV of loans identified as overvalued divided by the total reported portfolio NAV.  Overvalued loans were determined by identifying the difference between the estimated restated carrying values relative to the reported carrying values of each counterparty loan. A counterparty loan with an estimated restated carrying value that is lower than the reported carrying value is determined to be overstated.

overstated, which encouraged further investment and allowed DLI to avoid redemptions by informed investors and minimized the investors who requested regular dividends as opposed to reinvesting the purported returns. Investors were not properly alerted to the real risk of loss from DLI's most substantial investments and material facts were not disclosed or insufficiently described. The generation of excess management and performance fees damaged DLI and its investors and enabled Ross to pull out more money for his personal benefit.

In the following pages, the Receiver will summarize issues with respect to five other loans by way of example.

### 1. QuarterSpot, Inc.

The Complaint outlines alleged fraudulent conduct specific to the QuarterSpot lending platform, (including falsifying borrower payment information, grossly overstating the valuation of the position, and collecting excess management and performance fees based on that overvaluation). The Receiver believes that the allegations of the SEC Complaint are well-founded and supported by substantial evidence. As outlined in the Complaint, Ross helped engineer false borrower "payments" that caused many of the loans to be valued at par, instead of at no value, outrightly manipulating the loan values. The amount and timing of reserves were also manipulated to meet return targets. Between 2014 and 2017, DLI overvalued the QuarterSpot position by approximately $53 million and overstated performance by at least two to three percent annually. This overvaluation alone resulted in DLI collecting at least around $11 million in excess management and performance fees. See page 72 for a discussion of Ross's bad acts with respect to the QuarterSpot loan.

### 2. VoIP Guardian Partners I, LLC

In addition to the fraud with QuarterSpot, the Receiver estimates that the losses in connection with the $202 million VoIP Guardian credit facility will likely account for 25% of the loss of the Master Fund's purported value. From mid-2015 on, DLI provided financing for VoIP Guardian in steadily ballooning amounts. Ross represented that the loans were made to purchase, at a discount, accounts receivable of lower-tier telecommunications companies that supposedly would be paid by top tier telecommunication companies such as Verizon, Orange, and AT&T. In reality, neither the collateral for the loans, nor the lower-tier telecommunication counterparties, were legitimate. VoIP Guardian ceased paying DLI in late 2018. VoIP Guardian shortly thereafter filed for Chapter 7 bankruptcy. As early as February of 2017, Ross was aware that an active criminal investigation was underway in the Netherlands focused on VoIP Guardian's telecommunication business and counterparties. Criminal charges were filed against VoIP Guardian, its principal Rodney Omanoff, and associates. The Receiver's investigation of Omanoff and his relationship with Ross are the subject of ongoing investigation. See Exhibit 6 for additional detail.

The fraud involving VoIP Guardian developed very early on in DLI's history. DLI initially invested in a similar company, Talking Capital Partners I, LLC, in 2014 and transitioned to VoIP Guardian in 2015. The same primary individuals operated both counterparties. Both Talking Capital and VoIP Guardian purported to be in the telecom receivables factoring business and offered the same too-good-to-be-true risk-free 15% return. DLI's investment ballooned to

61

$200 million by December 2018, with 80% of that amount loaned against receivables owed to parties that operated overseas, used foreign bank accounts, and had no indicia of legitimacy. When DLI could no longer fund new investments, the foreign businesses disappeared. This evidence suggests VoIP Guardian was either a Ponzi scheme or a money-laundering or other criminal enterprise.  DLI's failure to provide any new money in November 2018 led to the immediate collapse of the VoIP Guardian operations.

### 3.   Dealstruck Holdings, Inc.

Dealstruck Holdings, Inc. ("Dealstruck") was touted by DLI as an early successful consumer loan-based investment, but was also overvalued and the purported returns from this investment were misrepresented from the outset.  Ross personally held an interest in Dealstruck.  The evidence indicates he caused DLI to take actions that increased DLI's position in poorly performing portfolios to protect his individual position or misrepresent DLI's overall position, all the while causing DLI to fail to adjust its valuations or disclose the underlying weaknesses in the collateral to DLI's investors.  Despite glowing representation of the returns from the Dealstruck portfolio, in reality DLI was pumping more money into the Dealstruck loan portfolio such that by September 2016 its net funding was over $45 million.  In the summer of 2016, DLI needed to provide a working capital loan with Dealstruck itself in order for it to meet payroll.  In December 2016, DLI foreclosed on the underlying loan portfolios and had to take responsibility for the slow collection of the loans over time.  The remaining Dealstruck loans were not liquidated until October 2019. The portfolio ultimately yielded only a 2.7% internal rate of return – far less than what could support 10-12% net returns to investors.   The investors were misled as to the full set of circumstances and the impact related to Dealstruck's eventual wind down.

### 4.   LoanHero, Inc.

Similar to the Dealstruck investment, LoanHero, LLC ("LoanHero") was also touted by DLI as an early successful consumer loan-based investment that was also overvalued with purported returns misrepresented from the outset.  LoanHero was formed in 2014.  Ross also personally held an interest in Dealstruck and was one of the four founding members of the company, which was set up as a "point of sale consumer finance solution."   On April 30, 2015, DLIF and, after the establishment of the master-feeder structure in 2016, the Master Fund began providing a revolving loan facility to LoanHero with a 16% interest rate.  Ross touted the value of the LoanHero investment, but the actual performance of the underlying loans financed by LoanHero was much worse than represented by Ross.  LoanHero was only able to make the required interest payments on the facility by using new loan funding from DLI.  By June of 2016, DLI's internal analyses questioned the sustainability of the LoanHero collateral.  DLI's internal reports showed the return from the loans to LoanHero to be 6.1%, well below what could sustain continuing to make the coupon payments due.  Rather than reduce its funding and the risk to DLI, Ross increased the loan commitment to LoanHero to $25 million in November of 2016.  By September of 2107, DLI's internal reporting showed that the LoanHero loans serving as collateral for DLI were only returning 0.6%.  Even though the facility had been undercollateralized for three months, on October 30, 2017, DLI increased the maximum facility amount to $42.5 million.  On December 29, 2017, DLI was forced to conduct a strict foreclosure of the facility and the Receivership Entities took possession of the underlying loans as a whole loan portfolio. DLI failed to disclose the

62

foreclosure in investor letters from December 2017 through March 2018. The underlying loans were not completely liquidated until the Receiver sold the loans at auction during the receivership. The internal rate of return on the LoanHero investment was only 2.9% -- a stark contrast to the representations by Ross about LoanHero.

        5.   Investment M

In May of 2017, DLI began loaning tens of millions of dollars to Investment M, an entity seeking to monetize a patent portfolio primarily through patent litigation. In the judgment of the Receiver and his counsel, among other problems, DLI's investment in this patent strategy was inconsistent with the representations of DLI's investment strategy made to investors; overvalued by DLI; insufficiently underwritten; and the risks to investors were not adequately disclosed. There were a series of foreseeable legal changes almost immediately after DLI began its funding of Investment M that made patent litigation of the type invested in far more challenging and risky.

    C.   Incorrect NAVs in 2016 and 2017

The weakness in the financial position and the serious overvaluation of the NAVs, which represent the value of the portfolio and each individual investor's account, can be illustrated by considering the major components of the portfolio NAV as of December 31, 2016. By then, $633 million of the purported $825 million in portfolio NAV (77%) was attributed to problematic assets worth far less than represented.

| Portfolio NAV Breakdown - December 31, 2016 | | |
|---|---|---|
| | NAV ($M) | NAV (%) |
| Substantial Losses Expected[1] | | |
| Investment T | $195.0 | 23.6% |
| VoIP Guardian | $101.6 | 12.3% |
| Investment H/I | $83.7 | 10.1% |
| **Total - Substantial Losses Expected** | **$380.3** | **46.1%** |
| | | |
| Problem Investments | | |
| QuarterSpot | $128.4 | 15.6% |
| Dealstruck | $63.7 | 7.7% |
| Investment E/D | $60.5 | 7.3% |
| **Total - Other Problem Investments** | **$252.5** | **30.6%** |
| | | |
| **Total Problematic Investments** | **$632.9** | **76.7%** |
| Other Investments[2] | $192.1 | 23.3% |
| **Total Portfolio NAV** | **$825.0** | **100.0%** |

1) Expected losses range from $36 million to $94 million for each counterparty based on the reported NAVs less the estimated restated values as of December 31, 2016.
2) Excludes non-portfolio components of total NAV such as cash and accounts payable.

63

As of December 31, 2017, $589 million of the purported $840 million in portfolio NAV (70%) was attributed to problematic assets worth far less than represented.

| Portfolio NAV Breakdown - December 31, 2017 | | |
|---|---|---|
| | NAV ($M) | NAV (%) |
| Substantial Losses Expected[1] | | |
| Investment H/I | $191.8 | 22.8% |
| VoIP Guardian | $184.4 | 21.9% |
| Investment T | $47.8 | 5.7% |
| Investment M | $34.5 | 4.1% |
| **Total - Substantial Losses Expected** | **$458.4** | **54.6%** |
| | | |
| Other Problematic Investments | | |
| QuarterSpot | $51.0 | 6.1% |
| LoanHero | $38.9 | 4.6% |
| Investment E/D | $21.9 | 2.6% |
| Dealstruck | $18.6 | 2.2% |
| **Total - Other Problematic Investments** | **$130.4** | **15.5%** |
| | | |
| **Total Problematic Investments** | **$588.8** | **70.1%** |
| Other Investments | $251.3 | 29.9% |
| **Total Portfolio NAV** | **$840.1** | **100.0%** |

1) Expected losses range from $11 million to $164 million for each counterparty based on the reported NAVs less the estimated restated values as of December 31, 2017.

The above examples do not present a full outline of all of DLI's issues regarding overvaluation and problematic investments, but are offered to illustrate common issues. In summary, with many of the major portfolio positions, although along the way DLI was reporting consistent returns, the positions were falsely represented to investors, and the Receiver expects to recover only a fraction of the value of all remaining open positions.

  D.  Estimation of Restated Values

Since Ross wanted to and did take egregious actions to hide losses and prop up loan values, he and DLI also did not disclose to investors the true nature of the investment portfolio's performance at the time the losses were incurred. For the purposes of this Report, the Receiver has prepared an analysis to estimate appropriate historical counterparty loan carrying values for every month since October 2012 with the benefit of information available as of the date of this Report. The main assumption in the analysis is that a more appropriate carrying value[89] of any given counterparty loan is equal to the amount of cumulative loan funding multiplied by the ratio of actual or estimated ultimate cash recoveries, including participation proceeds, divided by total actual or estimated cash funding. In other words, the estimation of restated values grosses up or down each new loan

---

[89] Carrying value is another term for reported loan value, which is a significant component of the calculation for reported portfolio NAVs.

funding by the percentage of the ultimate cash gain or loss realized or expected to be realized on each total counterparty loan. Or said differently, estimated restated values are based on the immediate realization of the ultimate cash gains or losses realized or expected to be realized on a *pro rata* basis.[90] While this simplified analysis is conservative and does not necessarily result in values that would support actual restated values, it does provide insightful information regarding the actual performance and value of all counterparty loan fundings.[91]

There are three main illustrations from this analysis that can help better understand the true performance and value of counterparty loans over time: (1) estimated restated values vs. loan fundings shows the ultimate estimated net recovery for each dollar invested at the time it was invested, (2) estimated restated values vs. reported portfolio NAVs shows how loan performance was misrepresented, and (3) estimated restated total value vs. Feeder Funds' net invested capital shows how the Feeder Funds would have been unable to repay their investors' net invested capital solely from the value of the investment portfolio and without the benefit of funds contributed by new investors.

1. Estimated Restated Values vs. Loan Fundings

The following schedule shows the difference between the estimated restated carrying values of each counterparty loan relative to the amount funded. The results are shown on a quarterly basis for the two partial stub years and for 2015; otherwise the results are presented on an annual basis. Amounts shown with green shading indicate loan fundings to counterparties that returned or are expected to return more than what was funded while amounts shown with red shading indicate loan fundings to counterparties that returned or are expected to return less than what was funded. As shown in the schedule, on an aggregate basis, loans to counterparties were profitable on an aggregate basis through the third quarter of 2015. However, the seeds were sown for future losses. After that period, and starting with the initial funding of $19.5 million into the VoIP Guardian loan, all loan funding on a cumulative basis was disastrously unprofitable.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

---

[90] An illustrative example is as follows: ABC Company received $50 million in total loan funding across all time periods and repaid a total of $45 million including interest (90% cash recovery). Consider an initial loan funding of $10 million. The estimated restated value of the $10 million initial loan would be $9 million ($10 million x 90% = $9 million).

[91] Further expert development and analysis of the portfolios on a more fact-specific basis may lead to the conclusion that the actual overvaluations were larger.

65

**Estimated Restated Values vs. Loan Fundings (Inception – 3/2019) ($M)**

| | 4Q12 | 2013 | 2014 | 1Q15 | 2Q15 | 3Q15 | 4Q15 | 2016 | 2017 | 2018 | 1Q19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IOU Central Inc. | $0.4 | $3.0 | $3.0 | $0.5 | $0.3 | $1.0 | - | - | - | - | - | $8.3 |
| QuarterSpot [1] | - | 1.5 | 5.9 | 2.0 | 3.6 | 2.5 | 1.6 | 16.1 | 2.8 | - | - | 36.1 |
| DealStruck Funding | - | - | 0.4 | 0.3 | 0.1 | 0.2 | 0.2 | 1.8 | - | - | - | 3.0 |
| Investment E/D | - | - | 8.9 | 2.1 | 1.6 | 1.0 | 1.4 | 1.4 | - | 0.0 | - | 16.6 |
| Realty Mogul, Co. | - | - | 0.3 | 0.2 | - | - | - | - | - | - | - | 0.5 |
| Talking Capital | - | - | 1.1 | 0.6 | 2.3 | 0.2 | 1.9 | 0.2 | - | - | - | 6.4 |
| StreetShares, Inc. | - | - | 0.0 | 0.0 | 0.0 | - | - | 0.0 | - | - | - | 0.0 |
| Investment N | - | - | 0.6 | 0.5 | - | - | - | 6.5 | 7.5 | 4.9 | - | 19.9 |
| Investment H/I | - | - | - | (2.3) | (0.8) | - | (4.9) | (20.2) | (56.4) | (1.4) | - | (85.9) |
| Investment P | - | - | - | 0.4 | 0.3 | 0.5 | 0.0 | 1.5 | 1.6 | 1.3 | - | 5.7 |
| Forward Financing SPV, LLC [2] | - | - | - | - | 1.4 | 1.0 | 3.0 | 1.2 | 1.4 | 4.8 | 0.1 | 13.0 |
| LoanHero, LLC | - | - | - | - | 0.0 | 0.1 | 0.1 | 0.9 | 0.8 | - | - | 1.9 |
| Investment S/T [3] | - | - | - | - | - | 2.7 | 1.8 | 7.9 | 1.4 | 1.7 | 0.7 | 16.2 |
| Bay Point Capital Partners, LP | - | - | - | - | - | 0.4 | 0.7 | 4.6 | 3.5 | 2.7 | - | 11.9 |
| VoIP Guardian Partners I, LLC | - | - | - | - | - | - | (19.5) | (69.4) | (44.6) | (14.3) | (1.3) | (149.2) |
| Nativa Capital Partners, LP | - | - | - | - | - | - | 0.1 | - | - | - | - | 0.1 |
| CarePayment Technologies, Inc. | - | - | - | - | - | - | - | 12.7 | 5.3 | - | - | 18.0 |
| OLP – Sequoia Funding SPV1, LLC | - | - | - | - | - | - | - | (0.3) | (0.3) | - | - | (0.6) |
| Investment R | - | - | - | - | - | - | - | 0.7 | 1.5 | 0.1 | - | 2.3 |
| Investment F/G | - | - | - | - | - | - | - | (1.2) | (6.3) | - | - | (7.6) |
| Investment K | - | - | - | - | - | - | - | (9.4) | (0.0) | (0.0) | - | (9.4) |
| Investment M | - | - | - | - | - | - | - | (23.7) | (17.3) | - | - | (41.0) |
| LiftForward SPV III, LLC | - | - | - | - | - | - | - | 2.4 | 1.1 | - | - | 3.5 |
| Origin SPE, LLC (Mepco) | - | - | - | - | - | - | - | 10.0 | 5.7 | - | - | 15.7 |
| Morrison Oil LLC | - | - | - | - | - | - | - | (2.9) | (0.3) | (0.1) | - | (3.2) |
| The Mane Choice Hair Salon, LLC | - | - | - | - | - | - | - | 0.5 | 0.0 | - | - | 0.5 |
| Fast Pay Partners, LLC [4] | - | - | - | - | - | - | - | - | 3.7 | - | - | 3.7 |
| Investment L | - | - | - | - | - | - | - | - | (6.1) | (4.0) | - | (10.0) |
| FPP, LLC (Multistream Capital) | - | - | - | - | - | - | - | - | 0.0 | 0.1 | 0.1 | 0.1 |
| **TOTAL** | $0.4 | $4.5 | $20.3 | $4.5 | $8.9 | $9.7 | ($13.5) | ($34.4) | ($99.7) | ($19.7) | ($4.5) | ($123.4) |

Color legend: Amounts shown with green shading indicate loan fundings to counterparties that returned or are expected to return more than what was funded while amounts shown with red shading indicate loan fundings to counterparties that returned or are expected to return less than what was funded.

Note: The last period for which the books were closed was November 30, 2018, therefore the amounts shown for estimated restated values after this date do not have any corresponding reported amounts.

1) Includes $54.2 million in participation proceeds from DL Global.
2) Includes $44.0 million in participation proceeds from DL Global.
3) Includes $127.8 million in participation proceeds from DL Global and $43.8 million in loan purchase proceeds from Quanta.
4) Includes $6.0 million in participation proceeds from DL Global.

2.   Estimated Restated Values vs. Reported Portfolio NAVs

The following chart and schedule show the difference between the estimated restated carrying values relative to the reported carrying values of each counterparty loan based on the conservative methodology used for the purposes of this Report.  While the chart shows monthly results on an aggregate basis, the schedule shows results for each counterparty loan on a year-end or stub period-end basis, except for 2015 which is shown on a quarter end basis.  The amounts in each column in the schedule represent each date's calculated amount.  Amounts shown with green shading indicate the estimated restated carrying values of each counterparty loan is greater than the reported carrying values of the counterparty loan while amounts with red shading indicate the estimated restated carrying values of each counterparty loan is lower than the reported carrying values of the counterparty loan, or the reported portfolio NAV.  On an aggregate basis through September 2015, loans to counterparties were reported at values that were largely in line with or below the estimated restated carrying value based on the methodology used here.  After September 2015, reported portfolio NAVs on an aggregate basis were substantially greater than the estimated restated values, the magnitude of which serves as a financial measure of the misrepresentations to investors.

66

### Estimated Restated Values vs. Reported Portfolio NAVs (Inception – 11/2018) ($M)



**Reported Portfolio NAV**   **Estimated Restated Values**

Schedule of variances between the estimated restated carrying values of each counterparty loan relative to the reported carrying values of the counterparty loan, or the reported portfolio NAV, for selected dates by counterparty and in the aggregate:

| | 12/2012 | 12/2013 | 12/2014 | 3/2015 | 6/2015 | 9/2015 | 12/2015 | 12/2016 | 12/2017 | 11/2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| IOU Central Inc. | $0.9 | $3.7 | $2.9 | $2.9 | $2.2 | $1.2 | $0.2 | ($1.4) | $0.0 | ($0.1) |
| QuarterSpot [1] | - | 1.3 | 5.1 | 5.9 | 7.9 | 8.3 | 7.7 | 10.0 | 1.0 | 1.2 |
| DealStruck Funding | - | - | (0.0) | (0.2) | (0.9) | (1.6) | (2.5) | (5.7) | (1.0) | (1.4) |
| Investment E/D | - | - | 6.3 | 6.7 | 6.3 | 5.1 | 4.0 | (4.4) | (7.5) | (7.3) |
| Realty Mogul, Co. | - | - | 0.2 | 0.3 | 0.1 | (0.1) | (0.2) | (0.3) | (0.4) | (0.1) |
| Talking Capital | - | - | 0.9 | 1.2 | 2.2 | 0.8 | 0.4 | (0.0) | (0.0) | (0.0) |
| StreetShares, Inc. | - | - | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Investment N | - | - | 0.5 | 0.9 | 0.8 | 0.6 | 0.5 | 4.4 | 5.7 | 1.5 |
| Investment P | - | - | - | 0.8 | 1.1 | 0.6 | 0.3 | (2.0) | (3.4) | (3.9) |
| Investment H/I | - | - | - | (2.3) | (3.2) | (3.4) | (8.6) | (36.3) | (115.1) | (141.8) |
| Forward Financing SPV, LLC [2] | - | - | - | - | 1.2 | 1.7 | 3.9 | (0.4) | (3.0) | 1.3 |
| LoanHero, LLC | - | - | - | - | 0.0 | 0.0 | 0.0 | (1.3) | (2.0) | (1.8) |
| Investment S/T [3] | - | - | - | - | - | (5.5) | (11.2) | (51.5) | (56.0) | (48.2) |
| Bay Point Capital Partners, LP | - | - | - | - | - | 0.4 | 0.9 | 2.7 | 2.1 | 0.1 |
| VoIP Guardian Partners I, LLC | - | - | - | - | - | - | (19.7) | (93.6) | (156.6) | (192.6) |
| Nativa Capital Partners, LP | - | - | - | - | - | - | 0.1 | - | - | - |
| CarePayment Technologies, Inc. | - | - | - | - | - | - | - | 5.7 | 0.1 | 0.0 |
| OLP – Sequoia Funding SPV1, LLC | - | - | - | - | - | - | - | (0.5) | (1.0) | (0.0) |
| Investment R | - | - | - | - | - | - | - | 0.7 | (0.4) | (3.8) |
| Investment F/G | - | - | - | - | - | - | - | - | (1.5) | (8.3) |
| Investment K | - | - | - | - | - | - | - | - | (6.2) | (3.4) |
| Investment M | - | - | - | - | - | - | - | - | (27.0) | (52.1) |
| LiftForward SPV III, LLC | - | - | - | - | - | - | - | - | 1.1 | (0.0) |
| Origin SPE, LLC (Mepco) | - | - | - | - | - | - | - | - | 5.7 | 4.3 |
| Morrison Oil LLC | - | - | - | - | - | - | - | - | (3.1) | (3.9) |
| The Mane Choice Hair Salon, LLC | - | - | - | - | - | - | - | - | 0.3 | - |
| Fast Pay Partners, LLC [4] | - | - | - | - | - | - | - | - | - | 1.0 |
| Investment L | - | - | - | - | - | - | - | - | - | (6.4) |
| FPP, LLC (Multistream Capital) | - | - | - | - | - | - | - | - | - | 0.1 |
| **TOTAL** | $0.9 | $4.9 | $16.0 | $16.2 | $17.6 | $8.1 | ($24.3) | ($173.8) | ($367.7) | ($465.7) |
| **Total % of Reported NAV** | 90.4% | 27.2% | 14.7% | 10.5% | 8.2% | 2.7% | (5.9%) | (21.1%) | (43.8%) | (59.1%) |

Note: The NAV amounts used in this analysis do not include any cash set aside for loan fundings in future periods. As such, the variances shown above for any given counterparty in any given period may be overstated by the amount of cash set aside for future investments. The last period for which the books were closed was November 30, 2018, therefore the chart and schedule do not extend beyond that date.

Color legend: Amounts shown with green shading indicate the estimated restated carrying values of each counterparty loan is greater than the reported carrying values of the counterparty loan while amounts with red shading indicate the estimated restated carrying values of each counterparty loan is lower than the reported carrying values of the counterparty loan.

1) Includes $54.2 million in participation proceeds from DL Global.
2) Includes $44.0 million in participation proceeds from DL Global.
3) Includes $127.8 million in participation proceeds from DL Global and $43.8 million in loan purchase proceeds from Quanta.
4) Includes $6.0 million in participation proceeds from DL Global.

The counterparty loan values reflected in the schedule directly above do not include all components of total NAV; the amounts reflect only the portfolio components of total NAV.  The non-portfolio components of total NAV include cash on hand, plus receivables and prepaid expenses less accrued management fees, accrued performance fees and other payables.  The portfolio NAV plus non-portfolio NAV equals total NAV.

3.   Estimated Restated Total Value vs. Feeder Funds' Net Invested Capital

The following graph shows the difference between the estimated restated total value[92] relative to the Feeder Funds' net invested capital,[93] a comparison which results in a determination of solvency or insolvency.  As shown in the graph below, the estimated restated total value (see blue areas) exceeded the Feeder Funds' net invested capital (see orange area) until April 2016 when a divergence between the two began.



Note: Feeder Funds' Net Invested Capital represents investors' total net cash invested with DLIF prior to the October 2016 restructuring and DLIF and DLIFF's total net cash invested at the Master Fund subsequent to the October 2016 restructuring.  Total net cash invested is based on the total of subscriptions less redemptions less distributions. Amounts exclude Direct Lending Investments, LLC activity and do not necessarily reflect the invested capital at the Master Fund. The last period for which the books were closed was November 30, 2018, therefore the amounts shown for Estimated Restated Total Values after this date do not have any corresponding reported amounts.

---

[92] Estimated restated total value is another way of saying estimated restated total NAV, which includes the values of the counterparty loans (discussed and identified above) plus the reported non-portfolio components of total NAV which consists of cash on hand, plus receivables and prepaid expenses less accrued management fees, accrued performance fees and other payables.

[93] Feeder Funds' net invested capital represents investors' total net cash invested (based on the total of subscriptions less redemptions less distributions) with DLIF prior to the October 2016 restructuring and DLIF and DLIFF's total net cash invested at the Master Fund subsequent to the October 2016 restructuring.

In the chart above, the light blue area represents the value of loans purchased by DL Global based on the price that was paid in late 2017.  Without this transaction with DL Global, the estimated restated total values would have been lower which would have resulted in an earlier insolvency date.

> E.  Misrepresentations to Investors

>> 1.  Private Placement Memorandums

The Feeder Fund Private Placement Memorandums ("PPM") generally emphasized the goal of "seeking to **generate current income** through opportunistic investments in financing transactions, including without limitation, in loans to small and medium-sized businesses and consumers, and non-bank lenders."  (October 2016 DLIF PPM, emphasis added.)  While including a caveat it "cannot guarantee results," the PPMs stated that the Feeder Funds seek to offer:

- Potential for investment returns greater than those provided by investment-grade fixed income investments;
- Lower exposure to interest rate risk by investments with short-term maturities or otherwise through uncommitted financing arrangements that are discretionary;
- Diversified exposure to small- and medium-sized businesses and consumers across geographic areas, professions, and asset classes; and
- Diversified underwriting exposure through multiple underwriting platforms.

>> 2.  Investor Letters

One central strategy for Ross to communicate to investors was through DLI's monthly investor letters.  Each month, Ross prepared and signed an investor letter that included charts of the Feeder Funds' historical monthly returns over time. The letters also contained headings like "Consistent Performance." One of the Feeder Funds' principal objectives was repeatedly stated as being to "[m]aintain unlevered, double-digit, investment returns."  DLI's monthly investor letters and fact sheets consistently marketed the Feeder Funds' 10-12% returns, no lock-up, and monthly (35-day) liquidity.  The presentations often provided other overly optimistic views of the safety and projected returns from DLI's investment strategy:

- DLIF "will not stray" from "the sweet spot for private credit: short-term, high-yield, sub-$150K loans to local, established businesses" (July 2013 investor letter);
- In January 2014, the investor letter announces the DLIF's ownership of "over 800 similar loans with consistent payment, pre-payment, and default characteristics";
- The April 2014 letter celebrates how DLIF continues "to be the only Fund focused exclusively on small business loans";
- Additionally, the "About" section asserts that DLIF is for investors "who want higher returns from their fixed income portfolio" and for "investors who wish to diversify away from equities";

69

- The October 2014 investor letter asserts that DLIF's assets are "delivering double-digit returns in the shortest-duration, highest-yielding, lowest-volatility fixed income class available in the US today";
- DLI "continue[s] to apply conservative lending principles" (October 2015 investor letter);
- DLIF's "loans are rapidly replaced throughout the business cycle," ensuring that it "has ample liquidity for redemptions, and that the Fund could "self-liquidate" to meet any future outsized redemptions "without impacting future returns" (April 2016 investor letter);
- DLIF "own[s] loans and not equity" (July 2016 investor letter);
- For the month ending November 30, 2016, Ross listed various factors that affect DLI's returns, which included having to write down bad loans. Ross emphasized that DLI writes down bad loans as soon as it becomes aware of any impairment, contrasting DLI with other investment funds that failed to be "conservative" in this respect and stating that "[b]ecause we at DLI intend to build a private credit firm that will endure for decades to come, we take our responsibility to properly mark assets very seriously";
- In his investor letter for the month ending December 31, 2016, Ross claimed that "[o]ne of the hallmarks of DLIF [the domestic Fund] has always been, in our opinion, its conservative approach to taking reserves against late loans";
- DLI "produce[s] the Fund's returns based on interest income net of new loan loss reserves and fund expenses" (February 2017 investor letter);
- "Specialty finance remains the less-well-traveled path within private credit, and our focus will continue to be on remaining within this niche." (2017 year end review);
- The Master Fund "charge[s] interest by the day" in its Facility Deals (February 2018 investor letter); and
- Although "extending monthly close process may inconvenience some investors, the benefit to all investors of having valuation reports available for the Funds to close their books each month is ultimately … more supportive of the optimal operations of the Funds" (October 2018 investor letter).

The investor letters are also notable for what they omit about the financial difficulties faced by the platforms.  For example, the 2016 investor letters fail to disclose that the Fund was lending money to Dealstruck in order for the company to meet payroll, let alone that Ross also had a financial interest in Dealstruck.

3.  Investor Fact Sheets and Marketing Materials

DLI's investor "fact sheets" and marketing materials also presented a false picture regarding the safety and nature of its "direct lending" investments:

- DLI's fact sheets for the months of January 2015 to July 2016, which it provided to prospective and current investors, emphasized the Funds' high returns relative to defaults, boldly directing investors, "But don't focus on the bad loans; we write plenty of loans off but still achieve excellent returns."
- DLI stated that its loans were to companies with "asset-heavy balance sheets" and that its "assets commonly pay cash interest";

- A fact sheet from the fall of 2017 described its investment approach as providing "financing solutions to best-in-class specialty finance operators who each exhibit specific competitive advantages and asset heavy balance sheets";
- The fact sheet stated that "[t]he non-banks that we finance generally bear some or all of the risk of underperformance and we credit this approach with our historically high, stable returns";
- Even as late as January of 2019, the Fund's objective was described as to "generate attractive current income";
- DLI stated that DLIF "has achieved average annual returns of 10.8% with no down months since inception; and
- DLI represented that its underwriting, deal structuring, and collateral monitoring were top notch and "DLI's investment process reflects the strength of our team."

Ross frequently sent misleading emails to investors and caused others at DLI to send misleading emails to investors and to provide false information regarding the Funds' financial performance:

- On October 7, 2015, Ross emailed a prospective investor a series of "highlights of the Fund," emphasizing that it "produces consistent, non-market-correlated returns." Ross further explained that DLIF has achieved "10-12% returns net to investors with no down months." In this same October 2015 email, Ross continued, "Defaults trending down, now at 4% and could be as high as 20% without loss of principal," and he noted the Funds' "[f]ull transparency."
- In an email dated February 15, 2016, Ross sent a prospective investor an investor presentation, directing him to "[n]ote the historical returns on p3 of the Presentation." Ross also represented that "[o]ur investors receive double-digit unlevered returns, and we have had no down months, and the Fund is suitable for regular and IRA accounts." Ross also included the same "highlights of the Fund" that he included in his October 7, 2015 email, again emphasizing strong and stable returns, low default rate, and full transparency.
- In multiple communications with prospective and existing investors up into at least spring 2017, including in emails dated October 21, 2016, February 23, 2017, and March 13, 2017, DLI's investor relations representative emphasized in the "Fund Highlights" that DLI "continues to deliver very stable, unlevered, double digit returns with no down months since the Fund's inception in 2012 [bold in original]."
- During the relevant period, Ross and others at DLI also provided or made available to prospective and current investors "default sensitivity analysis" spreadsheets that detailed the amount of historical write downs and included graphs showing defaults as a percentage of assets under management.
- Ross and DLI's representatives also routinely highlighted low default rates for the investments.  For example, on January 12, 2016, Ross sent an email to investors with the subject line "Loan Loss Reserves + other files" that attached a spreadsheet titled "DLIF – Default Sensitivity Analysis." This spreadsheet detailed historical monthly write downs and expressed those write downs as a very small percentage of assets under management for each month, arriving at an average monthly write down percentage. The same spreadsheet included a tab with a graph that tracked the default rate each month over time.

71

- Up into mid-2017, DLI representatives at Ross's direction continued to provide to prospective and current investors "default sensitivity analysis" documents that showed the historical default rates for the investment portfolio.

### 4. QuarterSpot Borrower Loan Repayments

Despite a growing problem with the impaired nature of QuarterSpot loans, and Ross's concern about the increasing unrecognized losses, the QuarterSpot portfolio continued to grow. From August 2013 to June 2017, the QuarterSpot portfolio's loan principal plus cash value increased from $0.4 million to $149.6 million. By all accounts, QuarterSpot appeared to be one of DLI's best-performing positions. From at least December 2013 to January 2018, however, Ross knew of serious problems relating to the quality of DLI's QuarterSpot loan portfolio and concealed these issues by:

- Colluding with QuarterSpot by falsifying thousands of payments for non-paying or late-paying QuarterSpot borrowers, causing the false appearance that non-paying loans were performing, and funding those payments by rebating QuarterSpot's service fees;
- Controlling how QuarterSpot transmitted its reports and information to DLI staff and Opus Fund Services, hiding his role in QuarterSpot's reporting processes;
- Affirmatively misrepresenting the status of delinquent and/or non-paying loans to DLI investors and/or prospective investors; and
- Using his personal Gmail email address to communicate with QuarterSpot, to avoid detection by DLI personnel.

As the portfolio grew, Ross began to direct the falsification of payments in QuarterSpot's reports, which manipulation increased over time as the actual performance of the loans deteriorated.

By September 6, 2017, Ross's scheme evolved in both process and scope. By then, Ross was utilizing monthly spreadsheets to mass-tag the loans for which to falsify payments (and the amount of each payment). Each month, QuarterSpot would send Ross loan-level data. Ross would then add columns to the spreadsheet indicating (1) whether QuarterSpot was to reflect a payment on the loan; and (2) the amount of that payment. QuarterSpot would then incorporate Ross's requested payment information into its reports, and then forward those reports to DLI staff.

Ross's bad acts related to QuarterSpot include, among other things:

- Falsely inflating QuarterSpot's loan balances, cumulatively, for the period 2014 to 2017, by $53 million;
- Preventing DLI from taking an adequate amount of loan reserves;
- Causing DLI to overstate its valuation of the QuarterSpot loan portfolio and the Master Fund;
- Causing DLI to overstate its return by about 200 basis points, on average, for the period 2014 to 2017;
- Causing DLI to collect over $11 million in excess fees, for the period 2014 to 2017; and
- Undermining DLI's, its investors', and potential investors' ability to assess whether continued investment in QuarterSpot, or similar assets, was warranted.

72

Ross's actions allowed him to continue raising capital for DLI, enabling DLI to continue its operations under the guise of a very-successful investment fund, while avoiding the scrutiny that DLI's investments and business model deserved.  Ross's bad acts with respect to QuarterSpot epitomized his disregard for reporting and financial integrity, his willingness to conceal problems with respect to DLI's investments, and his general dishonesty with his colleagues, investors, and third parties.  Further, Ross's acts with respect to QuarterSpot exposed himself, DLI, his business associates, and others to regulatory and/or other liability.

### VII. Conclusion

1. Under U.S. law, each DLIF Investor is similarly situated and holds the same type of claim for restitution on account of that fraud.  The fraud was a substantial factor causing the losses of DLIF Investors.

2. Irrespective of whether a Ponzi scheme exists, the Distribution Plan should be based on the principal that, for DLIF Investors subject to U.S. rules, similarly situated investors must be treated alike to preserve equity and fairness and that all fraud victims should be treated alike, as is required by applicable U.S. law.  The pervasiveness of the fraud and the commingling of assets are sufficient to warrant the pooling of the assets and liabilities for purposes of distributions to be made under any Distribution Plan.

3. There was fraud from the inception perpetrated by Ross that has caused similar harm to each of DLIF and DLIFF, which harm will be borne by the investors in each. While similar (or possibly materially identical) factual circumstances may apply to the investors of DLIFF, their rights and potential claims as against DLIFF are a matter of Cayman Islands law. Under U.S. law, each DLIF Investor is similarly situated and holds the same type of claim for restitution on account of that fraud.  The fraud is one substantial factor that caused the losses that will be borne by the DLIF Investors.

4. It is unlikely the investors will be repaid in full.  It would be inequitable as a matter of U.S. law to distribute assets based on an assumption that an investor should recover both fictitious profits and principal based on a benefit of bargain basis since (a) reports of returns were made to all investors based on misrepresented NAV figures; and (b) earlier investors were repaid at the expense, and to the detriment, of the similarly situated later investors.

5. The best way to put the DLIF Investors on equal footing is to treat the prior payments made to these investors, whether as distributions or redemptions, as a return of principal, so that the DLIF Investors who receive a distribution through the Distribution Plan may share on a *pro rata* and equitable basis.

6. The assets and liabilities of the Receivership Entities must be pooled together in order to equitably and sensibly account for all of the assets of the Receivership Entities and to fairly make distributions to DLIF Investors and other creditors of the Receivership Entities who will receive a distribution pursuant to the Distribution Plan.

73

7.  Because DLIF Investors have received differing levels of returns, a distribution method that seeks to equalize returns to the DLIF Investors would be most equitable.

8.  The Receiver believes that the claims distribution plan has to be based in equity and that the Rising Tide Method would be most appropriate to allocate assets to DLIF Investors.

74

**Exhibits**

Exhibit 1
Identification of Certain Instances of Fraud

Included in this exhibit is a sampling of statements by Ross, or by others made at his direction, that are either, false, misleading, or omit to include material facts; as well as exchanges demonstrating an intent to defraud with respect to QuarterSpot.  Note that these are a sample of representative misrepresentations and not a full catalogue of all misrepresentations or the evidence of fraud.

**2013**

*Monthly Investor Letters*

| | |
|---|---|
| **March 2013** | Ross decreased IOU Central's "pro-forma" monthly returns for 2009 - 2012 within the chart he provided in each letter without explaining or stating a change in methodology. |
| **June 2013** until **March 2016** | Each month for almost three years, Ross stated, "We expect no change to our underlying investment thesis," which included "close association with experienced underwriters." [In reality, DLI began purchasing loans from QuarterSpot, Inc. ("QS") within two months of QS beginning to underwrite loans.][94] |
| **June 2013** | Ross announced that the fund "will not stray" from "the sweet spot for private credit: short-term, high-yield, sub-$250K loans to local, established businesses." |
| **July 2013** | Ross claimed that "First Annapolis Consulting wrote a good article on Merchant Cash Advances, which have interest rates of 70%+. The piece helps point in context how DLIF is able to attract high-quality, low-default business borrowers with a 30% interest rate, which sounds high but is actually low compared to the traditional options faced by local businesses."  Ross continued, "Quarterspot loans are very similar to IOU Central: 6, 9, or 12 month terms, daily repayment, average interest rates in the 30% range." Ross also stated that there are "no changes to [DLI's] current strategy" while increasing the second component of this strategy, the targeted default rate, from 1.78% to 5%. |
| **Oct. 2013** | Ross announced that the *Wall Street Journal* had quoted him and provided a link to the blog post that stated, "When he loans money to small businesses, Mr. Ross says he looks for six-months of bank statements, and business and personal credit reports for the people running the company" [This is an overstatement as to QS.  Ross did not seek this information (i.e., bank statements and business and personal credit reports) from persons managing QS.] |

---

[94] The contents in the brackets throughout this exhibit provide brief explanations of the nature of the specific misrepresentations by Ross.

| | |
|---|---|
| **Nov. 2013** | Ross stated, "(As a reminder, staffing and other General Partner expenses are borne by myself and do not affect Fund returns.)" [This is false given that the PPMs include a section entitled "Expenses of the Partnership," which include such expenses] |

Ross also stated, "The Los Angeles Business Journal, a subscription-only weekly, published a lengthy front-page story on the Fund that was very flattering. You can read it in the separately attached PDF." The news article included representations by Ross that: (1) As many as one borrower in five could default, and Ross' investors would still come out ahead; (2) "Banks have been leaving the small-business loan market for 10 years and they continue to do so…The size of the hole is growing, not shrinking."; (3) About 6 percent of loans across Ross' portfolio default, though in most cases borrowers will eventually have to pay. Although the loans are made to a business, they're personally guaranteed by the business owner [QS did not require personal guarantees from borrowers].

Ross also stated, "LendAcademy guest-posted a piece I wrote," and provided a link to access the content, which contained representations by Ross that (1) "Platforms that keep none of their own loans face a unique trust problem…because they have a strong incentive to grow quickly at the expense of good underwriting. Two factors mitigate against this sort of moral hazard: the short duration of the loans, so that investors would smell a rat before managers could achieve an exit, and second, the integrity that I have seen across all management teams in this space"; and (2) in the "Comments" section, Ross responded: "LendingClub and Prosper…expend significant financial resources on **SEC compliance** and customer service to make 30%+ of their loans available to retail investors. This is the right thing to do, and they do it, but **it is not the profitable thing to do**."

Ross also stated, "I published a Seeking Alpha piece," and provided a link to access the content, which included representations by Ross that: (1) In the absence of SEC rules, "Believe [him], private debt hedge funds would be happy to sell to non-accredited investors"; and (2) Ross "spend[s] a lot of time thinking about whether or not the growth of private debt, including online lending, is a bubble…One of the biggest differences between private credit today and the mortgage bubble is duration: the consumer loans are mostly 3 year with some 5 year. The business loans I buy in my fund are all 1 year or less."

| | |
|---|---|
| **December 2013** | Ross stated, "Bankless Times interviewed me on the 'future of small business lending'" and provided a link to the content, which included Ross' responses to two questions: (1) Responding to question "what criteria do you use to select the lenders you work with?" Ross states: "Most important is the lender's management team…These need to be loans that businesses are happy to receive and fully able to pay back. The rest of my lender due diligence process centers around lending practices, including how they source borrowers, their underwriting process and expected default modeling, a full review of their legal documents, their track record, and their funding as an enterprise. Choosing lenders is the most important thing I do…We do not make mistakes during this process"; and (2) Responding to question "you do not favor loaning to startups. |

77

Why is that?" Ross states: "all borrowers need to have enough of an existing business to pay me back whether their growth ambitions succeed or not…Startups do not have an existing business to fall back on, therefore lending to them is not conservative enough for me." [QS & Dealstruck were fledgling businesses: (a) QS launched in June 2013, merely two months before Ross/DLI entered the deal; and (b) Ross/DLI finalized deal with Dealstruck the following month in January 2014, despite Dealstruck having been operating for less than two years.]

*Prospective/Investor Communications*

| | |
|---|---|
| **Sept. 27, 2013**<br>with PPM | Ross: "[I]t would not be acceptable for me to bring you into the Fund without having sent the PPM. Of course **you can withdraw any amount you like**…Although the PPM stipulates 35 days notice (i.e., tell me before the start of the month) I'm sure I could get you the money sooner. As you know the one year loans provide me with a lot of liquidity." |
| **Sept. 28, 2013**<br>with PPM | Ross: "If you want them, popular options are 8% (i.e., enough to pay your taxes) or All Interest so that every quarter your account will go back to the original amount, and all extra is wired out to you." Ross continued: "The Fund generally writes all non-paying loans down to zero within 10-60 days, and the lawsuit process takes about a year, so the Fund's returns right now are in a kind of "low period" when I have defaults (and mark them to zero, hurting the Fund's returns) but am not yet winning lawsuits (which will result in windfall money when we collect). And returns have been very good despite that." |
| **Oct. 4, 2013 –**<br>**Oct. 7, 2013** | In an extended exchange with an investor, Ross states: "Also note that when I launched with QuarterSpot on August 1, I announced it in the attached July investor letter (which is published in early August). My investors expect a high level of transparency with respect to fund strategy. No one likes surprises." The investor responds: "If you are not able to share data from Quarterspot, is it possible for you to just invest proceeds into IOU only and not Quarterspot. I don't feel like I should have to do due diligence directly with Quarterspot if you are the one doing the investing in their deals. You obviously share a lot of data about IOU Central to your potential investors yet can't share anything on Quarterspot. Ross responds: "I went through a fairly deep look at QuarterSpot's process…The result of the lower servicing fee is that I could withstand higher defaults vs IOU and still have the same or higher returns…You definitely don't (and can't because of the NDA) do the same due diligence as me. I think I've picked the two strongest underwriters in the space that sell loans. Mostly you're betting that you more or less agree. I am running a fund, and it provides a uniform experience to all investors…There are certainly mistakes that can be made which will cause someone's returns to suffer in this asset class. When it comes to spending money on loans, I don't think I've made any, and I'm more knowledgeable and cautious now than I was a year ago." The investor then asks Ross about "Quarterspot advertising that their rates are 85% less costs and no personal credit checks or personal guarantees?" Ross responds that: "They are definitely checking personal credit." The Investor provides an article "where they say No Personal Credit Checks." Ross maintains his position: "Personal Credit Checks: I think at the time they were getting personal info via the Experian model, but their process has been redesigned around both scores." |

78

| | |
|---|---|
| **Oct. 7, 2013**<br>Ross forwards above to QS CEO | Ross urges QuarterSpot to help lure investors in by tailoring misinformation, telling QS' CEO: "FYI on the below for when you talk to [investor]. I took care to craft my language around Personal Credit Checks so that you are not put in an awkward spot in any way. Hopefully I did OK." QS responds: "Thank you for your discretion, Brendan…I'm fully behind partnering with you and DLIF on anything that makes sense…Will start reaching out to my contacts on your behalf tomorrow." |
| **Dec. 3, 2013** | Ross: "I've generally been doing a 60% reserve when it is 30 days late, and 100% at 60 days. Sometimes I've been more aggressive, as with loans where the business is no longer operating, or just when I think I'm being prudent…I think I'm about as aggressive at creating reserves as anyone could be. Plus I'm also writing loans down to zero that will definitely see a recovery one day…just don't know when that day will come." |
| **Dec. 9, 2013**<br>Ross and QS exchange | Ross: "[I am] happy to discuss how to handicap late loans. I've been doing this a while now.  Generally speaking, if they've missed payments and are not currently making any but plan to "get caught up in two weeks", it's bad news. Once they get a taste for not paying, it's trouble." Response email from QS to Ross: "…As part of getting our underwriting tuned and generating the numbers for our discussion, I've put together a framework for modeling and reporting that's extremely flexible…" The evidence indicates Ross and QS were more concerned with the data reflected in QuarterSpot's reports than in objective, accurate financial reporting. |
| **Dec. 11, 2013** | Ross: "My loans just self-liquidate so quickly on their own that I don't care as much about having a secondary market."  "I don't really care about the borrowers. I can line up borrowers by doing deals with more platforms. My focus in on lining up investors. That's all I care about. Make sense?" |
| **Dec. 13, 2013**<br>Ross to third-party marketer of Fund | Ross in response to question about why investors should not approach lending platforms directly to invest: "Great question that sometimes comes up. It's rarely asked in completel [*sic*] seriousness, its more like: explain to me why I need you again. Here's approx. what I say. 1. Availability. IOU and QuarterSpot are full…  4. Cash Drag: The loans self-liquidate very quickly, producing a lot of cash that needs to be put back to work. In short: the portfolios require attention. 5. Size and Leverage: As I continue to add underwriters, I will naturally have both leverage to ensure that I get fair deals and choices which enable me to vary where I deploy capital based on returns." |
| **Dec. 13, 2013**<br>DLI investor relations rep. | "These are **exactly the rebuttals that I give to prospects as well**. Everyone is trying to figure out ways of cutting the middleman out if [*sic*] the picture… |

79

<u>2014</u>

*Monthly Fact Sheets*

**January 2014
until July 2016**    Included in a "frequently asked questions" section: (1) "What has made this
investment possible now?" The response stated, "Transparency. Software now
exists that enables the Fund – and its investors – to see real time portfolio
performance. Fund management knows what is happening to every loan, every
day, and we can show it directly to investors at any time"; (2) "Do you get
personal guarantees?" The response stated, "**Of course**. All borrowers are
personally liable for defaulted loans" [QS borrowers did not execute personal
guarantees (see emphasis in original)].

*Monthly Investor Letters*

**January 2014**    Ross restated each of DLIF's monthly results for 2013 as well as all of IOU
Central's "pro-forma" returns for all prior months and years in the standard chart
included in all investor letters (DLI had previously restated IOU's returns in
March 2013, above). Ross also announced the Fund's ownership of "over 800
similar loans with consistent payment, pre-payment, and default characteristics."
Ross also stated, "GARP, the Global Association of Risk Professionals, asked
me to write a piece explaining consumer and small business direct lending to
their institutional investor audience," and provided a link to the content, in which
Ross explained under the heading "Recession-Proof?" that "The fund I
personally run buys high-yield, short-term small business loans. The default rate
of the loans in this fund would have to reach 22 percent in order to drive returns
down to zero percent."

**February 2014**    Ross stated: "*Private Wealth*, a Family-Office-focused print magazine, profiled
the fund in Banking on Small Business," and provided a link to the content,
which contained representations by Ross that: (1) Loans are short term – six to
12 months; (2) The fund currently has about $21 million under management and
aims to reach $100 million by the end of the year; (3) "The key to successfully
growing an alternative lending business is to find pools of attractive borrowers,"
Ross says. "It's all about the borrowers because the money is not that hard to
find." [see opposite December 11, 2013 statement]; (4) The online lenders go to
documents that cannot be misrepresented—by getting direct access to the
borrower's bank account—and make a lending decision based on that
information; and (5) "the best process is to establish relationships with
underwriters you trust and then work out the mechanics to ensure their
underwriting quality continues to stay high," Ross says; (6) The fund
experiences defaults of 6% or so. "We know that some of our loans are going to
go bad," Ross says. "That's factored into the model that delivers returns." The
fund writes down defaulted loans to zero. "We don't keep loans on our books
that will one day have a 30-cent-on-the-dollar recovery, which is IOU's historic
legal recovery goal. The returns each month are net of bad loans being written
down to zero.

Ross also stated: "I'm back in *Forbes*," and provided a link to the content, which
contained representations by Ross that: (1) DLI "connects investors directly
with qualified business borrowers; and (2) DLI's agreement with Dealstruck

80

will make capital available to entrepreneurs [The reference to entrepreneurs contradicts Ross' consistent representations to investors, "no startups"]

**March 2014**   Ross stated: "We begin our 18th month of continuously profitable operations with an important milestone successfully behind us: Our inception-to-date Audit is complete! …While not the kind of document that most people can stay awake through, it does serve as a valuable third party validation of our strategy and its ability to produce returns…I continue to have four to six conversations a month with new lenders, all of whom make short-term, high-yield small business loans. The best of these will end up fueling the Fund's continued expansion and dominance of this important lending category."

*Prospective/Investor Communications*

**Jan. 3, 2014**   Ross' response to the question "What is the relationship between your company
**with PPM**   and IOU?" is: "I buy loans from them. They do not own any part of the Fund or the GP, and I'm not compensated by them in any way."  [Ross fails to mention his ownership in IOU (250k+ shares) at this time]

**Jan. 4, 2014**   Investor: "I would like to get a bit more guidance…" 1. When looking at the interest rates in the loan calculator [Ross previously sent], it shows about 15%. What you are saying is that if we add the guaranty fees and the fact that the loan is being paid along the year – the actual interest is about 30% and **the 15% number is bullshit**?

Ross: "**Yes**…The origin of the "guarantee fee" is actually the US Small Business Administration, which charges 1-3% guarantee fees. IOU just upped that to 10%."

**Jan. 7, 2014 –**   Investor: "seems that IOU is a start-up who doesn't earn money at the moment,
**Jan. 13, 2014**   and with your $20M cash you are buying about 50% of all is [*sic*] loans. Your fund is also a stat-up [*sic*]."

Ross: "IOU will be cash flow positive in a quarter or two…It's actually a pretty good story – easy to understand just based on their income from growing their balance sheet and fully utilizing a credit line they already have in place…It's definitely a story I've told to investors doing fairly deep due diligence."

**Jan. 15, 2014**   "Our goal is to be open and transparent with you so we can find a way to partner
**third-party**   with your firm… Attached, find: (2.)  Loan example [from IOU] that shows the
**marketer email;**   details of the information we can evaluate for each loan we are going to buy or
**Ross copied**   have bought."  [This is not true for the QS loans]

**Jan. 21, 2014**   Canned solicitation includes: "No start-up companies" and "live screen sharing
**DLI investor**   of the current portfolio" without distinguishing QuarterSpot as a startup
**relations rep.**   company.  [These types of messages were sent many times]

**Jan. 24, 2014**   Ross: "A good next step is for us to do a screen share, and I'll show you **the**
**with PPM**   **Fund's live portfolio** including the loans, their underwriting details, and the **daily** flow of payments from the borrowers to the Fund." [The standard or typical language no longer narrowly tailored to IOU]

81

| | |
|---|---|
| **Feb. 1, 2014** | DLIF's April 25, 2013, Regulation D filing with SEC stated the "Minimum investment accepted from any outside investor" to be: $250,000. On February 1, 2014, DLI accepted a $25,000 subscription [In reality, monies accepted from a third-party marketer]. |
| **Feb. 3, 2014**<br>DLI investor relations rep. | "What we have found very helpful to our clientele is a live screen share session, where our portfolio manager takes you inside our fund so you can understand what we are doing…"; IOU Case Study: "All borrowers are prime or super-prime…" |
| **Feb. 10, 2014**<br>Altor Group consultant and Ross exchange | Consultant: "I have completed your Due Diligence Report and its [*sic*] attached. Let me know if there are item you would like to see reflected differently or edits made. I am happy to work with you to create the most useable document, while still remaining objective."<br><br>Ross: "9.7.12 – Maybe add in the QS section that no known cases of fraud or identity theft have occurred."<br><br>Consultant: "I am on it and will have these changes made by the end of the weekend. Thanks!" |
| **Mar. 8, 2014**<br>Ross to QS | Ross: "scanning the Listings report for Feb 2014 I'm seeing a very substantial number of Late Loans that are not written off. It looks like loans that are between late 30 and 60 total $409k. And the loans that are 0-30 late are also fairly substantial…Am I doing something wrong here? I'm feeling pretty worried about where we are….I need to understand how we get out of the woods that we're in right now, where you are using up equity to make up for the underwriting, which is scary as hell for both of us." |
| **Mar. 20, 2014** | Ross: "Quarterspot – very little late loans." Investor: "I have been investing on Quarterspot. Out of 30 loans that I have invested, 4 are currently late and a total of 9 loans have had some delinquency. Is that comparable to what you see?" |
| **Mar. 21, 2014** | Ross: "I know [QS] is fixing a bug this morning that is going to successfully insert some payments that were made by borrowers but never hit the system – maybe those will improve what you see because I know a number of my loans that look Late in the interface will no longer be late." Investor: "Just checked my quarterspot acct. Several severely late loans are now fully repaid." |
| **June 2014** | Asset Valuation Policy (provided to prospective/investors by October 5, 2014, if not earlier) stated for "Late Payment Scenarios" if no payment received in last 1 month, the asset value was 60%; if no payment in last 2 months 20%; if no payment in last 3 months, 0%. |
| **Sept. 29, 2014**<br>with investor presentation | DLIF September 2014 Presentation represents, "Overview: we buy and hold these **cash-flow rich loans** in a **simple, transparent investment vehicle**; Loans are acquired from **experienced lenders** who follow strict underwriting guidelines…" presentation continues, "Fund underwriting is sophisticated and thorough"; "The underwriting process is complex, thorough and rapid." |

82

| | |
|---|---|
| **Oct. 20, 2014** with PPM | Ross: "I can show you the Fund's live loan portfolio via screen share"; also attached misleading *Private Wealth* article and DLIF September 2014 Presentation (see above). |
| **Oct. 27, 2014** from third party marketer with Ross copied | Attached Default Sensitivity Analysis, a spreadsheet that detailed DLIF's historical monthly write downs and expressed those write downs as a very small percentage of DLIF's assets under management for each month, arriving at an average monthly write down percentage. The same spreadsheet included a tab with a graph that tracked the default rate each month over time. |
| **Oct. 29, 2014** DLI investor relations rep. | Canned solicitations: "No start-up companies…live screen sharing of the current portfolio…all notes self-liquidating [notes from 5 lenders] …no subprime…"; attached DLIF Notice Letter 2014-10-06: "moving to BDC structure in 2015…"; attached Credit Sensitivity Analysis and DLIF October 2014 Presentation (above). |

## 2015

*Private Placement Memoranda*

| | |
|---|---|
| **Jan. 2015** | Stated that under DLI's valuation policy, loans that had not received payments in the last 30 days would be "[v]alued at 50% of remaining principal balance, and no accrual of interest." Loans that had not received a payment in the last 60 days would be "[v]alued at 0% of remaining principal balance, and no accrual of interest." |
| **Dec. 2015** | Expressed DLI's valuation policy in the same manner as January 2015 (above). |

*Monthly Fact Sheets*

| | |
|---|---|
| **Jan. 2015** to **July 2016** | Stated: "But don't focus on the bad loans; we write plenty of loans off but still achieve excellent returns." Included a "frequently asked questions" section that contained the question, "What happens to the defaulted loans?" The response stated, "We write them down to $0, then we work with our lending partners to pursue all defaulted borrowers in a traditional collections process. Although we expect to collect 20 cents on the dollar based on history, we take the ultra-conservative approach of writing bad loans down to $0. Any collections we receive are windfalls for fund investors." |

*Monthly Investor Letters*

| | |
|---|---|
| **February 2015** | Celebrated returns as "especially satisfying given that most of our loans continue to be repaid daily, and February has about 10% fewer days to collect interest than January and March." |
| **April 2015** | Declared that DLI "continue[s] to apply conservative lending principles and reap the rewards for our investors." |

| October 2015 | DLI "continue[s] to apply conservative lending principles"; concludes that as a result of halving default rates, there is now a "lower risk portfolio"; attributes improvement in risk-adjusted returns to both a decrease in defaults within existing lenders and a shift towards more conservative lenders as defined by greater and better deal flow. |
|---|---|
| December 2015 | "[N]o performance fees will be earned by [DLI] until a 7% return is first earned by investors." |

*Specific Evidence of QuarterSpot Fraud*

| Jan. 13, 2015 | Quarterspot provided Ross with a list of late loans and asked for permission to charge them off: "Let us know if the list below is ok to chargeoff…" |
|---|---|
| Jan. 13, 2015 | Ross to QS: "In case this wasn't totally clear: definitely DO NOT just charge off the Eric list below.  That will create MAJOR problems for me!!"  QS responds, "Got it loud and clear, I am finishing up the work to enter the charge offs and postdate them.  I will hold until you get the late loans." |
| Jan. 18, 2015 | Ross directs QS to add false payment for 42 loans in "Collections," with false payment dates, and then instructed QS how to transmit its falsified reports. |
| Jan. 20, 2015<br>QS to Opus | Emails spreadsheet with the title QS_DailyLoans_2014.xlsx, which reflected falsified payment information that Ross provided to QuarterSpot. |
| Feb. 8, 2015<br>Ross to QS | "I'd like to talk this week about late loans, again, as I'm not sure that the volume of late loans is actually slowing down despite your efforts.  It still seems that more loans are going late each month than I can afford and still have normal returns, so that the can we are kicking down the road is growing in size." |
| Mar. 10, 2015<br>Ross to QS | I also want to talk about the volume of new late loans and the speed at which they are accumulating…It is critical to me that the increase in volume of late loans decelerate relative to what I am writing off, so that I am starting to catch up." |
| Aug.  27,  2015<br>Ross to QS | "I have many payment plan loans whose "maturity date" is in the past. Can one of you guys give me a call to discuss how you can fix this? Obviously there are many solutions. This is important.  It is screwing up our balance sheet reporting, and it shouldn't be hard to fix." |
| Aug.  28,  2015<br>Ross to QS | "1. For the loans that have not been officially modified, assume the current daily payment and the current remaining balance, and compute a new end date.  This would by definition be no further out in the future than the original loan term length, and likely less than that. 2.  For loans that have been officially modified, obviously we want the new date for as long as they stay on the modified schedule.  If they fall off then we'd want to revert to (1) above. Goal is to produce maturity dates in the future even if they tend to roll.  This will take the issue off the table." |

84

*Prospective/Investor Communications*

**Oct. 7, 2015**     Ross provides series of "highlights of the Fund," emphasizing that DLIF "produces consistent, non-market-correlated returns"; further explains that it has achieved "10-12% returns net to investors with no down months." continues, "Defaults trending down, now at 4% and could be as high as 20% without loss of principal," and he noted the Funds' "[f]ull transparency."

<u>2016</u>

*Monthly Investor Letters*

**April 2016**     DLIF "does not buy from marketplace lenders," and its "loans are rapidly replaced throughout the business cycle, ensuring that the fund "has ample liquidity for redemptions, and that the fund could "self-liquidate" to meet any future outsized redemptions "without impacting future returns."

**July 2016**     DLIF "own[s] loans and not equity." The "funds with equity positions often have long lockups, operating more like a private equity fund than a debt vehicle like DLIF whose goal is simply to produce current income." Under the heading "how we think about debt vs equity in the lenders we finance," DLI explains that it generally combines two features, including "avoiding equity positions in lenders in favor of debt-only positions with high current coupons." The letter continues, "Because we own loans and not equity, winding down a position is not as traumatic as it is for equity holders. We simply let the loans run off."

**Aug. 2016**     References a file of 10,000 **daily pay,** one-year loans in its section about quantitative underwriting describing "What We Look for in a Lender," creating the inference that these are the types of investments still being pursued.

**Nov. 2016**     Ross listed various factors that affect DLI's returns, which included having to write down bad loans. Ross emphasized that DLI writes down bad loans as soon as it becomes aware of any impairment, contrasting DLI with other funds that failed to be "conservative" in this respect and stating that "[b]ecause we at DLI intend to build a private credit firm that will endure for decades to come, we take our responsibility to properly mark assets very seriously."

**Dec. 2016**     "December caps another year of excellent performance as [the Fund] continue[s] to deliver double-digit returns without leverage in one of the most attractive investible asset classes: private credit." "One of the hallmarks of DLIF has always been, in our opinion, its conservative approach to taking reserves against late loans."

**Omissions**     The investor letters are also notable for what they omit to say about the financial difficulties faced by the platforms. For example, the 2016 investor letters fail to disclose that the money was being lent to Dealstruck in order for the company to meet payroll, let alone that Ross also had a financial interest in Dealstruck.

*Prospective/Investor Communications*

| | |
|---|---|
| **Feb. 3, 2016** | Ross: writes to QS, "quite a few of these loans have Payment amounts of 50, 100, or 200. What is going on with those? I think they will stick out and should be reverted back to their normal payment amount for these late loans." QS: "These are loans that are either on temporarily or permanently reduced payment plans. Borrower's tend to say they can afford to pay a round number, which is the reason for these." |
| **Feb. 15, 2016** | Ross: attached an investor presentations and directed investor to "[n]ote the historical returns on p3 of the Presentation"; represented that "[o]ur investors receive double-digit unlevered returns, and we have had no down months, and the Fund is suitable for regular and IRA accounts"; included the same "highlights of the Fund" also in October 7, 2015 email, again emphasizing the Fund's strong and stable returns, low default rate, and full transparency." |
| **Apr. 19, 2016** and **June 24, 2016** | Ross provided same "Fund highlights," again attaching investor presentations and stating, "Our investors have received 10-12% unlevered returns, and we have had no down months, and the Fund is suitable for on- and offshore accounts." |
| **July 5, 2016** and two emails on **Sept. 17, 2016** | Ross circulated a document titled "Private Credit Investing Portfolio Summary" to investors and their representatives. Among other things, this document included specific information about the historical returns for the QuarterSpot position, including the historical loss reserves taken on that position, while touting the QuarterSpot position's consistently strong performance. |
| **Aug. 21, 2016** | Ross provided updated default sensitivity analysis with same sort of historical write down information that showed DLIF write downs as a percentage of assets under management and included a graph tracking default rates over time. |
| **Oct. 11, 2016** | Ross: "For the two remaining platforms where we continue to buy whole loans, Investment E/D and Quarterspot, we reserve 50% if loans are 30 days late and 100% if they are 60 days late. There are some limited exceptions, but it's generally according to that formula." |
| **Oct. 20, 2016** between consultants at Minard Capital | In response to recommendations to improve appearance of monthly factsheets that DLI provided to investors, [Designer] wrote, "Brendan [Ross] likes the text in all white with it going big to small according to pie slice size. He also knows you can't read it, and as he says 'well it's not really meant to be read.'" |
| **Oct. 21, 2016** DLI investor relations rep. | Emphasized in the "Fund Highlights" that DLI "continues to deliver very stable, unlevered, double digit returns with no down months since the Fund's inception in 2012." |
| **Oct. 23, 2016** Ross and Minard Capital | Minard: Pie Chart "Cannot read "Consumer" – white text on a light blue background is always illegible"; Ross: "leave consumer pie slice as it is. It's investor's least favorite and I want to downplay it. That was on purpose."; Minard: Short-Duration Collateral Chart – "Can't read 26-36 mo. – see above (change to dark blue or make font color dark gray or black.); Ross: "same as Consumer. Let's keep it that way." |

86

<u>2017</u>

*Monthly Investor Letters*

| | |
|---|---|
| **Jan. 2017** | Praises the "4+ track record as a reliable producer of returns for private debt investors." |

**Feb. 2017**   DLI "produce[s] the Fund's returns based on interest income net of new loan loss reserves and fund expenses"; summarized DLI's January 2015 valuation policy for its whole loan positions, explaining that "[l]oans 30 days late in payment are marked at 50% of their principal balance" and "[l]oans without a payment in 60 days are written down to 0%," noting that "[a]djustments can be made based upon the facts and circumstances of the individual notes." This investor letter further explained that "[b]ased on these rules, we would then make necessary loss reserves and produce the Fund's returns based on interest income net of new loan loss reserves and fund expenses."; "[f]undamental to understanding our approach is knowing that regardless of how we gain exposures, we always value positions as if we held the collateral directly on our books, and for good reason: if any of our borrowers fail, we expect to take over the collateral."; indicated that even for its non-QuarterSpot investments structured as credit facilities, "our goal in valuing positions is to remain consistent with the original granular approach," explaining that "[w]e generally apply borrowing base eligibility rules consistent with our original loan by loan valuation policy."

**July 2017**   Indicated that DLI had learned of the issue with QuarterSpot as part of its regular reassessment of its valuation policies and suggested that the issue arose from lack of visibility into QuarterSpot's loan-level data; Announced the side pocket, explaining that "[s]ide pockets are a tool used by asset managers to hold any assets for which the estimated fair value cannot be determined as of the measurement date, while still allowing the remainder of the fund's assets to be fair valued for financial reporting purposes."; Disclosed (at the end of a long footnote) that "[a]n internal cash flow study was performed which indicated an impairment for a portion of the QuarterSpot portfolio. We believe that additional information needs to be considered and analyzed before the fair value of these assets can be determined."; DLI described anticipated improved returns due to its ongoing replacement of Whole Loan Deals with Facility Deals, but then describes these new transactions as achieving investor returns in a similar way.  The letter did not disclose details of the QS impairment, nor that the partial payments that led to many of the loans being impaired were "rebate" payments that Ross had directed to make delinquent loans appear current.

**August 2017**   DLI announced sale of QS loans to the third party; DLI did not disclose to investors Ross's personal guarantee or the pledging of his equity interest in DLI.

*Prospective/Investor Communications*

**Jan. 2017**
**Due   Diligence**
**Questionnaire**   Described DLI's valuation methodology, stating that "small business loan pricing methodology is based on the payments history of the loans with a general valuation rule that assets late in making payments for 30 days will be valued at 50% and those delinquent 60 days or more  will be marked to 0%."

87

| | |
|---|---|
| **Jan. 29, 2017** | Ross explained that DLI used a servicing fee rebate for a different whole loan platform and contrasted that with QS, for which he represented no such rebate arrangement existed, citing QS' "good" and "stable" performance over time. |
| **Feb. 23, 2017** and **Mar. 13, 2017** | DLI investor relations representative emphasized in the "Fund Highlights" that DLI "continues to deliver very stable, unlevered, double digit returns with no down months since the Fund's inception in 2012." |
| **April 2017** to at least **June 2017** monthly investor presentations | Touted performance of the QS position and specifically its low default rate; graph purported to quantify QS' rate of loan "charge-offs" (loan defaults) and compare that rate favorably as being lower than default rate for loans originated by a well-known public company small business lender; explained, "DLI's small business lending partner QS outperforms by mitigating charge-offs, not just attempting to offset them with higher pricing." |
| **Aug. 6 and 7, 2017** | Ross: "The question is: when a loan is 5% or 10% behind, what is the likelihood of recovery…I suspect that even 5% behind means the loan is done for."  QS: "Do you want to permanently edit the "Payment" field for those borrowers, inserting $150 or something like that?  Seems like there should be a value in the database for them." |
| **Summer 2017** Omissions | When others at DLI discovered impairment of QS position that led to side pocket, Ross did not disclose to investors that the partial principal payments at issue were not borrower payments but instead "rebate" payments by QS that he had directed; instead, Ross arranged a quick sale to get the delinquent QS loans off the Master Funds' books, failing to disclose key facts to investors. |
| **August and September 2017** | Ross further concealed his rebated payments in communications from to investors concerning QS and the potential impairment, side pocket, and sale to the third-party fund. |
| **Sept. 6, 2017** | Emails between Ross and QuarterSpot reveal that Ross's scheme had evolved in both process and scope. By then, Ross was utilizing monthly spreadsheets to mass-tag the loans for which to falsify payments (and the amount of each payment). |
| **Fall of 2017** Monthly Fact Sheets | Described its investment approach as providing "financing solutions to best-in-class specialty finance operators who each exhibit specific competitive advantages and asset heavy balance sheets"; "non-banks that we finance generally bear some or all of the risk of underperformance and we credit this approach with our historically high, stable returns." |

88

**2018**

*Monthly Investor Letters*

| **February 2018** | The Master Fund "charge[s] interest by the day" in its Facility Deals. |
|---|---|
| **October 2018** | "[E]xtending monthly close process may inconvenience some investors, the benefit to all investors of having valuation reports available for the Funds to close their books each month is ultimately … more supportive of the optimal operations of the Funds." |

*Specific Evidence of QuarterSpot Fraud*

| **Sept. 6, 2017, Oct. 11, 2017, and Jan. 8, 2018** | Spreadsheets that Ross sent to QS include payments for 455 loans totaling $99,641, 407 loans totaling $55,468, and 345 loans totaling $18,573, respectively.  In January 2014, Ross directed that QS falsify 42 loans payments, totaling $13,734.22.  The reduction in false payments, from September 6, 2017 to January 8, 2017, coincides with DLI's sale of its impaired assets. |

**2019**

| **January 2019** | The Feeder Funds' objective was still described as one to "generate attractive current income." |

89

Exhibit 2
Bank Accounts Included in the Report

Direct Lending Investments LLC
1. Citibank x5510
2. Wells Fargo Bank x0714
3. Wells Fargo Bank x1467
4. Bill.com Clearing Account

Direct Lending Income Fund, L.P.
5. Northbrook Bank & Trust Co. x7598
6. Northbrook Bank & Trust Co. x8052
7. Wells Fargo Bank x1927

Direct Lending Income Feeder Fund, Ltd.
8. Northbrook Bank & Trust Co. x4068
9. Northbrook Bank & Trust Co. x6033
10. Wells Fargo Bank x1919

DLI Capital, Inc.
11. Wells Fargo Bank x1893
12. Northbrook Bank & Trust Co. x6410

DLI Capital Partner, Inc.
13. Wells Fargo Bank x1901

DLI Assets Bravo, LLC
14. Wells Fargo Bank x1602
15. Wells Fargo Bank x2329
16. Northbrook Bank & Trust Co. x3290
17. Wells Fargo Bank x1594

DLI Assets, LLC
18. Wells Fargo Bank x2311 (*account was also under the name of DLI Assets Bravo, LLC*)
19. Northbrook Bank & Trust Co. x8381
20. Wells Fargo Bank x1885

DLI TC, LLC
21. First Republic Bank x5690

DLI SPV I, LLC
22. Wells Fargo Bank x4908

Direct Lending Capital Partners, Ltd.
23. Northbrook Bank & Trust Co. x9356

Direct Lending Income Fund (DE Statutory Trust)
24. Citibank. x9324

Note: No bank accounts were identified for DLI Lending Agent, LLC, DL Capital, Inc., or Direct Lending Services, Inc.

90

91

## Schematic of Certain Bank Accounts



Source: Image extracted from DLI's records.

Sharp v. Shinhan et al., Exhibit 2
Receiver's Report Page 94 of 116

Exhibit 3
DLI's Explanation of the Master-Feeder Structure (October 2016 Restructuring)

The following is an excerpt from a letter sent to investors on November 23, 2016: [95]

As we imagined a future that benefitted from the simplest possible structure between us and the lenders we finance, it became apparent that being able to engage in direct lending activities would be beneficial in many circumstances. However, such lending activities if engaged in directly by DLIF would result in all investors being subject to income taxes and obligated to file tax returns in certain state and local jurisdictions in which the fund operates and would potentially result in non-U.S. investors being subject to U.S. federal income taxes on a net basis and obligated to file U.S. federal income tax returns and. Because of the significant burden this would place on our investors, we needed to find a corporate structure that would allow us to act as a direct lender inside of a master feeder structure, while permitting investor to deploy capital in the traditional way into feeder funds.

Using a master fund that is a corporation eliminates this issue, which only applies to pass-through entities like LPs and LLCs that don't elect to be treated as corporations for U.S. federal income tax purposes. Corporation are not a pass-through entities for U.S. income tax purposes and pay U.S. federal and state taxes on all of their income.

**Capitalizing the Master Fund**

If our corporate master was only capitalized by the feeder funds with equity, then these corporate taxes would be quite burdensome. However, the feeder funds will capitalize the corporate master through an appropriate combination of debt and equity, with the interest on the debt resulting in a deductible expense at the corporate master level and thus reducing the tax drag at the corporate master to an acceptable level.

In addition to eliminating certain state and local filing obligations for U.S. investors, DLIF intends to push down the management fees and certain other expenses to the corporate master. For periods prior to the restructuring, the deduction of these expenses for U.S. individual investors, and certain estate and trust investors, would have been significantly limited under rules applicable to miscellaneous itemized deductions. After the restructuring, these expenses are expected to be fully deductible by the corporate master.

---

[95] Source: 'DLIF - Master-Feeder Structure - Oct 2016.pdf.'

**How the Structure Works:**

(1) The two feeder funds, domestic and offshore, take in 100% equity from investors. (The feeder funds have no leverage).

(2) The two feeder funds send capital to the corporate master as follows: up to 80% of the capital is in the form of debt and 20% or more of the capital in the form of equity.

(3) Most expenses including the management fee will be expenses of the master fund and thus will be deductible by the master fund.

(4) The debt of the master fund currently bears a 12% coupon to the feeder funds, so that the interest income to the feeder is 0.80% per month (12% coupon = 1% per month, but only 80% of the capital is debt, so its 0.80% per month in interest).

(5) Any returns in the master fund above 0.80% per month will represent returns on the equity in the master fund. These returns are taxed at the master fund level at the U.S. federal rate of 35% (plus state and local taxes) and the remainder will be paid out as dividends to the feeder funds.

(6) Foreign investors will pay a U.S. withholding tax on their allocable share of the dividends from the master fund which will be the letter of an applicable tax treaty between such investors' jurisdiction of residence and the United States and the 30% maximum rate.

At the end of this restructuring, the tradeoffs are thus roughly summarized as follows:

- U.S. and non-U.S. investors protected from filing tax returns.
- The management fee and the majority of expenses are tax deductible.
- In a month with returns higher than 0.80%, as all historical months have been, fund returns will be slightly lower than before as a result of corporate tax drag.
- Investor after-tax returns may be higher or lower depending on its individual circumstances, though many US taxable investors in higher tax brackets are likely to have higher after-tax returns.

93

Exhibit 4
DLIF and DLIFF's Reported NAV





Source: Company records.

Exhibit 5
Observations Regarding Ross's Personal Interest in Counterparties

**IOU Central Inc.**

1.      On February 13, 2012, Ross and DLI separately entered into Non-Disclosure Agreements with IOU Financial Inc. and IOU Central Inc.

2.      In April 2012, Ross purchases (through a joint account with his wife) 91,000 shares of IOU Central, Inc. common stock on the open market.  The stock was and is listed on the Toronto stock exchange. Between June 22, 2012 and July 26, 2012, Ross purchased another two hundred and twenty thousand (220,000) total shares of IOU Central common stock.

3.      On September 6, 2012, DLI and IOU enter into a master purchase agreement, to govern the purchase of small business loans originated by IOU.

4.      November 1, 2012, DLIF commences operation.  IOU is its only lending platform at inception.

5.      Late 2012, DLI announced to investors that it had purchased 46 loans from IOU Central for $575,000 and recirculated cash from a handful of early paydowns.

6.      In August 2015, DLI decides not to increase its investment in IOU loans due to poor performance of the loans.  However, DLI agrees to allow repayments of existing loans to be used to purchase new loans.  The last funds were wired to IOU in August 2015.

7.      In March 2016, DLI notifies IOU that it will not allow any more loan proceeds to be used to purchase new loans.  Thereafter, all loan proceeds are remitted to DLI as they are collected. The reason was poor performance of existing loans. Between September 23 and September 30, 2016, Ross sold the 220,000 shares of IOU Central common stock for a loss of $17,567.00.

8.      On October 4, 2016, Ross sold his remaining 91,000 shares of IOU Central common stock for a total loss of $24,683.00.

9.      The Master Fund continues to hold a small amount of IOU loans that have been written off as uncollectible.

**LoanHero, LLC**

1.      LoanHero, LLC ("LoanHero") was formed on June 25, 2014.

2.      Under the original operating agreement, the 11 initial members were issued a total of 8,750,000 Units for gross consideration of $875.  Ross was one of the initial members and was issued 1,200,000 Units for $120.

3.      Ross was also one of four "Funding Members."  Like Ross, each Funding Member received 1,200,000 Units and agreed to contribute $50,000 by July 25, 2014 and another $50,000 by October 15, 2014, and would have forfeited his Units if the capital contributions had not been made. The other Funding Members were Neil Senturia, Zalman Vitenson, and Daniel Bradbury (managing member of BioBrit LLC).

4.      Ross made his capital contributions on July 23, 2014 and October 16, 2017.

5.      On March 23, 2015, LoanHero converted to a Delaware corporation.  Upon conversion, the Units of each of the Funding Members were reclassified to Series Seed-1 Preferred Stock.  The Units of all other members were reclassified to common stock.

6.      On April 16, 2015, LoanHero completed a funding round by issuing its Series Seed-2 Preferred Stock.  The funding included the conversion of notes previously issued by LoanHero for $326,984.93, and new cash of $35,000.  Ross made an additional cash investment of $50,000 in this offering from his 401(k) account and received 394,321 shares of Series Seed-2 Preferred Stock.

7.      On April 30, 2015, DLIF entered into a Loan and Security Agreement ("LSA") with FundHero, LLC ("FundHero"), a subsidiary of LoanHero, under which DLIF agreed to make revolving loans to FundHero to finance the purchase of consumer loans originated by LoanHero. Prior to the origination of loans financed by this line of credit, LoanHero had not previously conducted operations.

8.      On June 2, 2015, Ross was issued stock options to purchase 300,000 common shares at $0.043 per share under LoanHero's 2014 Equity Incentive Plan.

9.      Despite internal DLI analyses questioning the sustainability of the LoanHero facility, DLI failed to reduce its allocation of capital to LoanHero or adjust its valuation. Instead, DLI increased its commitment to LoanHero.

10.     On January 18, 2016, Ross and LoanHero's CEO exchanged email correspondence in which Ross inquired about the percentage of LoanHero he owned. Ross expressed a need to own less than 5% of its equity to be compliant with various SEC rules and wondered if he could sell some of his interests but maintain a right of repurchase once his total ownership fell below 5%.  LoanHero's CEO responded that Ross owned 7.8864% individually and another 2.0732% through his Ross Asset Advisors Inc. 401K Trust.

11.     On March 6, 2016 Ross emailed LoanHero's CEO again and stated that he would resent having to sell at a haircut given that he was providing the credit facility to LoanHero. In response, LoanHero's CEO explained that he was one of many at LoanHero who were deeply appreciative of Ross, that he did not fully understand the nuances of the problem, apologized if he misspoke and asked Ross not to get angry. Ross then asked LoanHero's CEO to "create a contact" for him.

12.     A Third Amendment to the LSA increased the maximum facility amount from $20 million to $25 million as of November 10, 2016.

13.    In an email to a prospective investor in January 2017, Ross explained that he was going to give his shares of LoanHero back to the company as part of a larger negotiation that is increasing the percent of equity LoanHero must have in its facility and represented that the deal would benefit the fund, not himself.

14.    On March 24, 2017, Ross or his 401(k) account entered into the following agreements to divest his ownership interests in LoanHero:

    a.   Sale of 1,200,000 shares of Series Seed-1 Preferred Stock to a third party for $100,000;

    b.   Sale of 394,321 shares of Series Seed-2 Preferred to a third party for $49,999.91.

    c.   Termination of 300,000 stock options.

15.    In September 2017, DLI sent a notice of default to LoanHero under the line of credit.

16.    In October 2017, despite the fact the facility had been undercollateralized for three months, a Fifth Amendment to the LSA increased the maximum facility amount to $42.5 million.

17.    In December 2017, DLI conducted a strict foreclosure of the underlying loan portfolio but failed to disclose this fact to investors for months.

18.    LoanHero is now out of business.


**Realty Mogul, Inc.**

1.    On March 21, 2013, Ross joined Realty Mogul, Inc. (RMI), receiving emails about investment opportunities and status of the company.

2.    As early as December 2013, Ross and RMI's CEO corresponded consistently on business strategies for RMI.

3.    On March 27, 2014, Ross purchases 39,475 shares of Series A Preferred Stock in RMI for $100,000 and executed the following agreements: (a) Investor Rights Agreement; (b) Voting Agreement; (c) Series A Preferred Stock Purchase Agreement; (d) Form of Amended and Restated Certificate of Incorporation; and (e) Right of First Refusal and Co-Sale Agreement.

4.    On July 17, 2014, Ross encouraged RMI's CEO to invest in DLIF and sent her the fund's PPM and subscription documents.

5.    On August 28, 2014, DLIF and RMI enter into a master agreement to govern the terms under which RMI would offer loans to DLIF for purchase and DLIF would purchase such loans.

6.    In March 2015, DLIF decided not to purchase any additional loans from RMI.  The reason was poor performance of the loans previously purchased.

7.     DLI continued to include RMI in the investor fact sheets after March 2015 until November 2015 and investor letters from April through June 2018.

8.     A valuation report for September 30, 2016 highlighted DLIF's decision to wind down its position with RMI throughout 2016 and as of the end of 2016, only a few loans remain on the books.

9.     On March 29, 2017, Ross sells the Series A Preferred Stock to a third party for $223,366.90.

10.    The funds continue to hold a small amount of RMI loans.


**Nativa Capital Management, LLC**

1.     In September 2015, a term sheet was signed which contemplated that DLIF would provide loans to finance coffee growers in Honduras.  The term sheet provided that Ross would own 25% of Nativa Capital Management, LLC ("NCM").

2.     By an email dated October 9, 2015, Omanoff circulated corporate documents for NCM, which included an unsigned operating agreement that reflected that Ross owned 25% of NCM.  The operating agreement was never signed.

3.     After due diligence, DLIF decided not to provide the financing described in the term sheet.

4.     However, DLIF agreed to provide inventory financing to a coffee buyer for the 2015/2016 growing season.

5.     On December 14, 2015, DLIF and Nativa Capital Partners I, LLC ("NCP") entered into a line of credit to provide financing.  As part of the closing, Nativa provided DLIF with a signed operating agreement for NCM dated October 5, 2015 under which Ross was not a member.  Nativa also provided that member resolutions of NCM and NCP, which recite that Omanoff and Noel Carrette were the sole owners of NCM, which was the sole owner of NCP.

6.     On December 16, 2015, DLIF wired $3,706,803.14 to NCP's bank account. On the same day, NCP transferred $3,558,531.01 to Beneficio Santa Rosa SA through its bank.

7.     The Receiver has not located any record that Ross ever signed an operating agreement for NCM.

8.     Ross is not known to have received any distributions as an owner of NCM.

9.     Ross is not known to have received a Form K-1 as an owner of NCM.

10.    In early March of 2016, Nativa Capital Partners I, LLC paid off the entire DLIF facility. On March 2, 2016, Rodney Omanoff instructed his bank to transfer or debit $3,066,188.09 from the Nativa Capital Partners I, LLC bank account.

**QuarterSpot, Inc.**

1.     On August 1, 2013, DLIF entered into a master agreement to govern the terms under which QuarterSpot, Inc. (QuarterSpot) would sell loans to DLIF, and under which it would service such loans.

2.     On November 7, 2013, Ross purchased 20,000 shares of QuarterSpot common stock in a private placement for $100,000.

3.     In an email to a prospective investor in January 2017, Ross explained that he was selling back to QuarterSpot his equity for what he paid despite subsequent up-rounds.

4.     On March 24, 2017, Ross sold all 20,000 shares to QuarterSpot for $100,000. In August/September 2017, the Master Fund decided to discontinue purchasing new loans from QuarterSpot and entered into an agreement which provided that its purchases would taper off to enable QuarterSpot to arrange alternative funding sources for its loans.


**Dealstruck Holdings, Inc.**

1.     February 11, 2014, DLIF and Dealstruck Holdings, LLC ("DS") and MyBusinessLoan.com, LLC ("MBL") entered into a master purchase agreement under which DS/MBL would offer small business loans to DLIF, and DLIF would purchase 50% participations in such loans that it agreed to purchase.

2.     On September 5, 2014, Ross purchased 40,323 Series Seed Preferred Shares in DS for $50,000.52.

3.     December 2014 to July 2016:  Fund relationship restructured multiple times.

4.     On January 27, 2016, Ross purchased $200,000 of convertible promissory notes issued by DS.

5.     In December 2016, the Master Fund conducts a strict foreclosure of DS's assets, which eliminated the equity shares held by Ross and the convertible note in the name of his trust.

6.     On January 1, 2017, Ross agreed to purchase a $1,000,000 promissory note issued by MBL to Soni-Ross Investments, LP for $900,000.  The only investor in Soni-Ross was Sandeep Soni, a personal friend of Ross.


**VoIP Guardian Partners I, LLC**

1.     Original discussions occur between Ross and Omanoff about Omanoff forming VoIP Guardian Partners I, LLC ("VOIP Guardian"), which would be in the business of purchasing telecom receivables.  DLIF would finance the purchases through a line of credit.

2.     On December 27, 2015, Omanoff circulated a final copy of the VoIP Guardian loan agreement dated October 9, 2015 and an unsigned version of an operating agreement for VoIP Guardian, LLC, the sole member of the borrower VoIP Guardian under the line of credit, both of which reflected that Ross owned 4.9% of VoIP Guardian, LLC.

3.     The line of credit was signed on December 31, 2015.  The operating agreement was not signed.

4.     While no record that Ross ever signed an operating agreement for VoIP Guardian, LLC has been identified, Ross and DLI reported many times, including to the SEC and in audited financial statements that he held an ownership interest in VoIP Guardian.

5.     The original executed Loan and Security Agreement dated December 30, 2015 (to be effective October 1, 2015) on Schedule I, Terms Schedule, stated that "**Brendan Ross owns 4.99% of VoIP Guardian, LLC**."

## Investment H

1.     As early as November 2014, Brendan Ross and Frank Turner (who would eventually become DLI's Chief Investment Officer) began attending conference calls and site visits regarding investments in what would become Investment H. Unsurprisingly, ultimately both Ross and Turner obtained ownership interests in Investment H when it was formed. One of DLI's other executives was involved in creating credit evaluation algorithms for Investment H when Investment H was starting its business and also obtained a small ownership interest in Investment H in return for his work.

2.     On February 19, 2015, Ross and Turner were copied on an email transmitting a contemplated "Revised Corporate Structure" of Investment H. The document anticipated both Ross and Turner as "Managers/Board" members of Investment H.

3.     On February 26, 2015, DLIF made a bridge loan to Investment H for $3 million.

4.     On April 1, 2015, the bridge loan was amended to increase the amount to $4 million.

5.     On April 30, 2015, DLIF entered into an operating agreement with Investment I.  The amounts due under the bridge loan were converted into a capital account balance in Investment I.

6.     On July 14, 2015, Ross was issued 50,000 Nonvoting Incentive Units in Investment H.  On or around that date, DLI's CIO at the time, Bryce Mason, was also issued 12,500 Nonvoting Incentive Units in Investment H. Copies of the documents evidencing these issuances have yet to be obtained by the Receiver.

7.     On February 1, 2016, DLIF agreed to make a $5 million term loan to Investment H, to be used for general corporate purposes.

8.     On November 9, 2016, Ross and Investment H entered into an agreement under which the Nonvoting Equity Incentive Units were cancelled for a payment to Ross of $1. In an

agreement dated the following day, Bryce Mason also agreed to return all granted Units in exchange for $1. In an email to a prospective investor in January 2017, Ross explained that DLI began producing a report of his personal trading as of September 2016 as part of DLI's SEC compliance obligation to track employee trades. Ross further informed the investor that VOIP Guardian and Investment H do not appear on the report because Ross "just gave those back."

9.      January 31, 2017, Investment H and DLIF entered into Amendment No. 1 to the term loan agreement to extend the maturity date to December 31, 2019 and to increase the loan amount to $40 million.

Exhibit 6
Talking Capital and VoIP Guardian Overview

**Summary of the Talking Capital Investment**

Talking Capital Partners I, LLC ("Talking Capital") was supposed to be a company that factored telecom receivables. In particular, the business model focused on a three-way transaction with the following types of parties:

1. Tier 1 – major carriers such as Verizon, AT&T, Sprint, T-Mobile, Vodafone, British Telecom, France Telecom/Orange S.A., Deutsche Telekom have large physical networks in the major countries. But these Tier 1 carriers do not own equipment in smaller, typically "third world" countries.

2. Tier 3 – these are smaller companies. They may not own any network equipment at all. They may also simply serve as brokers that make deals with companies that own telecom equipment in various third-world companies to supply the termination and connection services of calls coming from the Tier 1 companies.

3. Local parties/Foreign Telecom Carriers – these parties are either unknown or invisible. They supply the call termination service in the local country.

DLI's Investment in Talking Capital

Talking Capital offered DLI a chance to participate in factoring the Tier 3 receivables owed by the Tier 1 companies. In effect, DLI's cash would pay the Tier 3 daily based on the call volume so the Tier 3 could pay its local telecom partners. Then DLI would be reimbursed when the Tier 1 paid its bill. Talking Capital would monitor the amount the Tier 3 was entitled to bill the Tier 1 through Talking Capital's switch technology.

Talking Capital Timeline

DLI was introduced to Talking Capital on or about September 23, 2014 via email. Brad Reifler offered Ross a chance to invest in Talking Capital through various notes that Reifler would guaranty. Ross described a desire to invest in Talking Capital, that Ross first heard about a potential investment from Reifler,[96] who owned several funds. Ross supposedly believed that DLI was competing for the deal and needed to loan money immediately, before doing any diligence to secure its spot.

The principles of Talking Capital were Reifler, Omanoff, Proto, Rahman. Right from the outset there were misrepresentations made to DLI related to the Talking Capital deal.

---

[96] Reifler himself was sued for fraud by the SEC related to his investments. *Securities and Exchange Commission v. Bradley C. Reifler,* United States District Court, District of Nevada, Case No. 2:20-cv-00511-RFB-DJA, Complaint, Dkt. No. 1.

Initial Agreement

The initial DLI Investment was a $3.5 million promissory note at 17% interest to facilitate purchase of telecom receivables. Talking Capital granted DLIF a security interest and Reifler provided a personal guaranty. Talking Capital represented that these receivables purchases were safe and secure because they were receivables from Tier 1 telecom carriers like British Telecom and the like.  This quickly moved into a Master Receivables Purchase Agreement on December 1, 2014 between Talking Capital and DLI TC, LLC (a newly created subsidiary) with an initial $25 million receivable purchase maximum and an option for DLI to purchase more (appearing to up to an additional $100 million).

DLI Investment

DLI invested $3.5 million in November 2014 under a promissory note. DLI then quickly scaled up its investments by investing an additional $38.5 million between November 2014 and July 2015. During this time DLI received only $128,337 in payments. By November 2015, DLI had $55.7 million outstanding. It received a $14.5 million payment in December 2015, in which $9.6 million was categorized as a principal payment reducing its YE balance to $41.7 million.



Source: Company records.

Talking Capital Wind Down

Based on the cash flows, DLI's investment with Talking Capital peaked in November 2015 at $59.7 million after which Talking Capital made a series of cash payments to DLI above $10 million per month from December 2015 to March 2016 and subsequent final payments in April and May 2016.

| Month | Payment | Balance |
|-------|---------|---------|
| Dec-15 | $14,500,000 | ($41,201,663) |
| Jan-16 | $13,000,000 | ($28,201,663) |
| Feb-16 | $23,236,203 | ($6,965,460) |
| Mar-16 | $12,960,185 | $5,994,725 |
| Apr-16 | $3,335,220 | $9,329,945 |
| May-16 | $554,557 | $0 |

The excuse proffered in DLI's underwriting memorandum for the wind down of Talking Capital and the transition from Talking Capital to VoIP Guardian is that the "regulatory environment" changed. However, the new VAT regulations in the UK did not start until after DLI had begun reducing its Talking Capital investment through large repayments.  In addition, DLI made its first substantial loan to VoIP Guardian of $30 million in December 2015 after making its final investment in Talking Capital in November 2015. Beginning in December 2015, DLI began to receive back all its investment in Talking Capital, signifying a winddown that began before purported regulatory changes.

There is also at least some evidence to suggest that DLI transitioned from Talking Capital originally in cooperation with Omanoff's desire to exit Talking Capital and start a competing venture that would leave behind Talking Capital's liabilities and Reifler as a business partner. Reifler claimed in his suit that Omanoff invested in a fraudulent counterparty at Talking Capital around this time. Moreover, the changes to VAT tax collection in DLI's memo did not justify creating a new business entity but more likely signaled the end of what could have been Talking Capital's criminal business model, which appeared premised on stealing VAT taxes.

The December 2015 monthly loan package for VoIP Guardian showed that VoIP Guardian was investing in the same receivables that Talking Capital had invested in. For example, DLI's records contain a December 2015 invoice from iKarim, a Talking Capital Tier 3 vendor, to PGTI, a Tier 2, for $18 million that was payable to VoIP Guardian, virtually identical to an iKarim invoice payable to Talking Capital in November 2015. Other evidence reflects that Omanoff was commingling as between Talking Capital and VoIP.

The repayment of DLI's Talking Capital investment in April 2016 also coincided with several weeks of questions from DLI's auditors regarding the Talking Capital investment and a desire to conduct more procedures to test the validity of that investment. In response to the auditor's questions, Ross sent an email to Omanoff, pressuring him to repay the Talking Capital debt immediately.

**Summary of the VoIP Guardian Investment**

In October 2015, for reasons that are not yet fully known, some of the principles of TC formed a new entity called VoIP Guardian LLC (the VoIP entities are collectively referred to as "VoIP Guardian"). According to allegations by Brad Reifler in his lawsuit against them, the other principals of TC or its affiliates, including Omanoff, Proto, and Rahman, betrayed him and formed a new venture to steal the business and shut him out.

On October 9, 2015, Omanoff and others executed an LLC operating agreement for VoIP Guardian. Of note, the agreement contains a signature line for an entity called Contracts & Contracts, Inc. Although the executed version contains the signature of Rodney Omanoff for this entity, other documents strongly suggest that the intention was to give Ross a 4.9% interest in VoIP Guardian that would belong to Brendan Ross. The original LLC membership interest chart shows Contacts & Contracts holding 4.99% of VoIP Guardian.

On December 30, 2015, DLIF (by and through Millennium Trust) entered a Loan and Security Agreement with VoIP Guardian Partners, I, LLC with an effective date of <u>October 1, 2015</u>. Omanoff separately executed a $20 million promissory note to pay DLIF $20 million, also dated October 1, 2015, though like the underlying Loan and Security Agreement, it appears likely it was not actually signed until December 2015 or later. The form of note contained no interest rate and no repayment date. Importantly, the original executed Loan and Security Agreement on Schedule I, Terms Schedule, stated that "**Brendan Ross owns 4.99% of VoIP Guardian, LLC.**"

The Loan and Security Agreement altered the prior business model of having a DLI subsidiary purchase receivables and instead created a credit facility in which VoIP Guardian borrowed money to acquire receivables. The initial maximum facility amount was set at $20 million but DLI amended it effective December 31, 2015, one day after the date of the original signed agreement, to increase it to $50 million. VoIP Guardian granted DLI a security interest in all its assets, including all the receivables. The DLI amendment increasing the amount of the loan to VoIP Guardian did not take place until at least February, when DLI's balance was $33 million by 12/31/2015 and $43 million by January 31, 2016 despite no authorization for DLI to have increased the loan to such an amount.

<u>Loans to VoIP Guardian</u>

<u>*2015*</u>

DLI began loaning money to VoIP Guardian in October 2015, with an initial loan of $1.9 million. But in December 2015, DLI made another loan of $30.9 million, followed by another loan of $18 million in January 2016. However, by the end of March 2016, VoIP Guardian had repaid all outstanding amounts. Beginning in April 2016, DLI began a series of regular loans to VoIP Guardian that increased the balance to $99 million by December 2016 and $180 million by December 2017. During this time, DLI reported only $11 million in payments from VoIP Guardian.

105



VoIP Guardian used DLI's investments in December 2015 to factor invoices from counterparties that previously did business with TC, including iKarim. In January, VoIP Guardian began doing business with a Tier 3 using a Spanish address. In April, Rudare began factoring invoices through VoIP Guardian. All these invoices included VAT tax payments to VoIP Guardian. In May, VoIP Guardian received a credit letter for HILF for purposes of adding them as a new Tier 3.

*2016*

In late May, 2016, DLI prepared a draft valuation memo that stated that in evaluating the default risk of VoIP Guardian, DLI will look at the "underlying credits that serve as collateral" and that DLI has no reason to believe there is any risk of default.[97] It is unclear what factual basis or analysis supported this conclusion as it doesn't appear that DLI had done any meaningful diligence on the Tier 1 counterparties it relied on for repayment at any point during the TC or VoIP Guardian relationship. As seen below, within weeks of this memo, DLI began factoring receivables from new Tier 3s without any proof that the entities were real businesses and would also begin depending on repayment from entities identified as Tier 1 counterparties that had previously served as Tier 3 companies to VoIP Guardian. It bears repeating that the entire premise for Tier 3 factoring was that these businesses lacked any meaningful working capital. Yet DLI would rely on these purported "Tier 1" entities to repay tens of millions of dollars in credit.

In June 2016, VoIP Guardian began factoring Najd. The VoIP Guardian credit notice to Ross indicating that Najd was approved as a Tier 3 stated that Najd was a Tier 3 in the UAE and would be supplying termination services to iKarim, who, only months earlier, was a Tier 3 factoring

---

[97] Email and Draft valuation policy dated May 27, 2016 at page 24.

invoices. The credit letter and file do not contain any apparent credit analysis of Najd or of iKarim now a Tier 1 company. But more review is needed to see if DLI performed a credit analysis to verify that iKarim was sufficiently credit worthy to rely on for payment of factored invoices.[98] The premise of the Tier 3 factoring relationship that Tier 3 companies lacked working capital and thus paid a high fee to factor invoices contradicts a decision to extend tens of millions in credit to these same entities by relying on them to repay DLI.

By August, 2016, iKarim reappeared in the invoice traffic from VoIP Guardian as a Tier 1 based in the UK and paying Najd, a UAE incorporated Tier 3, for allegedly providing minutes in Somalia, Liberia, Chad, and Zimbabwe, some of the same markets that iKarim supposedly provided Tier 3 termination services for when it was a Tier 3.

This relationship is particularly astonishing because DLI did not prepare its Credit Underwriting Memo on VoIP Guardian until September 2016. The Underwriting memorandum listed IKarim as a Tier 3 even though it was purportedly a Tier 1 at the time of the memo. In addition, the memo implied that the risk of the VoIP Guardian investment is low because the Tier 1 companies obligated on the factored AR are large, credit worthy, multinational telecom companies like Verizon, AT&T, and Orange.



By November 2016, Indigo11, which in September 2015 had been a Tier 3 providing termination services to PGTi (a supposed Tier 2) reappeared as a Tier 1 paying a new Tier 3, Telacme.[99] By January 2017, DLI had more than $100 million loaned to VoIP Guardian.  Over time, DLI's repayment risk concentrated in iKarim and Indigo11.

---

[98] DLI's Monthly Lending folder contains a folder with purported Credit Files on the Tier 3 entities **but does not contain any apparent reports evaluating the credit worthiness of the supposed Tier 1 companies** that would be repaying DLI's investment each month by paying their invoices.
[99] Telacme Limited Credit Notice, dated October 17, 2016.



Source: Company records.

*2017*

In mid-January 2017, Duff & Phelps ("Duff") issued a valuation report for DLI as of September 30, 2016. The Duff report concludes that the payments to DLI are "guaranteed by large Tier 1 telecommunications carriers." But Duff names none of these supposed Tier 1 companies nor identified any analysis of the amounts owed by each Tier 1 or the basis for its conclusion that such companies were credit worthy.

In February 2017, Reifler filed suit against Talking Capital and Ross for transferring business to VoIP Guardian in violation of restrictions in the DLI contract with TC and accused his former partners, including Omanoff of stealing TC's business to shut him out.

Effective April 1, 2017, VoIP Guardian executed a promissory note for $200 million to DLI. However, DLI had already exceeded the prior $100 million limit in its June 2016 amendment. The date of execution is unclear.

On or about April 17, 2017, VoIP Guardian sent a letter to DLI informing DLI that HILF Telecom, BV, a Tier 3 factoring its receivables through VoIP Guardian has not received a $20 million payments from its Tier 1 counterparty. BT Nederlands, a Tier 1 doing business with HILF, withheld approximately $20 million payable to VoIP Guardian on suspicion that HILF or others affiliated with it are spoofing calls in order to generate minutes that can be charged by HILF to BT.  BT also expressed concerns that HILF was participating in money laundering. VoIP Guardian appears to have also disclosed to DLI its correspondence with BT attempting to obtain release of the money. BT's response letter indicated its concern that calls on its network to various countries serviced by HILF were fake and being used for money laundering. Between April and December,

lawyers in the Netherlands initiate various legal strategies to force release of the funds. All efforts have been unsuccessful to date.

BT did not explain the mechanism of money laundering but it may be that by placing and paying for millions of 1 second calls and then paying BT, who then remits a portion of the money to VoIP Guardian, who has in turn already paid such money to HILF, the call originating party is effectively transfers/launders money to HILF or HILF's call terminating providers in the target markets.

Despite the failure of DLI's core investment assumption that Tier 1 companies represent no risk of default, DLI made no meaningful changes to its valuation or investment practices regarding VoIP Guardian and instead continued to increase its loan to VoIP Guardian.

By December 2017, DLI was part of communications involving DLI's exposure to VoIP Guardian including the dispute involving HILF. It was reported to Ross that per Dutch counsel, VoIP Guardian had been added by the Dutch prosecutors as a suspect.

*2018*

In April 2018, DLI obtained Thompson Reuters reports investigating iKarim and Najd. The reports include multiple charts that claim no red flags showing a connection to criminal activity but also identify no reasonable basis for concluding that iKarim is a Tier 1 telecommunications company with sufficient assets or business operations to support the dollar value of invoices it purportedly owes to Najd (and thus to VoIP Guardian and DLI). The report identified only two persons associated with the company and minimal financial information. The report on Najd is no more comforting. It likewise found minimal connections to known criminals. But the report reflects numerous financial red flags including that: Najd is UAE registered but based in Thailand, there are only two persons known to be associated with Najd, Najd has no available financial information and almost completely unknown in every respect. Nothing shows Najd could support or generate millions of dollars in telecom transactions.

On June 12, 2018, DLI sent VoIP Guardian notices of default. Shortly after, DLI amended its credit agreement with VoIP Guardian and negotiated a side letter. DLI indicated the interest reduction is to allow Omanoff funds to fight for recovery of the HILF monies. Within seven days of sending a default notice, DLI "rescinds" its default notice.

Even though VoIP Guardian was unable to repay $20 million of its loan due to the situation in the Netherlands, DLI continued to hide this situation from its investors. DLI did not disclose the VoIP Guardian default in its monthly newsletters on after April 2017 or PPMs to investors dated after April 2017. Nor did DLI or its auditors report it in the DLI 2017 audited financial statements or notes. DLI's audited financials also failed to disclose DLI's lack of credit analysis of the Tier 1 or Tier 3 companies that were part of its factoring arrangement, particularly VoIP Guardian's large outstanding balances owed by purported Tier 1 companies with no financial records or history. DLI Capital's 2017 Audited schedule of investments reported DLI's investment in VoIP Guardian *at a principal cost and fair value* of $180,396,984.

DLI's valuation file dated June 30, 2018 shows that DLI had reported no impairment on its VoIP Guardian loan despite almost 18 months since BT refused to make payment.

Beginning in late July 2018 until November, DLI was engulfed in work responding to an SEC letter. During this time, the only apparent focus on VoIP Guardian related to Ross's equity ownership and the disclosure and evidence of same and DLI paid little attention to the size or safety of its nearly $200 million investment.

As early as March 2018, VoIP Guardian had reached close to their maximum credit facility and continued at or near that balance for the remainder of 2018. In late November 2018, DLI executed a Fifth Amendment to the Loan Agreement but was unable to extend further credit to VoIP Guardian above $200 million. DLI had expected to get cash from the liquidation of its Mepco investment, but that refinancing got delayed and led to a cash shortfall at DLI. Shortly after, in December 2018, purported Tier 1 companies Indigo11 and iKarim paid slower than usual. At the end of December 2018, iKarim and Indigo11 sent a partial $10 million payment followed by another $10 million payment in January. After discussions in January, Indigo and iKarim failed to make further payments and then disappeared. At the time of the default, Indigo11 owed over $100 million and IKB Services owed in excess of $60 million.

In 2019, DLI investigated its documentation and determined that Indigo 11 changed its business address from the UK to the same Santa Monica address as VoIP Guardian starting in September 2017. iKarim appeared to change its address to VoIP Guardian's in January 2019. DLI also appeared to recognize for the first time that the purported Tier 1 counterparties, particularly Indigo 11 and iKarim, had served as Tier 3 counterparties earlier in DLI's business with TC and VoIP Guardian.

In March 2019, DLI reported to authorities that it may have been defrauded.

110

KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone:  (310) 651-2997

CHRISTOPHER D. SULLIVAN (148083)
*csullivan@diamondmccarthy.com*
STACEY L. PRATT (124892)
*stacey.pratt@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>DIRECT LENDING INVESTMENTS LLC,<br><br>        Defendant. | Case No. 2:19−cv−02188−DSF−MRW<br>Hon. Dale S. Fischer<br><br>**PROOF OF SERVICE** |

## PROOF OF SERVICE

I hereby declare under penalty of perjury pursuant to the laws of the state of California that I am a citizen of the United States, over the age of eighteen years and not a party to the within-entitled action.  My business address is 150 California Street, Suite 2200, San Francisco, CA 94111.  On **November 20, 2020**, I served a copy of the within document(s):

- **RECEIVER'S REPORT REGARDING THE INVESTIGATION OF THE RECEIVERSHIP ENTITIES' BUSINESS CONDUCT AND RECOMMENDATIONS REGARDING DISTRIBUTIONS**

X   <u>**SERVED VIA ELECTRONIC TRANSMISSION/EMAIL**</u>: On **November 20, 2020**, I served the following persons and/or entities at the by transmitting via electronic mail the document(s) listed above to the addresses set forth below:

Nicolas Morgan, nicolasmorgan@paulhastings.com

Matthew Dors, Esq., matthew.dors@collascrill.com

Rocco Cecere, Esq., rocco.cecere@collascrill.com

Rupert Stanning, Esq., rupert.stanning@collascrill.com

Christopher D. Johnson, cdj@cjacayman.com

Jill Zadny, jz@cjacayman.com

Karen Scott, ks@cjacayman.com

Jacob A. Johnson, Alston & Bird LLP, jacob.johnson@alston.com

Will Sugden, Alston & Bird LLP, will.sugden@alston

Mark Rosenbaum, mrosenbaum@wrslawyers.com

Howard J. Weg, hweg@hjwadvisor.com

X   <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**</u> On **November 20, 2020**, Pursuant to L.R. 5-3.2.1, the document listed above will be served by the court via NEF and hyperlink to the document which effects electronic service on counsel who are registered with the CM/ECF system.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the state of California that the above is true and correct. Executed on **November 20, 2020**, at Concord, California.

*/s/ Erika R. Shannon*
Erika R. Shannon